# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,

v.

ROBERT MENENDEZ

 and

SALOMON MELGEN,

Defendants.

Crim. No.  2:15-cr-00155
Hon. William H. Walls

## SENATOR MENENDEZ'S MOTION TO DISMISS THE INDICTMENT BECAUSE ALL CHARGES AGAINST HIM DEPEND ON PROVING ALLEGATIONS THROUGH EVIDENCE THAT IS INADMISSIBLE BY THE SPEECH OR DEBATE CLAUSE
### (Motion to Dismiss No. 1)

Abbe David Lowell
Jenny R. Kramer
Christopher D. Man
Scott W. Coyle
**CHADBOURNE & PARKE LLP**
1200 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 974-5600

Stephen M. Ryan
Thomas J. Tynan
**MCDERMOTT WILL & EMERY LLP**
500 North Capitol Street, N.W.
Washington, D.C. 20001
(202) 756-8000

Raymond M. Brown
**GREENBAUM ROWE SMITH & DAVIS LLP**
Metro Corporate Campus One
P.O. Box 5600
Woodbridge, NJ 07095
(732) 476-3280

*Counsel for Defendant Senator Robert Menendez*

TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

ARGUMENT .........................................................................................................................4

I.       SPEECH OR DEBATE CLAUSE IMMUNITY IS BROAD AND CONDUCT IT
SHIELDS MUST BE STRUCK FROM THE INDICTMENT AND
EXCLUDED AT TRIAL ...................................................................................................4

II.      THE INDICTMENT RESTS ON SPEECH OR DEBATE
IMMUNIZED MATERIALS ..........................................................................................13

        A.      The Medicare Reimbursement Policy Issues Are Immunized..............................13

        B.      The Port Security Policy Issues Are Immunized ...................................................25

CONCLUSION......................................................................................................................32

TABLE OF AUTHORITIES

CASES

Dastmalchian v. DOJ, 2014 U.S. Dist. LEXIS 148617 (D.D.C. Oct. 20, 2014) ..........................23

Doe v. McMillan, 412 U.S. 306 (1973) ..........................................................................................4

Eastland v. United States Servicemen's Fund, 421 U.S. 491 (1975)................................. 1, 4-6, 11

Forrester v. White, 484 U.S. 219 (1988)........................................................................................2

Gravel v. United States, 408 U.S. 606 (1972) ...................................................................4, 22, 23

Helstoski v. Meanor, 442 U.S. 500 (1979) .....................................................................................6

In re Grand Jury, 587 F.2d 589 (3d Cir. 1978) .......................................................................... 3-4

In re Grand Jury Investig. (Menendez), 2015 WL 3875670 (3d Cir. Feb. 27, 2015) ......5, 8, 10, 14

In re Possible Violations of 18 U.S.C. §§ 201, 371, 491 F. Supp. 211 (D.D.C. 1980) ..................3

Jewish War Veterans v. Gates, 506 F. Supp. 2d 30 (D.D.C. 2007)............................................. 5-6

Lee v. Biden, 1989 U.S. App. LEXIS 22951 (9th Cir. June 5, 1989) ..........................................23

Marshall Field & Co. v. Clark, 143 U.S. 649 (1892)......................................................................7

Miller v. Transam. Press, Inc., 709 F.2d 524 (9th Cir. 1983)........................................................5

McSureley v. McClellan, 553 F.2d 1277 (D.C. Cir. 1976)................................................. 3, 5-7, 31

Nixon v. Fitzgerald, 457 U.S. 731 (1982)......................................................................................2

Powell v. McCormack, 395 U.S. 486 (1969)...................................................................................1

Rangel v. Boehner, 785 F.3d 19 (D.C. Cir 2015) ...................................................................... 6-7

Tavoulareas v. Piro, 527 F. Supp. 676 (D.D.C. 1981)....................................................................5

Tenney v. Brandhove, 341 U.S. 367 (1951) ...................................................................................8

United States v. Brewster, 408 U.S. 501 (1972)................................................................... 8, 10-12

United States v. Biaggi, 853 F.2d 89 (2d Cir. 1988) ................................................................6, 9

United States v. Dowdy, 479 F.2d 213 (4th Cir. 1973) .................................................. 6, 7, 10-12

United States v. Garmatz, 445 F. Supp. 54 (D. Md. 1977)...........................................12

United States v. Helstoski, 442 U.S. 477 (1979) ..................................................10, 11

United States v. Helstoski, 635 F.2d 200 (3d Cir. 1980) ..............................................10

United States v. Johnson, 419 F.2d 56 (4th Cir. 1969) ................................................10

United States v. Johnson, 383 U.S. 169 (1966) ..............................................1, 3, 8, 10

United States v. McDade, 28 F.3d 283 (3d Cir. 1994) ...............................................5, 9

United States v. Munoz-Flores, 495 U.S. 385 (1990)...................................................7

United States v. Murphy, 642 F.2d 699 (2d Cir. 1980) ...............................................10

United States v. Rose, 28 F.3d 181 (D.C. Cir. 1994)....................................................6

United States v. Turkish, 623 F.2d 769 (2d Cir. 1980)..................................................4

United States v. Urciuoli, 513 F.3d 290 (1st Cir. 2008) ..............................................31

Webster v. Sun Co., Inc., 561 F. Supp. 1184 (D.D.C. 1983)..........................................5

Zivotsky v. Clinton, 132 S. Ct. 1421 (2012)..............................................................7

## CONSTITUTION/STATUTES

U.S. Const. art. I, § 6....................................................................................................1

U.S. Const. art. I, § 5, cl. 2...........................................................................................2

U.S. Const. art. I, § 3, cl. 7...........................................................................................2

U.S. Const. art. II, § 2, cl. 2 .................................................................................3, 23

6 U.S.C. § 982............................................................................................................26

## MISCELLANEOUS

"Congress Successfully Pushes CMS to Review and Rescind Burdensome Requirement,"
Menendez.Senate.gov (June 30, 2011),
http://www.menendez.senate.gov/newsroom/press/congress-successfully-pushes-cms-to-review-
and-rescind-burdensome-requirement .......................................................................13

## **INTRODUCTION**

In creating a system of separation of powers with checks and balances, the Founders placed in the first article of the Constitution a prohibition against the Executive Branch calling into question certain actions of legislators.  The Speech or Debate Clause provides that Members of Congress:

> shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their attendance at the Session of their Respective Houses, and in going to and from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place.

U.S. Const. art. I, § 6.  Where an "activity is found to be within the legitimate legislative sphere, balancing plays no part.  The speech or debate protection provides an absolute immunity from judicial interference."  Eastland v. U.S. Servicemen's Fund, 421 U.S. 491, 509 n.16 (1975).

From the time the Supreme Court first construed the Clause through today, it has emphasized that "the privilege should be read broadly, to include not only 'words spoken in debate,' but anything 'generally done in a session of the House by one of its members in relation to the business before it.'"  United States v. Johnson, 383 U.S. 169, 179 (1966) (quoting Kilbourn v. Thompson, 103 U.S. 168, 204 (1880)).  The reason the Speech or Debate Clause is construed both broadly and absolutely is that its protections do much more than protect any individual Member of Congress:  "'The immunities of the Speech or Debate Clause were not written into the Constitution simply for the personal or private benefit of Members of Congress, but to protect the integrity of the legislative process by insuring the independence of individual legislators.'"  Eastland, 421 U.S. at 502 (quoting United States v. Brewster, 408 U.S. 501, 507 (1972)); see, e.g., Powell v. McCormack, 395 U.S. 486, 503 (1969) ("Our cases make it clear that the legislative immunity created by the Speech or Debate Clause performs an important function in representative government.  It insures that legislators are free to represent the

interests of their constituents without fear that they will be later called to task in the courts for that representation.").

The Speech or Debate Clause is not a legal technicality; it is not a gift to Congress; and it is not a side door exit for misbehaving legislators.  The absolute immunity provided to Members of Congress by the Speech or Debate Clause is very similar to the absolute immunity provided to members of the Judicial and Executive Branches.  Forrester v. White, 484 U.S. 219, 224 (1988). By design, the Framers expected that there would be conflict between the branches, as each acted to check and balance the power of the other.  Absolute immunity provides members of each branch with the necessary independence to do their jobs without fear that taking official acts that stoke the displeasure of those in rival branches could result in civil or criminal liability.  Rather than allow members of one branch to sit in judgment of members of another branch,[1] the Framers intended such fights to be had in the political process, with "we the people" serving as judge in deciding who will be elected or re-elected.

The investigation and prosecution of this case transgress the limits of the Speech or Debate Clause by questioning Senator Menendez's activities within the legislative sphere. Among other examples, the prosecution questions Senator Menendez's legislative oversight over

---

[1]     Only in the exceptional case of impeachment, where the burden is so high that it is rarely invoked successfully, do members of the Legislative Branch sit in judgment of members of the Executive or Judicial Branches.  Nixon v. Fitzgerald, 457 U.S. 731, 771 n.6 (1982).  Even then, and unlike our British predecessors who frequently imposed imprisonment and even the death penalty as a consequence of impeachment, the Constitution provides that a judgment of impeachment "shall not extend further than to removal from Office."  U.S. Const., art. I, § 3, cl. 7.  The Constitution does not provide for removal of members of the Legislative Branch by the other branches because, by holding regular elections, Members of Congress are regularly tried through the electoral process.  Moreover, the Legislative Branch can remove one of its own, even for conduct the Speech or Debate Clause would prevent the other branches from considering. Johnson, 337 F.2d at 191; see U.S. Const. art. I, § 5, cl. 2 ("Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behaviour, and, with the Concurrence of two thirds, expel a Member.").

the Department of Health and Human Services ("HHS") and Center for Medicaid and Medicare Services ("CMS"): he inquired about and sought a change in policy concerning a Medicare reimbursement issue.  Similarly, the prosecution questions Senator Menendez's oversight over the Department of State and Department of Commerce:  he wanted to ensure that these agencies did not undermine his signature legislation requiring 100% inspection at ports that send cargo ships to the United States.  And, the prosecution questions Senator Menendez's vetting of a presidential nominee, notwithstanding his constitutional responsibility and therefore unfettered discretion to give his "Advice and Consent" to such nominations.  U.S. Const., art. II, § 2, cl. 2.  All these actions are squarely within the protective scope of the Speech or Debate Clause, and are subject to its absolute immunity.

To give effect to the immunity afforded by the Speech or Debate Clause, the Court must strike all charges and allegations in the Indictment that fall within the scope of the Clause or that depend on evidence that would fall within the Clause.  See, e.g., Johnson, 383 U.S. at 185 (ordering all references to Speech or Debate materials stricken from the indictment and barring the use of such materials at trial); McSurely v. McClellan, 553 F.2d 1277, 1299 (D.C. Cir. 1976) (en banc) ("[T]he Speech or Debate Clause acts as an exclusionary rule and testimonial privilege, as well as substantive defense.").[2]  No evidence privileged by the Speech or Debate

_____

[2]      This Motion provides a sufficient basis for the Court to resolve the Speech or Debate Clause issues in the Senator's favor.  Additionally, the Court also may conduct a Simmons-like hearing to resolve these issues.  In re Grand Jury, 587 F.2d 589, 597-98 (3d Cir. 1978) (authorizing hearing in the Speech or Debate context comparable to those permitted under Simmons v. United States, 390 U.S. 377 (1968)); In re Possible Violations of 18 U.S.C. §§ 201, 371, 491 F. Supp. 211, 214 n.2 (D.D.C. 1980) (Bryant, C.J.) (same).  Simmons provides a hearing on a motion to suppress under the Fourth Amendment, where a defendant can testify to assert his constitutional right and that testimony cannot later be used against him.  Simmons, 390 U.S. at 393-94.  Likewise, the Court can hold an evidentiary hearing on the availability of Speech or Debate immunity and, if a defendant chooses to testify, "no testimony so elicited may

Clause may be admitted at trial and, because all charges against Senator Menendez specifically rely upon alleged conduct that is immunized by the Speech or Debate Clause, those Counts must be dismissed. (Indict. Counts 1 (conspiracy), Count 2 (Travel Act), Counts 3, 5, 7, 9, 11, 13, 15, 17, 19-21 (bribery).)[3]

## ARGUMENT

### I.    SPEECH OR DEBATE CLAUSE IMMUNITY IS BROAD AND CONDUCT IT SHIELDS MUST BE STRUCK FROM THE INDICTMENT AND EXCLUDED AT TRIAL

The immunity afforded by the Speech or Debate Clause extends more broadly than to speeches and debates held on the floor of Congress; it extends to any act that is "an integral part of the deliberative and communicative process by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or which the Constitution places within the jurisdiction of either House." Gravel v. United States, 408 U.S. 606, 625 (1972); see, e.g., Eastland, 421 U.S. at 510-11 ("Our consistently broad construction of the Speech or Debate Clause rests on the belief that it must be so construed to provide the independence which is its central purpose."). In addition to immunizing votes on legislation, the Speech or Debate Clause immunizes "authorizing an investigation," "holding hearings," "preparing a report," and "authorizing the publication and distribution of that report." Doe v. McMillan, 412 U.S. 306, 313 (1973). The Clause also immunizes "informal information gathering in connection with or in aid of a legislative act . . . . Such information gathering may take the form of communications with organizations,

be used against him in any subsequent prosecution." In re Grand Jury, 587 F.2d at 597; see also United States v. Turkish, 623 F.2d 769, 776 (2d Cir. 1980) (approving this procedure).

[3]    Senator Menendez is separately moving to dismiss Count 22 (false statements) based on the Speech or Debate Clause and for other reasons. (MTD No. 13.)

constituents, or officials of a coordinate branch." <u>Jewish War Veterans v. Gates</u>, 506 F. Supp. 2d 30, 54 (D.D.C. 2007).[4]

The "power to investigate" must be protected because a "'legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change.'" <u>Eastland</u>, 421 U.S. at 504 (quoting <u>McGrain v. Daugherty</u>, 273 U.S. 135, 175 (1927)). "[I]nformation gathering, whether by issuance of subpoenas or field work by a Senator or his staff, is essential to informed deliberation over proposed legislation." <u>McSurley</u>, 553 F.2d at 1286. For example,

> [a] congressman cannot subpoena material unless he has enough threshold information to know where, to whom, or for what documents he should direct a subpoena. The acquisition of knowledge through informal sources is a necessary concomitant of legislative conduct and thus should be within the ambit of the privilege so that congressmen are able to discharge their constitutional duties properly.

<u>Id.</u> at 1286-87 (internal citation omitted); <u>see</u> <u>Jewish War Veterans</u>, 506 F. Supp. at 55 (explaining all opinions in the *en banc* <u>McSurley</u> case agreed on this point).[5]  Given that the

---

[4]    In this very case, the Third Circuit recognized that "informal legislative fact-finding and informal oversight" are protected. <u>In re Grand Jury Investig. (Menendez)</u>, 2015 WL 3875670 at *1 (3d Cir. Feb. 27, 2015) (citing <u>Lee</u>, 775 F.2d at 522, and <u>United States v. McDade</u>, 28 F.3d 283, 300 (3d Cir. 1994)); <u>see also</u> <u>McDade</u>, 28 F.3d at 300 (finding a protected "middle category of oversight activities"); <u>Lee</u>, 775 F.2d at 522 (finding legislative immunity applicable to "fact-finding, information gathering, and investigative activities[, which] are essential prerequisites to the drafting of bills and the enlightened debate over proposed legislation"). Other courts agree. <u>See, e.g.</u>, <u>Miller v. Transam. Press, Inc.</u>, 709 F.2d 524, 530 (9th Cir. 1983) ("Obtaining information pertinent to potential legislation or investigation is one of the 'things generally done in a session of the House,' concerning matters within the 'legitimate legislative sphere.' [For example, c]onstituents may provide data to document their views when urging the Congressman to initiate or support some legislative action." (citations omitted)); <u>Webster v. Sun Co., Inc.</u>, 561 F. Supp. 1184, 1189-90 (D.D.C. 1983) (Congressional Research Service analyst's receipt of information from lobbyist protected), <u>vacated and remanded on other grounds</u>, 731 F.2d 1 (D.C. Cir. 1984); <u>Tavoulareas v. Piro</u>, 527 F. Supp. 676, 680 (D.D.C. 1981) ("[A]cquisition of information by congressional staff, whether formally or informally, is an activity within the protective ambit of the speech or debate clause.").

prosecution previously argued Senator Menendez had no valid Speech or Debate claims for communications with members of the Executive Branch, it bears emphasizing: "These activities do not lose their legislative character simply because employees of the Executive Branch are involved." Jewish War Veterans, 506 F. Supp. at 59.

"The Supreme Court has consistently read the Speech or Debate Clause 'broadly' to achieve its purposes." Rangel v. Boehner, 785 F.3d 19, 23 (D.C. Cir. 2015) (quoting Eastland, 421 U.S. at 501).[6] Accordingly, "it is generally true that the Speech or Debate Clause forbids not only inquiry into acts that are manifestly legislative but also inquiry into acts that are purportedly legislative, 'even to determine if they are legislative in fact.'" United States v. Biaggi, 853 F.2d 89, 103 (2d Cir. 1988) (quoting Dowdy, 479 F.2d at 226 (emphasis added)). "In the usual case if the activity is arguably within the 'legislative sphere' the Speech or Debate Clause bars inquiry even in the face of a claim of 'unworthy motive.'" McSurley, 553 F.2d at 121295 (emphasis

---

[5]    Of course, "the legitimacy of a congressional inquiry [is not] to be defined by what it produces. The very nature of the investigative function – like any research – is that it takes the searchers up some 'blind alleys' and into nonproductive enterprises. To be a valid legislative inquiry there need be no predictable end result." Eastland, 421 U.S. at 509.

[6]    "[T]he 'central role' of the Clause is to 'prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary.'" Eastland, 421 U.S. at 502 (quoting Johnson, 383 U.S. at 181, and Gravel, 408 U.S. at 617); see United States v. Rose, 28 F.3d 181, 187 (D.C. Cir. 1994) (The purpose of the Clause is to ensure that "representatives, in the discharge of their functions, should be free from the cognizance or coercion of the co-ordinate branches, Judiciary and Executive. . . .") (quoting 8 Works of Thomas Jefferson 322-23 (1797)) "To effect this protection, the speech or debate clause not only provides a defense on the merits, but spares the legislator from having to devote his time and efforts to defending himself in court." United States v. Dowdy, 479 F.2d 213, 221 (4th Cir. 1973). Because this is a threshold issue related to the admissibility of evidence, the Court itself must address the issue before it goes to the jury. Id. at 226. Given that Speech or Debate Clause immunity prevents a Senator from being forced to endure the burdens of trial, a denied claim of immunity is subject to immediate appeal under the collateral order rule. See, e.g., Helstoski v. Meanor, 442 U.S. 500, 506-08 (1979); Rose, 28 F.3d at 185 ("Denials of claims of speech or debate immunity . . . are immediately appealable because the Speech or Debate Clause is designed to protect Members of Congress not only from liability but also from the cost and inconvenience of litigation.").

added).  Because the Clause "forbids inquiry into acts which are purportedly or apparently legislative," immunity attaches once a court concludes legislative activity "was <u>apparently</u> being performed."  <u>Dowdy</u>, 479 F.2d at 226 (emphasis in original); <u>cf.</u> <u>McSurley</u>, 553 F.2d at 1297-98 & n.74 (noting that "judicial inquiry must come to a halt" under the Speech or Debate Clause when it is apparent there was a seemingly valid legislative purpose for an act, and courts will not "embroil" themselves in questions as to where the line separating valid from invalid legislative purposes is drawn).

Courts must tread carefully because the potential for liability "lessens the ability of Members of the Congress to 'represent the interests of their constituents,' and litigation itself 'creates a distraction and forces Members to divert their time, energy, and attention from legislative tasks.'  Such litigation also undermines separation of powers."  <u>Rangel</u>, 785 F.3d at 23 (quoting <u>Powell</u>, 395 U.S. at 503; <u>Eastland</u>, 421 U.S. at 503).  These separation of powers concerns prevent courts from questioning the good faith of a claim by a Member of the Legislative Branch that he engaged in legislative activity, just as courts regularly refuse to second guess Legislative Branch characterizations of their internal acts in other contexts.  <u>See</u> <u>Marshall Field & Co. v. Clark</u>, 143 U.S. 649, 672 (1892) (while courts decide whether enacted legislation is constitutional, the "respect due to coequal and independent departments requires the judicial department to act upon that assurance, and to accept, as having passed congress, all bills" the Legislative Branch represents as having passed); <u>Zivotsky v. Clinton</u>, 132 S. Ct. 1421, 1433 (2012) (Sotomayor, J., concurring) ("Because of the respect due to a coequal and independent department, for instance, courts properly resist calls to question the good faith with which another branch attests to the authenticity of its internal acts."); <u>United States v. Munoz-Flores</u>, 495 U.S. 385, 10 (1990) (Scalia, J., concurring) ("Mutual regard between the coordinate

branches, and the interest of certainty, both demand that official representations regarding . . . matters of internal process be accepted at face value."). Such an "exemption from prosecution, for everything said or done by him, as a representative, in the exercise of that office" should be made "'without inquiring whether the exercise was regular according to the rules of the house, or irregular and against their rules.'" Tenney v. Brandhove, 341 U.S. 367, 374 (1951) (quoting Coffin v. Coffin, 4 Mass. 1, 27 (Mass. 1808) (emphasis added)).

To be sure, not everything a Member does is a protected legislative activity. The Clause does not cover activities that "are political in nature rather than legislative." Brewster, 408 U.S. at 512. In Johnson, for example, the Supreme Court held that pure case work – there, attempts by two Congressmen to "exert influence on the Department of Justice to obtain the dismissal of pending indictments" – was not protected. 383 U.S. at 171. Within this category are "a wide range of legitimate 'errands' performed for constituents, the making of appointments with Government agencies, assistance in securing Government contracts, preparing so-called 'news letters' to constituents, news releases, and speeches delivered outside the Congress." Brewster, 408 U.S. at 512. Senator Menendez acknowledges that his assistance to people applying for visas, for example, falls within this unprotected category, as it is pure case work.

Because contacts between a Member and a person in the Executive Branch can be either unprotected case work on behalf of an individual or protected legislative oversight and fact gathering, courts must examine the substance of the communications themselves to determine whether the communications are apparently legislative activity and thus immunized by the Speech or Debate Clause. In re Grand Jury Investig. (Menendez), 2015 WL 3875670 at *1 ("[D]istrict courts must make factual findings regarding the content and purpose of the acts and communications in question to assess their legislative or non-legislative character."). In

McDade, the Third Circuit provided some guidance on how courts should make this inquiry. There, the Court considered whether the Clause applied to letters to the Executive Branch that implicated government programs within the jurisdiction of committees on which then-Congressman McDade sat. 28 F.3d at 297-302. The first letter "openly lobbie[d] on behalf [of a particular company] in the defendant's district," but the second did not refer to "any particular business." Id. at 300. Instead, the second "discusse[d] the broader policy question whether the Army should award such a contract." Id. (emphasis added). As a result, "whatever the defendant's motivation in writing the [second] letter, the letter appear[ed] on its face to fall into the above-described middle category of oversight activities." Id. Thus, the line suggested by McDade is whether the Member was simply trying to assist a "particular" person or whether the Members was addressing a "broader policy question." Id. at 300.

Again, it should be emphasized that a communication or activity that appears to address a "broader policy question" should be found protected by the Speech or Debate Clause because "the Speech or Debate Clause forbids . . . inquiry into acts that are purportedly legislative, 'even to determine if they are legislative in fact.'" Biaggi, 853 F.2d at 103 (quoting Dowdy, 479 F.2d at 226). An errand on behalf of an individual that does not require a change in policy would be unprotected case work (e.g., filing a claim for government benefits, seeking an award of a government contract), but the appearance of a broader policy issue changes the Speech or Debate analysis entirely. As the Third Circuit explained in this very case, such protected legislative oversight or information gathering does not lose its immunity "'even though some personal exchanges transpired;'" the activity remains protected so long as a legislative purpose appears to be its "predominant purpose" or the activity appears to contain "'a significant legislative

component.'"  In re Grand Jury Investig. (Menendez), 2015 WL 3875670 at *1 (quoting Lee, 775 F.2d at 525).

Once it is apparent that an indictment charges conduct protected by the Speech or Debate Clause, the Court must strike those parts of the indictment, dismiss the charges that rest on protected conduct, and exclude any evidence of such legislative acts at trial:  "The Court's holdings in United States v. Johnson and United States v. Brewster leave no doubt that evidence of a legislative act of a Member may not be introduced by the Government in a prosecution. . . ." United States v. Helstoski, 442 U.S. 477, 487 (1979).[7]  The Supreme Court's decision in Johnson made clear that "all references" to Speech or Debate activities must be "eliminated" and "wholly purged" from an indictment, and the Clause also proscribes the use of "the evidence . . . during trial."  383 U.S. at 173, 185; see Brewster, 408 U.S. at 511 (noting Johnson "authorized a new trial on the conspiracy count, provided that all references to making the speech were eliminated");[8] United States v. Murphy, 642 F.2d 699, 700 (2d Cir. 1980) (finding an overt act alleged in the indictment "is not on its face protected by the Speech or Debate Clause, but if an offer of proof at trial indicates that it is protected when assessed in light of other evidence, the appellants will be entitled to have that particular allegation stricken"); Dowdy, 479 F.2d at 224

---

[7]     In Johnson, the government voluntarily dismissed several charges on remand because it could not prosecute those charges without Speech or Debate material.  United States v. Johnson, 419 F.2d 56, 58 (4th Cir. 1969).  The same was true in Helstoski.  United States v. Helstoski, 635 F.2d 200, 202 (3d Cir. 1980).

[8]     The Supreme Court noted in Johnson that "the defendant, not the prosecution, introduced the speech itself," but the Supreme Court still found a Speech or Debate Clause violation.  383 U.S. at 184.  Consequently, a Member's use of Speech or Debate Clause material at the trial itself will not necessarily result in a waiver of a Speech of Debate Clause claim.

(language in an indictment that offends the Speech or Debate Clause should be "stricken").[9] Consequently, for the Speech or Debate Clause "to be given meaning, the validity of an indictment must be determined in the context of the proof which is offered to sustain it, or in the context of facts adduced on a motion to dismiss," and "it may be necessary to go beyond the indictment to obtain the full meaning of what appear facially to be perfectly proper allegations." Dowdy, 479 F.2d at 223.

In Dowdy, a former Congressman was indicted for conspiring to accept bribes from a contractor that was under investigation by law enforcement. The contractor asked the Congressman and the committee he chaired to conduct its own investigation of the contractor. Id. at 218-19. The former Congressman claimed several overt acts charged in the indictment were legislative oversight activities protected by the Speech or Debate Clause. The Fourth Circuit agreed and reversed the conviction.

The indictment alleged the Congressman requested a meeting and then met with an Assistant U.S. Attorney, met with representatives of the Federal Housing Authority and the Housing and Home Finance Agency, and received documents from those agencies. Id. at 223.

---

[9]     The Supreme Court has acknowledged the potential costs associated with this very broad constitutional protection. "The Speech or Debate Clause was designed neither to assure fair trials nor to avoid coercion." Helstoski, 442 U.S. at 491; see Eastland, 421 U.S. at 509-11 ("[T]he broad protection granted by the Clause creates a potential for abuse."); Brewster, 408 U.S. at 516 ("In its narrowest scope, the Clause is a very large, albeit essential, grant of privilege. It has enabled reckless men to slander and even destroy others with impunity[] . . . ."). Moreover, even where the Clause is most clearly applicable in insulating a Member's conduct from review by the Judiciary, the Member is not held unaccountable. Rather, "the duty falls on the House of Congress to punish its offending member." Johnson, 337 F.2d at 191; see U.S. Const., Art. I § 5, cl. 2 ("Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behaviour, and, with the Concurrence of two thirds, expel a Member."). Nothing prevents the Executive Branch from asking the Legislative Branch to discipline its own Members, or to complain to "we the people" if it disagrees with the Legislative Branch's response. That is the nature of separation of powers.

The Fourth Circuit noted the bribery charges based on these actions appeared "plainly proper" on their face because the indictment failed to disclose that the contacts were actually made as part of a legislative investigation.  Id. at 223.  But when read in light of that evidence, "it is evident that these same overt acts might be interpreted as preparation for a subcommittee hearing on [the contractor]."  Id. at 223-24.  The Fourth Circuit held the defendant's contacts with the agencies were immunized by the Speech or Debate Clause.  Id. at 223-24.

The conviction in Dowdy could not stand because conduct that constituted Speech or Debate activities was charged in the indictment itself and evidence of such protected activities was admitted at trial.  The Fourth Circuit, however, permitted retrial with "the offending overt acts stricken," so that the government could attempt to prove the offenses "without reference to any legislative acts."  Id. at 213.  Prosecution would be permitted under a Brewster theory:  "The illegal conduct is taking or agreeing to take money for a promise to act in a certain way.  There is no need for the Government to show that [the Member] fulfilled the alleged illegal bargain; acceptance of the bribe is the violation of the statute, not performance of the illegal promise."  Brewster, 408 U.S. at 525; see also United States v. Garmatz, 445 F. Supp. 54, 64 (D. Md. 1977) (allowing bribery prosecution of a Congressman that properly charged an "illegal agreement" where the "indictment does not allege the performance by the defendant of any legislative acts").

Dowdy stands for the proposition that, while prosecutors cannot use protected legislative acts as evidence at trial, they may present direct evidence of the bribery agreement itself to prove a Brewster theory (without any reference to a legislative act having been performed).  Dowdy, 479 F.2d at 219-20 (bribe payor testified to agreement with the Congressman, and recorded conversations with the Congressman regarding the bribery agreement).  Significantly, that is not the prosecution's case here.  The prosecution has no direct evidence (no witnesses, no recording,

12

no letter, no email) that there ever was a *quid pro quo* agreement between Senator Menendez and Dr. Melgen (because no such agreement ever occurred). Instead, the prosecution wants to introduce Senator Menendez's legislative acts into evidence – something the Speech or Debate Clause flatly precludes. In the absence of any evidence of an agreement between Senator Menendez and Dr. Melgen, the prosecution's only hope is to attempt to infer the existence of an agreement by pointing to the Senator's legislative acts, alleging that they came after Dr. Melgen provided something of value, and inviting the jury to deduce that there must have been some agreement to connect the two events. Such an attenuated circumstantial case provides no legitimate basis for inferring causation in any event, but in this case it is barred altogether by the Speech or Debate Clause, which prohibits the prosecution from charging or offering any evidence of a legislative act against Senator Menendez.

## II.  THE INDICTMENT RESTS ON SPEECH OR DEBATE IMMUNIZED MATERIALS

The Indictment itself depends upon allegations of conduct that are immunized by the Speech or Debate Clause, and the prosecution cannot prove any of its claims regarding Medicare reimbursement policy or port security policy without reference to immunized materials. Because every charge against Senator Menendez contains these tainted allegations, the Indictment as a whole must be dismissed.

### A.  The Medicare Reimbursement Policy Issues Are Immunized

Senator Menendez serves as a member of the Committee on Finance, which oversees HHS and CMS. In June 2009, Senator Menendez alerted his staff to a Medicare issue concerning the repackaging or multi-dosing of the drug Lucentis that involved his "close

personal friend," Dr. Melgen,[10] and his staff then began investigating the issue.  In re Grand Jury

Investig. (Menendez), 2015 WL 3875670, at *1.[11]  Throughout their entire investigation, the

---

[10]    Daniel O'Brien, Senator Mendendez's former Chief of Staff and a mutual friend of both the Senator and Dr. Melgen, testified that Dr. Melgen is "probably either [the Senator's] closest friend or one of his three closest friends."  (O'Brien 1/21/15 Tr. at 30.)  O'Brien explained that Dr. Melgen "defines himself by national Hispanic issues, and sees Senator Menendez as the champion of national Hispanic issues," and that is why Dr. Melgen is such a strong political supporter of Senator Menendez.  (Id. at 31.)

[11]    The issue here was that the manufacturer of the drug Lucentis packaged it for sale in vials containing 400% of the recommended standard dose of 0.05 mL, i.e., each vial was sold containing 0.2 mL.  The manufacturer's labeling information even stated explicitly that physicians were purchasing a single-use vial containing 0.2 mL.  See Genentech, Inc., Lucentis - Highlights of Prescribing Information § 16 (June 2010) ("Each LUCENTIS carton, NDC 50242-080-01, contains a 0.2 mL fill of 10 mg/mL ranibizumab in a 2-cc glass vial"), http://www.genentech-access.com/sites/default/files/LUCENTIS_prescribing.pdf;    see  also Genentech, Inc., Lucentis - Highlights of Prescribing Information § 16 (June 2006) (same), http://dailymed.nlm.nih.gov/dailymed/archives/fdaDrugInfo.cfm?archiveid=6235.    But    CMS wanted physicians to throw away 0.15 mL and buy a new vial for every administration of the drug.  Consequently, in its ordinary use, approximately 75% of each vial of drug was wasted and certain pharmaceutical companies profited from selling any additional quantities of the drug that went unused.  For other drugs (including one used to treat the same disease as Lucentis), CMS did not oppose multi-dosing or repackaging, thus creating Executive Branch decision-making that drove billions of dollars to certain manufacturers, including the biggest supporters of the Affordable Care Act ("ACA").

Doctors are paid by Medicare on the basis of each unit they administer, see 42 U.S.C. § 1395w-3a(b)(1), and they do not bill Medicare for the purchase of a vial of medicine.  Some doctors, like Dr. Melgen, engaged in a practice of repackaging or multi-dosing, where they used the full amount of drug sold to them and listed on the FDA-approved labeling.  According to physicians, this avoids waste and saves them the cost of buying unnecessary drugs. Pharmaceutical companies do not like this practice because they want to sell more drugs, whether or not the drugs are used.  When Lucentis was initially approved, its manufacturer attempted to get doctors to use the more expensive Lucentis compared to the manufacturer's colorectal cancer treatment Avastin, which was being used off-label to treat the same eye disease as Lucentis.  Interestingly, CMS advocates aggressively for doctors to multi-dose Avastin. Simply put, doctors who multi-dose prefer to practice medicine by providing the medicine they deem best for the patient while avoiding the unnecessary expense of buying three times more medicine than they use (and being forced to throw away perfectly good medicine in the process). The cost to Medicare is the same either way because Medicare pays based solely on the number of units actually administered to the patients, whether those units come from one vial or three vials.  The issue here is whether Medicare reimbursement policy should operate differently for Lucentis than it does for any other drug that can be repackaged or multi-dosed.  It also is a

prosecutors failed to grasp the policy issues at stake and wrongly concluded that because Dr. Melgen was using facts known personally to him in his administrative matter that he must have been asking for his friend to intervene in his case. Nothing could be further from the truth, and discovery bears out that Sen. Menendez made no effort to ever intervene in Dr. Melgen's pending matters. The issues from Dr. Melgen's case highlight a broader policy question of this Administration's actions that benefit pharmaceutical companies while discounting issues experienced by practicing physicians—a policy question that falls squarely within Senator Menendez's oversight responsibilities as a member of the Senate Finance Committee.

Daniel O'Brien, Senator Menendez's Chief of Staff, testified that it was not uncommon for Dr. Melgen to discuss issues, policy issues or otherwise, and, "[g]enerally, [he] would just listen to him talk about his issues, knowing there wasn't much we could do to help." (O'Brien 1/21/15 Tr. at 45.) When these issues would be raised by Dr. Melgen, the Office "on a policy level either decided to help or just facilitate in a communication onto an agency." (Id.) There were "several" times the Office could not really further the issue, so it may just pass along information to the relevant agency. (Id. at 46.)[12] He testified that Dr. Melgen had a lot of ideas, but they were not "necessarily ones that [the Office] saw a public policy dimension to, so we would not engage them." (Id.) O'Brien explained, "our job is to filter requests and decide which

---

question of whether this Administration has elected a policy that favors the financial interests of certain pharmaceutical companies over physicians.

[12]    The Indictment contains an example of this, where it states the Senator sent a letter to an Embassy noting only that two sisters had applied for a visa, that they would be visiting someone "I know well," and asking the Embassy to give "these applications all due consideration within the requirements of the law." (Indict. ¶ 88.) This is a typical case work, where the Senator was simply flagging an issue for an agency at an individual's request. Of course, it can hardly be argued that asking an agency to give an application "all due consideration within the requirements of the law" is corrupt or overreaching. (Talbot 8/13/14 Tr. at 14 (emphasizing the Senator's Office was careful that such letters were "worded correctly, that you're just asking for the agency's consideration, you're not telling them what to do.").)

ones have merit and which one's don't." (Id. at 86.)  Michael Barnard, Senator Menendez's policy advisor on health issues testified similarly.  He explained that individuals ask the Senator to advocate on their behalf before federal agencies, "[a]ll the time," and sometimes the Senator gets involved where it is a "one off issue . . . unique to that individual" and "[o]ther times it's sort of a broader policy based inquiry." (Barnard 8/13/14 Tr. at 9.)

The Medicare reimbursement policy on multi-dosing Lucentis (which departed from Medicare's reimbursement policies on repackaging or multi-dosing other drugs) was an issue where the Office decided "there was an overarching health policy issue" that should be examined.  (Barnard 8/13/14 Tr. at 17.)  The Office learned about the "policy elements" of Dr. Melgen's practice from the doctor's lawyer.  (O'Brien 1/21/15 Tr. at 63; see id. at 43 ("the underlying issue was one of policy").)  Barnard testified that he understood there to be "[a]mbiguities and contradictions in the Medicare rules," and a "lack of clarity." (Barnard 8/13/14 Tr. at 18.)  He understood Dr. Melgen's request to be policy-related:  "Clarifying the rules of the road so it's understandable what it is that [doctors] can do in those instances." (Id. at 21.)  Senator Menendez "was trying to clarify the rules that allowed for this confusion in the first place." (Id. at 39.)  Even the Indictment itself alleges that Senator Menendez told CMS that he viewed the problem as a policy issue:  Its "policy guidelines regarding single-use vials were vague." (Indict. ¶ 169.)

The Senator and his staff contacted federal agencies as part of their investigation and oversight on these policy issues, and the Senator discussed these issues with the Acting Administrator of CMS, Marilyn Tavenner; Secretary of HHS, Kathleen Sebelius; and John

Blum, the Director and Acting Principal Deputy of CMS.[13]  The prosecution wants to treat these contacts as simply advocacy on behalf of Dr. Melgen, so it can characterize the contacts as unprotected case work.  But the mere fact that it was Dr. Melgen who called the Senator's attention to the issue, or the fact that Dr. Melgen could benefit from a prospective change in policy, does not render the activity case work.  It is not uncommon for legislators to learn of problems from particular individuals, and seek broader policy changes that would benefit that individual and others.[14]  From day one, the prosecution has assumed in its questioning of witnesses that Senator Menendez was trying to help Dr. Melgen in his administrative case, yet none of the witnesses ever confirmed that Senator Menendez so much as mentioned Dr. Melgen's name when discussing the policy issue at the key meetings charged in the Indictment.

While the Medicare reimbursement policy issues came to the attention of Senator Menendez and his staff through Dr. Melgen, the legislative information-gathering and oversight activities the Senator and his staff undertook were grounded in broader policy issues.  They were not merely trying to help a supporter with a personal errand; they were exploring a broader policy change that would affect all doctors who multi-dose or repackage injectable drugs or administer the drug Lucentis and, ultimately, all physicians generally given the wide-ranging consequences of Medicare's stated justification for its Lucentis multi-dosing policy.  For

---

[13]    To prepare, the Senator's staff created a list of "Talking Points."  (A-140.)  The document explained why there was "Confusion in Policy" in CMS' approach to Lucentis.  (A-145.) [Citations to "A-number" are to the appellate appendix in this case.]

[14]    Often, even legislation itself is named after individuals who inspired it, such as the Lilly Ledbetter Fair Pay Act (equal pay for women), the Ryan White Care Act (AIDS research), the Matthew Shepard and James Byrd Jr. Hate Crimes Prevention Act (hate crimes), among many others.  While such legislation may have been inspired by what happened to particular individuals, Congressional action on these bills was directed to a broader policy.  Not only is the legislation itself protected by the Speech or Debate Clause, the information-gathering and oversight underlying the legislation itself is protected as well.

example, the Indictment alleges that the Senator's staff reached out to "advocate for MELGEN" by asking CMS if it "would be issuing a new policy that would affect the future coverage of Lucentis in Florida."  (Indict. ¶ 157; see also id. ¶ 158 (noting CMS did not change its policy).) Plainly, this is "policy" directed information gathering and protected by the Speech or Debate Clause.  Moreover, the fact that it addressed a "new policy" concerning "future coverage" also meant that it could not retroactively impact Dr. Melgen's then-existing billing dispute with Medicare.  Because this was not case work on behalf of a particular individual, but rather addressed broader policy issues, Senator Menendez's contacts with federal officials regarding multi-dosing are protected as legislative information-gathering and oversight under the Speech or Debate Clause.  Nevertheless, the Indictment relies extensively on these immunized acts.[15]

-------------------------------

[15]      (Indict. ¶¶ 19 (claiming Person A was "equipping MENENDEZ and MENENDEZ's Senate staff with information and resources"); 21 (Menendez and his staff were "collecting information" and "advocating on MELGEN's behalf to Executive Branch officials"); 22 (promoting agenda with "Executive Branch officials, including a member of the President's cabinet" and with "fellow United States Senators"); 144 (alleging Senator Menendez and his staff addressed policy issues with CMS and HHS); 151-55 (explaining Senator Menendez's staff was addressing policy issues with Dr. Melgen's lawyer); 157-58 (Senator Menendez's staff asks CMS if they "would be issuing a new policy that would affect the future coverage of Lucentis in Florida"); 159-62 (addressing Senator Menendez's staff's investigation); 163 (noting Dr. Melgen's lawyer advised Senator Menendez's staff that CMS was proposing actions that have "no legal basis"); 164 (Senator Menendez's staff noting the Senator is trying to arrange a meeting with the Secretary); 165 (Senator Menendez's staff complains to CMS that its "regulations regarding Lucentis were unclear"); 166-67 (noting call between Senator Menendez and the Director and Acting Principal Deputy of CMS where Senator Menendez asked her "to consider the confusing and unclear policy on this"); 168 (Senator Menendez's staff's preparations for meetings with CMS); 169 (addressing Senator Menendez's call to CMS complaining "CMS' policy guidelines regarding single-use vials were vague"); 173-75, 177 (Senator Menendez's staff's investigation and preparation for meetings with HHS); 180-84 (Senator Menendez's staff trying to arrange a meeting for the Senator and Secretary); 185, 186 (noting the Senators had discussed the "dosing procedures" issues in Dr. Melgen's case), 188 (joint meeting between Dr. Melgen and both Senators); see also 187 (HELP Committee staff and Senator Menendez's staff discuss issue); 192 (Senator Menendez discussing the Secretary's authority with Dr. Melgen's lawyer); 194-97 (coordination between Senator Menendez's staff, Dr. Melgen's lawyers and CMS); 199 (Senator Menendez and his staff meet with Dr. Melgen's

After a call with Secretary Sebelius failed to address this administration's policy discrepancies in August 2010, the Senator considered raising broader issues involving multi-dosing at a hearing before the Senate Finance Committee.  In November 2010, the Senator asked his staff to "brainstorm[] a possible question for Berwick . . . on the broader issue surrounding Dr. Melgen's situation."  (A-857.)  Dr. Donald Berwick, Administrator of CMS, appeared before the Senate Finance Committee on November 17, 2010, at a hearing titled, "Strengthening Medicare and Medicaid: Taking Steps to Modernize America's Health Care System."  (A-859.) The day before, Senator Menendez's staff raised two "line[s] of questioning[,]" but ultimately the Senator chose not to raise the issue for unrelated political reasons associated with the debate over Obamacare.  (A-857.)  The staff advised that the "hearing [was] going to be very high profile" politically because it was "the all anticipated showdown hearing on healthcare reform." (Id.)  Indeed, "[R]epublicans [were] expected to go after healthcare reform and Berwick in a big way."  (Id.)  Accordingly, the staff recommended the Senator raise the "broader issue surrounding Dr. Melgen's situation" in a "private, rather than public setting," rather than as part of the political theatrics associated with the Obamacare debate.  (Id.)

---

lawyer to prepare for meeting with Tavenner); 200 (Senator Menendez addresses "multi-dosing" issue with Tavenner); 201 (Senator Menendez's staff sends him a memorandum regarding "CMS Policy" to raise in a follow-up call with Tavenner); 202 (Senator Menendez's staff explains call with Tavenner is to address "Medicare reimbursement policy" and that while "CMS is taking steps to clarify both multi-dosing from single-dose vials and overfills going forward. . . . [T]hese policies didn't exist before"); 203 (Senator Menendez's staff consults with Dr. Melgen's lawyer before call with Tavenner); 204 (Tavenner advises Senator Menendez that "CMS would not alter its position regarding billing for vials used for multiple patients," and Menendez advises he will go over her head to the Secretary of HHS); 207 (noting Senator Menendez's staff had a follow-up call with CMS regarding "multi-dosing and whether overfill could be considered in Medicare payments"); 208 (information gathering by Senator Menendez's staff); 209-10, 213 (Senator's staff contacts HHS to schedule a meeting with Secretary, and discussed meeting internally); 211-214, 221-22, 225-27 (information gathering by Senator's staff).)

Senator Menendez was not alone in raising these issues. First, Senator Tom Harkin, the Chairman of the Health, Education, Labor, and Pensions ("HELP") Committee, and the HELP Committee's "health policy team leader" met with Dr. Melgen on May 18, 2011. (A-246.) In preparation for the meeting, the HELP Committee's staff reached out to Senator Menendez's staff for more information so they could "prepare a memo." (A-244.) This meeting is specifically addressed in the Indictment in Paragraphs 185-89. Second, Senate Majority Leader Harry Reid's staff solicited information about the multi-dosing policy issues in Dr. Melgen's case and participated in a meeting with Dr. Melgen's representatives. (A-248, A-250.) Again, the Indictment specifically references these communications. (Indict. ¶¶ 193-196.)

Particularly troubling is that the Indictment makes much out of a meeting and calls that Senator Menendez had with Acting Administrator of CMS, Marilyn Tavenner, as part of her confirmation process. Aside from being Speech or Debate immunized as legislative information-gathering and oversight, these discussions are at the very core of the Speech or Debate Clause because the Senator was vetting her as a nominee of the President. Ms. Tavenner had been nominated to be the Administrator of CMS and was awaiting confirmation by the Senate. The Indictment references this June 7, 2012 meeting between Senator Menendez and Tavenner in which the multi-dosing issue was raised. (Indict. ¶¶ 198-208.)

The purpose of the meeting was for Senator Menendez to vet Tavenner's nomination, and, as part of this vetting, the Senator raised multi-dosing policy issues, among other policy issues, with her. The Senator was well within his rights and constitutional duty to consider her views on that issue, and any others he deemed relevant to his assessment of her nomination and confirmation. The Senator's calendar reflected that this meeting was "re: her nomination before the Finance Committee." (A-1033; see Gov't Br. at 20 n.5, In re Grand Jury (3d Cir. filed Feb.

6, 2015) (acknowledging this is true).)  Two days earlier, Senator Menendez stressed that he wanted to "[m]ake the larger policy case" with respect to Lucentis.  (A-1035.)  During the meeting, Senator Menendez and Administrator Tavenner discussed a number of policy issues: "FQHC" (Federally Qualified Heath Centers); "1115 Waiver[s]" under the Social Security Act; "Lucentis"; and "Makena," a drug used to decrease the risk of premature birth.  (A-1037-38.) With respect to Lucentis, Administrator Tavenner conveyed that she "agree[d] w/you (RM) on policy of not wasting[.]"  (Id.; see also A-1040-41.)[16]

The Indictment itself demonstrates that these discussions between the Senator and Tavenner were policy based, and therefore subject to Speech or Debate immunity.  The Indictment notes that following the Senator's meeting with Tavenner, the Senator's staff prepared a memorandum, "Talking Points: CMS Policy," for the Senator to use in future calls with Tavenner – another powerful indicator that these communications were about "policy" and are immunized by the Speech or Debate Clause.  (Indict. ¶ 201.)[17]  The Indictment also

---

[16]    Before the Third Circuit in this case, the government claimed the Court could segregate the communications between Senator Menendez and Tavenner, so that issues related to her nomination could be excluded, but the issues concerning Medicare policy could be admitted. There is no basis for such a distinction.  Senator Menendez included these Medicare policy issues in his consideration of her as a nominee – and he has unbridled discretion to consider any factor he wants in deciding whether to confirm her.  (Gov't Br. at 44.)  For the Judicial Branch to weigh in on what factors a Senator may legitimately consider in exercising his or her authority to confirm a Presidential appointment would clearly violate separation of powers.  (Supra at 9-13.)

[17]    The memorandum to the Senator began by highlighting the policy issues: "The subject of the call is to discuss the issue Medicare reimbursement when a physician multi-doses from a single-dose vial."  (A-1043.)  Barnard recapped the two "larger public policy questions" Senator Menendez raised with Administrator Tavenner a month earlier:

> Since Medicare encourages the efficient use of medication, shouldn't it also allow for multi-dosing, as long as it's safe and clinically appropriate?
>
> If multi-dosing is not allowed, but feasible, the only benefactor is the pharmaceutical company who manufactures the drug, since this significantly

references alleged communications between the Senator's staff and Dr. Melgen's counsel about one concern Tavenner might have had, "that other agencies have policies in place that prohibit multi-dosing" and the fact that the concern was baseless. (Id. ¶ 201). The Indictment goes on to explain that the discussion concerned policy issues, like why the "CDC guidelines" have "no bearing on Medicare reimbursement policy;" indeed, the fact that the discussion addressed how "CMS is taking steps to clarify both multi-dosing from single-dose vials and overfills going forward" confirms that the subject of the discussion was policy, and that a clear policy did not exist at the time. (Id. ¶ 202 (emphasis added).) Moreover, the Indictment reflects that in a follow-up call, Tavenner explained CMS would not allow multi-dosing on policy grounds. (Indict. ¶ 204.) Tavenner stated that CMS would take the same approach as the CDC guidelines, which were concerned that multi-dosing "increases the risk of infection." (Id.)[18] Obviously, the CDC guidelines apply to reusing single- use syringes (i.e., "needle-sharing"), which was never a part of Dr. Melgen's practice, nor was it ever the topic of any policy discussion.

Aside from the policy-driven nature of these conversations between Tavenner and Senator Menendez, the fact that they took place as part of the nomination and confirmation

---

increases the amount of product they would sell. Is this in the best interest of the Medicare program and the best use of taxpayer money?

(Id.) Barnard noted, Administrator Tavenner "seemed to understand the confusion and ambiguity surrounding this policy" and reminded the Senator that she had previously "stated that when she worked as a nurse and hospital administrator, they multi-dosed 'all the time.'" (Id.)

[18] The prosecution is presenting only one side of the policy debate in the Indictment in an effort to suggest that Senator Menendez was wrong as a matter of policy. But neither questions of guilt nor immunity turn on how the Court judges that policy debate. Indeed, the Court has no reason to wade into that policy debate at all. The relevant point, confirmed by the prosecution highlighting one side of the policy debate in the Indictment, is that this was a policy debate between the Senator and the Executive Branch. The fact that the Senator was engaging the Executive Branch on a policy level, in an effort to be better informed and to exercise oversight on policy issues, makes this a legislative activity shielded by the Speech or Debate Clause.

process makes it even clearer that the communications are immunized under the Speech or Debate Clause. The Senate's advice and consent on presidential nominees is a fundamental part of the legislative process because it is explicit in the Constitution itself. U.S. Const. art. II, § 2, cl. 2; see Gravel, 408 U.S. at 625 (the Speech or Debate Clause applies to "matters which the Constitution places within the jurisdiction of either House"). Consequently, a Senator's investigation into whether to confirm an appointment is protected by the Speech or Debate Clause. See Lee v. Biden, 1989 U.S. App. LEXIS 22951, *3-4 (9th Cir. June 5, 1989) (affirming dismissal of complaint against Senate Judiciary Committee on Speech or Debate grounds that alleged a failure to investigate wrongdoing by then-Judge Anthony Kennedy during his confirmation hearings for the Supreme Court; stating "Determinations by congressional committee members as to what matters within their jurisdiction merit further investigation are an integral part of the legislative process"); Dastmalchian v. DOJ, 2014 U.S. Dist. LEXIS 148617, at *12 (D.D.C. Oct. 20, 2014) (dismissing *pro se* complaint against Senate Judiciary Committee because the "allegedly unconstitutional decision to approve" a federal judge during the confirmation process "clearly falls within the parameters of [legislative] immunity"). Given the potential for confrontation between the Executive Branch and the Senate in the confirmation context, the need to preserve the Legislative Branch's independence from the Executive Branch is at its zenith.

The Indictment also addresses a meeting between Senator Menendez and HHS Secretary Sebelius on August 2, 2012 concerning these Medicare policy issues. (Indict. ¶¶ 209-20.) On its face, the Indictment addresses policy issues. It alleges that Senator Menendez "advocated" Dr. Melgen's "position," which was Senator Menendez's own policy position, and goes into detail as to why the Secretary disagreed with that position. (Indict. ¶ 216 ("explaining that CMS was not

going to pay for the same vial of medicine twice, and emphasizing that CDC guidelines expressly advised against multiple applications from the same vial to prevent contamination.").)[19]

The Indictment neglects to mention that this meeting included Senate Majority Leader Reid, Blum, and Jim Esquea, the Assistant Secretary of HHS for Legislation, and took place in the Senate Democratic Leader's Suite. (A-1047.) Both Senator Menendez and Senate Majority Leader Reid argued the policy CMS sought to implement concerning Lucentis was "wrong" as a matter of policy. (Id.) Senator Menendez indicated that to date, CMS' "[c]lear guidance" had focused on "efficiency" and to "leave [it] to [the] doc[tor]," such that CMS previously declined to interfere with the treatment protocols of practicing physicians. (A-1048.) Senator Menendez asked whether "as public policy," it was "wrong" for a doctor to treat a patient when medically appropriate with medication the doctor would otherwise discard. (Id.) At the end of the meeting, Senator Menendez told Secretary Sebelius it appeared that CMS would "[r]ather give PhRMA [money] whenever its app[ropriate]," intending to convey that CMS' position provides a substantial windfall to pharmaceutical companies. (Id.) To avoid this result and save taxpayer money, Senator Menendez stated he intended to "go before SFC" (Senate Finance Committee) and raise the issue there. (Id.)

_____

[19]    Again, the government presents only one side of the debate in an effort to make it appear Senator Menendez was wrong on the merits of the policy dispute. In reality, billing for repackaged or multi-dosed Lucentis did not cost the government <u>any</u> additional money because the government does not pay per vial. And, as noted above, the issue here is not which side was right on the substantive policy issue, but rather whether these conversations were policy-related, whether they involved legislative fact-finding and information-gathering, and whether they were a part of the Senate's oversight responsibilities. (<u>Supra</u> at 22 n.18.) By confirming the discussion was about policy, the Indictment makes clear this is a legislative inquiry protected by the Speech or Debate Clause.

Neither Senator Menendez nor Senate Majority Leader Reid raised Dr. Melgen's billing dispute (or any individual's case) in the meeting with Secretary Sebelius.  Nor did they ask Secretary Sebelius to intervene in any case.  Not one participant in the meeting even mentioned Dr. Melgen's name.  (A-1047-48.)  Secretary Sebelius – not the Senators – did reference "the case" and Blum noted an "[a]ppeals process," but Senate Majority Leader Reid (not Senator Menendez) called that excuse a "cop out," meaning CMS knew it was wrong at the policy level, but was pointing to the appeals process in a particular case rather than admit a mistake.  (Id.)  Of course, CMS policy would not only affect Dr. Melgen, but physicians nationwide.  Thus, both Senator Menendez and Senate Majority Leader Reid argued that to the extent CMS intended to take a firm stance against repackaging or multi-dosing, CMS should clarify its position "prospective[ly]."  (A-1047.)  Not only would a "retroactive" change in policy be "very unfair," it would establish the wrong precedent for other agencies.  (Id.)  Given their policy-driven nature, these communications must be found to have been on the immunized side of the Speech or Debate line.

As if the testimony generated during the investigation was not enough, Senators McCaskill and Collins sent a letter to HHS Secretary Burwell as recently as June 1, 2015 raising essentially the same policy issue related to the repackaging of Avastin and recent FDA Guidance making clear that the FDA will take no action against physicians who multi-dose drugs like Lucentis or Avastin.  All told, this policy debate is alive and well and continues between the Legislative and Executive branches.

**B.    The Port Security Policy Issues Are Immunized**

Prior to newly-elected Governor John Corzine appointing Senator Menendez to serve in the United States Senate in 2006, Senator Menendez had served in the United States House of

25

Representatives since 1993. In the House, he served on the Foreign Affairs Committee and Select Committee on Homeland Security. In the Senate, he served as Chairman of the Subcommittee on Western Hemisphere, Peace Corps, and Narcotics Affairs ("WHA Subcommittee") from 2011 to 2013. In January 2013, he was the first Latino elected Chairman of the Committee on Foreign Relations, a position he held until January 2015, when he became Ranking Minority Member. In those capacities, improving port security has been among his highest priorities. In addition to his historic concerns about national security, various highly used ports are in New Jersey.

On September 13, 2006, Senator Menendez advocated on the Senate floor for increased port security, and introduced the 100 Percent Scanning Amendment. (A-486.) Senator Menendez and his staff drafted several related bills (A-490), and obtained final passage of the provision, see 6 U.S.C. § 982. On December 8, 2010, the Senator and other members of the Subcommittee introduced the Western Hemisphere Drug Policy Commission Act. (A-453.)

On March 31, 2011, Senator Menendez chaired a WHA Subcommittee hearing titled "A Shared Responsibility: Counternarcotics and Citizen Security in the Americas," where the Subcommittee examined the pervasive narcotics problem in the Caribbean. (A-510.)

On December 15, 2011, Senator Menendez chaired a WHA Subcommittee hearing on "The U.S.-Caribbean Shared Security Partnership: Responding to the Growth of Trafficking and Narcotics in the Caribbean." (A-581.) In his opening statement, Senator Menendez explained why port security in the Dominican Republic mattered in his home state of New Jersey:

> SENATOR MENENDEZ. . . . I often think about this in a very significant way in my own home State because we know that some of those container ships ladened with cocaine-when they leave the Dominican Republic, where do they sail to? Well, they very often end up in the Port of Newark and Elizabeth, which is the mega-port of the east coast in my home state of New Jersey. From the port, the drugs go to the street corners and the schools of New Jersey and New York. All

26

of us here today, whether sitting on the dais or sitting in the witness chair, owe it to our children and those who protect them to do everything in our power to stop the flow of drugs in our country.

(A-588.)   In questioning Rodney Benson, Chief of Intelligence for the Drug Enforcement Administration, Senator Menendez elaborated on his concern:

> SENATOR MENENDEZ. Mr. Benson, let me ask you, using again the Dominican Republic by way of example. It is a major shipping, normal shipping, port. It has two major, significant ports. A lot of shipping goes to Europe. A lot of shipping comes to the United States to my home port in New Jersey. I have read a series of articles and concerns in which the basis of the cargo inspection, the basis of some of those ports being used where there is no inspection, or after an inspection takes place, the door is changed where the seal has been issued, which is sort of like our guarantee that in fact what has been inspected there is legitimate and able to come to the United States. And then the door is changed and moved to another container where ultimately what is in there is illicit drugs. There may be other items as well. Can you talk to the committee a little bit about that?

> MR. BENSON. Well, clearly the drug trafficking organizations have recognized that the ports are a place where they can move shipments of drugs to the United States and Europe. The major port there, the Dominican port, Casedo—and then there are 15 or so other smaller ports. We clearly have investigations tied to activity there. We work with our sensitive investigative units at targeting what is moving through those ports. There are issues, Senator, as you mentioned, with port security that needs to be looked at. But we continue to work with those trusted partners at targeting those organizations responsible for movement of drugs through the ports there.

(A-610.)   Additionally, Senator Menendez asked Benson about government corruption in the Dominican Republic and the role it played in narcotics trafficking to the United States:

> SENATOR MENENDEZ. . . . Can you comment for the committee on the growth in the narcotics trade in the DR, how it is entering and leaving the country, what effect corruption has on our ability to address this growing problem and reform the police? So let us start with an oversight on the Dominican Republic.

> MR. BENSON. Senator, the Dominican Republic, as we look at it from a targeting point of view, plays a major role as a transshipment point for those drug trafficking organizations. We see loads of cocaine and heroin moving up into the Dominican Republic. We saw utilization of aircraft. We see go-fast boat activity bringing loads of cocaine. We see containerized cargo moving up into the DR. It is still probably the most significant transit point for criminal organizations to take

those loads of cocaine and then we see it move from that point to the United States.  We see also significant loads of cocaine leave the Dominican Republic and also then move to Europe as well.  So it is a critical spot for us to work with our counterparts in the Dominican Republic from a targeting strategy point of view, and we do that every day.  There are issues of corruption in the Dominican Republic, and then there is also great partnerships and counterparts that we work with every day to get the job done.

(A-608.)  The Subcommittee heard from two additional witnesses, who provided expert advice on narcotic issues in the Caribbean.  One focused his testimony on the Dominican Republic.  (A-613-19.)  The day before the hearing, Dr. Melgen emailed the Senator's staff a summary of the status of the port security contract held by his company-on-paper, ICSSI.  (A-691.)

Senator Menendez also raised the concern that Latin American governments had unfairly treated American companies who do business there.  On July 31, 2012, Senator Menendez chaired a WHA Subcommittee hearing called "Doing Business in Latin America: Positive Trends But Serious Challenges."  (A-637.)  The hearing focused on issues American companies face in Latin America.  Senator Menendez asked about the Dominican Republic, and other countries:

> SENATOR MENENDEZ. . . . We have another company with American investors that has a contract actually ratified by the Dominican Congress to do x-ray of all of the cargo that goes through the ports, which have been problematic and for which in the past narcotics have been included in those cargo, and they [the Dominican Republic] do not want to live by that contract either.  You have some of the other countries that I have mentioned today with arbitration awards that have gone against them, and yet they do not want to live by that.

(A-660.)

As these hearings progressed, Senator Menendez and his staff communicated with agencies and third parties in preparation for traditional congressional oversight hearings and possible legislation.  For example, on March 30, 2011, Jodi Herman, then-Senior Policy Advisor to the Senator, asked Todd Levett, Special Assistant to the Assistant Secretary and Senior

Advisor for Congressional Affairs at the Department of State, about funding for the Caribbean Base Security Initiative ("CBSI") in the Dominican Republic. (A-849.) And on September 6, 2011, she arranged a meeting between Senator Menendez and Assistant Secretary of State Brownfield to discuss "[c]ounternarcotics legislation that would be amenable to the Department." (A-854.)

On December 12, 2012, Herman asked Levett about "EU threats to impose sanctions or take some type of action unless Latin Am. [c]ountries do a better job of port screening[.]" (A-852.) Approximately a month later, Kerri Talbot, Chief Counsel to the Senator, emailed Customs and Border Patrol ("CBP") and asked about rumored plans to donate cargo scanning equipment to be used in Dominican ports. She relayed Senator Menendez's concern about corruption in the Dominican Republic government, asked for a briefing, and requested confirmation of whether CBP intended to supply the Dominican Republic with port security equipment.

The Indictment makes numerous allegations concerning Senator Menendez's efforts to improve port security in the Dominican Republic, all of which are immunized by the Speech or Debate Clause because they clearly involve United States policy on port security.[20] The

---

[20]        (Indict. ¶¶ 23(b) ("pressure the U.S. Department of State" on port security issues); 117 (raising the "Dominican contract dispute in a meeting with the Assistant Secretary of State for the Bureau of International Narcotics and Law Enforcement Affairs"); 123 (Senator Menendez's staff arranging meeting with State Department staff, noting the Senator's policy concerns – that the Senator has "concerns about what is flowing through the ports either unobserved or with tacit permission"); ¶ 119 (noting the State Department understood the issue to be policy related, that "current scanners are inadequate and the port security is deteriorating quickly," and the "customs director is highly corrupt"); 120 (noting the State Department was advised on policy, that "the contract would help INL meet drug interdiction and port security objectives in the region"); 124 (noting Senator Menendez "expressed dissatisfaction with INL's lack of initiative" in a meeting with the State Department's Assistant Secretary); 125 (State Department's Assistant Secretary noting Senator Menendez asserted a problem with "corrupt officials" in the Dominican Republic

Indictment alleges that the company Dr. Melgen purchased had a contract that "required all shipping containers entering Dominican ports" to be screened by the company.  (Indict. ¶ 114.) There were issues as to whether the Dominican Government would honor the contract.  While The face of the Indictment reflects that the State Department understood the concern was that "current scanners are inadequate and port security is deteriorating quickly.  The customs director is highly corrupt," and adhering to the contract "would help [the U.S. government] meet drug interdiction and port security objectives in the region."  (Indict. ¶¶ 119-20.)  The Indictment also relays that Senator Menendez's staff advised the State Department that the Senator "continues to have concerns about what is flowing through the ports either unobserved or with tacit permission," and the Senator personally "expressed dissatisfaction with [the U.S. government's] lack of initiative in enforcement of the contract."  (Id. ¶¶ 123-24.)  Following the Senator's meeting with the Assistant Secretary, the Indictment recalls that Senator Menendez had previously suggested the contract was "being blocked by corrupt officials" and he raised that concern again at the meeting.  (Id. ¶125.)   The Indictment also alleges that the Assistant Secretary told the Senator the State Department was working up a "port initiative," which it might be able to leverage to assist the port contract.  (Id.)  Significantly, according to the Indictment itself,  Senator Menendez stated that if there was no solution soon, "he would call a hearing to discuss it."  (Id.; see also id. ¶ 129 (again relaying "Sen. Menendez threatened to call

at their meeting and he told the Senator that State is developing a "port initiative" that may impact the contract); 126-27 (follow-up emails between State Department and Senator Menendez's staff); 129 (State Department's Assistant Secretary claims Senator Menendez "threatened to call me to testify at an open hearing" on Dominican port security issues); 132-33 (explaining Senator Menendez's staff asked CBP not to donate equipment to the Dominican Republic because of a concern there is an "ulterior purpose" at work by Dominicans "who do not want to increase security in the DR" by having the government screen cargo, when "the government use of the equipment will be less effective than the outside contractor"); 134-142 (emails exchanged between CBP and Senator Menendez's staff regarding port security).)

me to testify at an open hearing.").)  Calling a congressional hearing obviously lies at the heart of legislative—and therefore protected—activity.

While the prosecution may try to characterize the issue simply as "Dr. Melgen's contract dispute," Senator Menendez and the Executive Branch clearly understood it as a broader issue involving security and corruption.  The alleged incidental benefit to Dr. Melgen if the ICSSI contract were enforced does not change the legislative nature of the issue.  The Indictment's explanation that Senator Menendez was conducting this investigation in preparation for a "hearing" places this conduct beyond any doubt within the Speech or Debate Clause's immunity, as this is the same type of information-gathering and oversight activity addressed in cases, like Eastland, McSurley, McDade and Lee.  (Supra at 4-13; see also United States v. Urciuoli, 513 F.3d 290, 295-96 (1st Cir. 2008) (explaining a State Senator's "advocacy" to mayors was not an official act, but would have been if he "invoked any purported oversight authority or threatened to use official powers in support of his advocacy").[21]

Later, the Indictment alleges that an issue arose with CBP potentially donating screening equipment to the Dominican Republic and again frames the issue in policy terms.  The Senator's staff wrote CBP that they were concerned "there is some effort by individuals who do not want to increase port security in the DR to hold up the contract's fulfillment," and "[t]hese elements (possibly criminal) want CBP to give the government equipment because they believe the government use of the equipment will be less effective than the outside contractor.  My boss is

---

[21]    The Indictment notes that the Assistant Secretary suspected Senator Menendez's plan to hold a hearing was a "bluff" (Indict. ¶ 124), but courts and juries must not second-guess a Senator's claim that his apparent legislative activity in fact was legislative even though some may suspect it was just a "bluff."  (Supra at 4-13.)  In McSurley, for example, the D.C. Circuit would not second guess whether a Subcommittee subpoena that apparently had a legislative purpose in fact did have such a purpose, when it was alleged "that the real purpose" was not legislative but to "cover-up . . . improper conduct" by the staff.  553 F.2d at 1298.

concerned that the CBP equipment will be used for this ulterior purpose and asked that you please consider holding off on the delivery of any such equipment until you can discuss this matter with us – he'd like a briefing."  (Indict. ¶ 133; <u>see</u> Talbot 3/16/15 Tr. at 17 (clarifying the email is just seeking "information," not asking them "never" to donate).)  Again, the Indictment itself frames this as a policy-based inquiry, which is protected by the Speech or Debate Clause. A request for a "briefing" is precisely the type of legislative information-gathering that is immunized under the Clause.

## CONCLUSION

Because every Count in the Indictment alleges conduct that is immunized by the Speech or Debate Clause or would require the introduction of evidence privileged by the Clause, the Indictment as a whole must be dismissed.

Respectfully submitted,

<u>/s/ Abbe David Lowell</u>
Abbe David Lowell
Jenny R. Kramer
Christopher D. Man
Scott W. Coyle
**CHADBOURNE & PARKE LLP**
1200 New Hampshire Avenue, N.W.
Washington, D.C. 20036
adlowell@chadbourne.com
(202) 974-5600

Raymond M. Brown
**GREENBAUM ROWE SMITH & DAVIS LLP**
Metro Corporate Campus One
P.O. Box 5600
Woodbridge, NJ 07095
rbrown@greenbaumlaw.com
(732) 476-3280

Stephen M. Ryan
Thomas J. Tynan
**MCDERMOTT WILL & EMERY LLP**
500 North Capitol Street, N.W.
Washington, D.C. 20001
sryan@mwe.com
(202) 756-8000

*Counsel for Defendant Senator Robert Menendez*