# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **No. 2:15-cr-155** |
| **v.** | ) | **Hon. William H. Walls** |
| | ) | |
| **ROBERT MENENDEZ and** | ) | |
| **SALOMON MELGEN,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| ——————————————————— | ) | |

## UNITED STATES' OPPOSITION TO DEFENDANT MELGEN'S MOTION TO DISMISS THE INDICTMENT, TO SUPRESS EVIDENCE, AND FOR A *FRANKS* HEARING

RAYMOND HULSER
CHIEF

Peter Koski
Deputy Chief

J.P. Cooney
Deputy Chief

Monique Abrishami
Trial Attorney

Public Integrity Section
Criminal Division
United States Department of Justice

Attorneys for the United States of America

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................... ii

TABLE OF EXHIBITS ............................................................................................... v

INTRODUCTION ....................................................................................................... 1

COUNTERSTATEMENT OF FACTS ....................................................................... 3

ARGUMENT ............................................................................................................ 11

I.      THE FBI LAWFULLY FOUND THE EVIDENCE DEFENDANT
MELGEN SEEKS TO SUPPRESS UNDER THE HEALTH
CARE FRAUD WARRANT. .............................................................. 13

II.    THE FBI LAWFULLY SECURED THE EVIDENCE
DEFENDANT MELGEN SEEKS TO SUPPRESS PENDING A
NEW WARRANT. .............................................................................. 17

III.   THE FBI LAWFULLY SEARCHED AND SEIZED THE
EVIDENCE DEFENDANT MELGEN SEEKS TO SUPPRESS
UNDER VALID WARRANTS. ........................................................... 20

       A.    The Descriptions of Defendant Melgen's Black Notebook
in the Affidavits Were Not Intentionally False and Did Not
Affect the Probable Cause Determination. ................................ 23

       B.    The Affidavits Were Sufficient to Establish Probable Cause
Even Without Reference to the Black Notebook or Any
Other Evidence Found at VREC............................................... 25

IV.   THE FBI DID NOT NEED A NEW WARRANT TO
LAWFULLY SEARCH AND SEIZE THE EVIDENCE
DEFENDANT MELGEN SEEKS TO SUPPRESS. ............................ 29

       A.    At a Minimum, the Health Care Fraud Warrant Authorized
Agents To Seize Defendant Melgen's Notebook and the
$58,500 Check. ........................................................................ 29

       B.    The Plain-View Doctrine Authorized Agents To Seize
Evidence That Appeared Related to Corruption and
Prostitution Without a New Warrant. ....................................... 33

V.    THE FBI ACTED REASONABLY, TRANSPARENTLY, AND
IN GOOD FAITH. ............................................................................. 34

CONCLUSION......................................................................................................... 38

# TABLE OF AUTHORITIES

## Cases

*Arizona v. Hicks*, 480 U.S. 321 (1987) ........................................................................ 16

*Davis v. United States*, 131 S. Ct. 2419 (2011) ........................................................... 35

*Florida v. Jimeno*, 500 U.S. 248 (1991) ............................................................... 11, 19

*Franks v. Delaware*, 438 U.S. 154 (1978) .................................................................... 25

*Herring v. United States*, 555 U.S. 135 (2009) ............................................................ 35

*Horton v. California*, 496 U.S. 128 (1990) ............................................................. 17, 33

*Hudson v. Michigan*, 547 U.S. 586 (2006) .................................................................. 35

*Illinois v. Gates*, 462 U.S. 213 (1983) ........................................................... 22, 23, 29

*Katz v. United States*, 389 U.S. 347 (1967) ................................................................. 11

*Marron v. United States*, 275 U.S. 192 (1927) ............................................................ 32

*Maryland v. Garrison*, 480 U.S. 79 (1987) ................................................................. 13

*Nix v. Williams*, 467 U.S. 431 (1984) .......................................................................... 34

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973) ....................................................... 18

*Segura v. United States*, 468 U.S. 796 (1984) ............................................................. 19

*United States v. (Curtis) Williams*, 592 F.3d 511 (4th Cir. 2010) ............................... 17

*United States v. (Dante) Williams*, 3 F.3d 69 (3d Cir. 1993) ....................................... 22

*United States v. (Howard) Johnson*, 690 F.2d 60 (3d Cir. 1982) ................................ 22

*United States v. (Paul) Johnson*, 63 F.3d 242 (3d Cir. 1995) ...................................... 11

*United States v. Burgard*, 675 F.3d 1029 (7th Cir. 2012) ........................................... 19

*United States v. Burnett*, 773 F.3d 122 (3d Cir. 2014) ................................................ 11

*United States v. Burton*, 288 F.3d 91 (3d Cir. 2002) ................................................... 22

*United States v. Christine*, 687 F.2d 749 (3d Cir. 1982); ....................................... 14, 31

*United States v. Gawrysiak*, 972 F. Supp. 853 (D.N.J. 1997) ..................................... 26

*United States v. Hines*, 628 F.3d 101 (3d Cir. 2010) ................................................... 12

*United States v. Hodge*, 246 F.3d 301 (3d Cir. 2001) .................................................. 23

*United States v. Jacobsen*, 466 U.S. 109 (1984) ........................................................ 18

*United States v. Johns*, 469 U.S. 478 (1985) ............................................................ 20

*United States v. Johnston*, 784 F.2d 416 (1st Cir. 1986) ................................. 15, 33, 34

*United States v. Katzin*, 769 F.3d 163 (3d Cir. 2014) ...................................... 35, 36, 37

*United States v. Kepner*, 843 F.2d 755 (3d Cir. 1988)................................................. 22

*United States v. Kurlander*, No. 11-315, 2012 WL 2263290 (D.N.J. June 14, 2012)................. 25

*United States v. Leon*, 468 U.S. 897 (1984)..................................................... 35, 37

*United States v. Lockett*, 406 F.3d 207 (3d Cir. 2005) .............................................. 18

*United States v. Loy*, 191 F.3d 360 (3d Cir. 1999) .................................................. 37

*United States v. Martin*, 157 F.3d 46 (2d Cir. 1998) ................................................ 18

*United States v. Menon*, 24 F.3d 550 (3d Cir. 1994) ........................................... passim

*United States v. Place*, 462 U.S. 696 (1983) ....................................................... 18

*United States v. Ritter*, 416 F.3d 256 (3d Cir. 2005) ............................................... 22

*United States v. Salomon Melgen*, No. 9:15-cr-80049 (Apr. 14, 2015).......................... 3

*United States v. Santarelli*, 778 F.2d 609 (11th Cir. 1985) ....................................... 15

*United States v. Sarraga-Solana*, 263 F. App'x 227 (3d Cir. 2008).................... 21, 22, 25, 29

*United States v. Stabile*, 633 F.3d 219 (3d Cir. 2011) ...................................... 14, 17, 20

*United States v. Tracey*, 597 F.3d 140 (3d Cir. 2010) ............................................. 36

*United States v. Vasquez De Reyes*, 149 F.3d 192 (3d Cir. 1998)................................. 34

*United States v. Yusuf*, 461 F.3d 374 (3d Cir. 2006) ...................................... 23, 24, 25

*United States v. Zimmerman*, 277 F.3d 426 (3d Cir. 2002) ....................................... 22

## **Statutes**

Fed. R. Crim. P. 41 ................................................................................... 20

## **Constitutional Provisions**

U.S. CONST. amend. IV ................................................................................................. 11

—

## **TABLE OF EXHIBITS**

| Exhibit | Description |
|---------|-------------|
| 1 | Search and Seizure Warrant with Attachments A and B, January 29, 2013 |
| 2 | Affidavit of Gregory J. Sheehy, August 21, 2015 |
| 3 | Affidavit of Timothy P. Donovan, August 21, 2015 |
| 4 | Email from Peter Koski to Kirk Ogrosky, re: Melgen Representation, March 11, 2013 |
| 5 | Black Notebook Found at VREC on January 29, 2013 (Under Seal) |
| 6 | Photographs of Women Found at VREC on January 29, 2013 (Under Seal) |
| 7 | Flight Records Found at VREC on January 29, 2013 (Under Seal) |
| 8 | Email from Eduardo Rodriguez to Robert Menendez, re: Quote, November 26, 2012, Found at VREC on January 29, 2013 |
| 9 | $58,500 Check, Deposit Slip, and Attorney Letter Found at VREC on January 29, 2013 |
| 10 | Note from Robert Menendez to Salomon Melgen, March 2, 2009, Found at VREC on January 29, 2013 |
| 11 | E-mail from Barbara Martinez to Colleagues, re: UPDATE: Melgen – shredding –SW, January 29, 2013 |
| 12 | Inventory, January 30, 2013 |
| 13 | Email Chain Involving Dean Wilbur, Roger Stefin, and Barbara Martinez, re: Melgen, January 31, 2013 |
| 14 | Sealed Affidavit, January 31, 2013 |
| 15 | Search and Seizure Warrant with Attachments A and B, January 31, 2013 |
| 16 | Email from Gregory Sheehy to Dean Wilbur, re: Fw: Search Warrant, February 1, 2013 |
| 17 | Email from Barbara Martinez to Colleagues, re: Senate Ethics, February 5, 2013 |
| 18 | Sealed Amended Affidavit, February 14, 2013 |

19          Amended Search and Seizure Warrant with Attachments A and B, February 14, 2013

20          Email Exchange Between Gregory Sheehy and Dean Wilbur, re: Amended Search Warrant, February 15, 2013

21          Email from Dean Wilbur to Roger Stefin, re: Melgen, February 4, 2013

22          Email from Dean Wilbur to Roger Stefin, re: Melgen – Vitreo Retinal Consultants, February 19, 2013

23          Email from Dean Wilbur to Roger Stefin, re: Melgen, March 7, 2013

24          Email from Dean Wilbur to Roger Stefin, re: Dr. Salomon Melgen, April 3, 2013

25          Single Page From Black Notebook Found at VREC on January 29, 2013 (Under Seal)

26          Grand Jury Subpoena to VREC, February 19, 2013 (Under Seal)

27          Grand Jury Subpoena to Salomon Melgen, February 19, 2013 (Under Seal)

28          Statement Released by the Office of U.S. Senator Robert Menendez, January 30, 2013

## <u>INTRODUCTION</u>

The most revealing thing about the merits of defendant Salomon Melgen's motion is what he leaves out of it.  The motion inexplicably omits a virtually dispositive fact: defendant Melgen expressly consented, through counsel, to the FBI temporarily securing the evidence he now seeks to suppress, so that the FBI could obtain a warrant explicitly authorizing it to be searched and seized.  Nowhere in the 32 pages in which he accuses an 18-year FBI veteran of misconduct, does defendant Melgen bother to bring this fact to the Court's attention.

Defendant Melgen's motion accuses Special Agent Gregory Sheehy of misconduct on at least a dozen separate pages; touts the unremarkable fact of defendant Melgen's friendship with his co-defendant, Robert Menendez, on at least ten separate pages; and complains about "Peter Williams" on at least seven separate pages.  But on not a single line of a single page does defendant Melgen disclose that his attorney was actually in direct communication with the FBI during the January 29-30, 2013, search of his practice; that the FBI informed his attorney exactly what it intended to do with evidence related to corruption and prostitution that it found there—separate it from health care fraud evidence and obtain a separate warrant explicitly authorizing it to be searched and seized; that his attorney expressly consented to this procedure on his behalf to expedite the completion of the FBI's search of his practice; and that the FBI promptly disclosed the original and amended corruption and prostitution warrants to his attorney after they were duly signed by a magistrate judge.  Moreover, defendant Melgen's motion neglects to disclose the fact that five days after the original warrant was obtained, through counsel, he volunteered simply to give the Government the evidence he now seeks to suppress, in return for quashing the warrant.

Defendant Melgen's motion seeks four forms of relief.  First, he seeks suppression for what he mischaracterizes as a warrantless search of his ophthalmology practice for corruption and

prostitution evidence, followed by a warrantless search and seizure of that evidence; second, in the alternative, he seeks a *Franks* hearing, claiming that the affidavit and amended affidavit in support of a search warrant contain intentional misrepresentations; third, upon any order of suppression, he seeks a hearing to determine what, if any, evidence constitutes fruit of the poisonous tree; and fourth, though mounting no argument in support and omitting it from his explicit prayer for relief, *see* Dkt. No. 64-1 at 32, he also requests dismissal.  Defendant Melgen's reasoning in support of the relief he seeks is counterfactual and provides no workable legal framework through which to analyze his claims.

As elaborated below, tracking the letter of Fourth Amendment law, the search and seizure was lawful, because (1) the FBI's discovery of the evidence defendant Melgen seeks to suppress occurred during an authorized search of his ophthalmology practice for health care fraud evidence, (2) defendant Melgen expressly consented to that evidence being temporarily secured pending a search warrant, and (3) the FBI obtained a separate valid warrant to search and seize that evidence. Even had the FBI not obtained a separate warrant, the search and seizure of the evidence defendant Melgen seeks to suppress was reasonable in light of (1) the broad scope of the health care fraud warrant, which authorized agents to seize, among other things, contact information and financial records, and (2) the plain-view doctrine.  Moreover, every step the FBI took was undertaken in good faith, rendering the exclusionary rule inapplicable.

In contrast to defendant Melgen's omission of material facts from his motion, the FBI was transparent and conscientious in its handling of the search and seizure of evidence from his ophthalmology practice.  The FBI's actions reflect thorough and attentive police work, not misconduct.  Defendant Melgen's motion and the related hearings he requests should be denied.

## COUNTERSTATEMENT OF FACTS

On January 29, 2013, the FBI executed a search warrant at defendant Melgen's ophthalmology practice, the Melgen Vitreo Retinal Eye Center (VREC), in West Palm Beach, Florida (the "health care fraud warrant"). *See* Ex 1. The warrant was executed by an investigative team of agents from the FBI and the Department of Health and Human Services Office of Inspector General, based in West Palm Beach, in consultation with federal prosecutors in the U.S. Attorney's Office for the Southern District of Florida, West Palm Beach division. That investigation had developed probable cause that defendant Melgen was engaged in a scheme to defraud Medicare through false and fraudulent claims involving single-use vials of Lucentis. The West Palm Beach investigation led to a 76-count health care fraud indictment of defendant Melgen filed in the Southern District of Florida on April 14, 2015. *See United States v. Salomon Melgen*, No. 9:15-cr-80049, Dkt. No. 3 (Apr. 14, 2015).

At the same time that the health care fraud team was preparing to obtain its search warrant, FBI agents in Newark, New Jersey, led by Special Agent Gregory Sheehy, were investigating allegations that defendants Melgen and Menendez were involved in a bribery scheme, and FBI agents in Miami were investigating allegations that the defendants traveled to the Dominican Republic to have sex with underage prostitutes. The bribery investigation was being undertaken in consultation with federal prosecutors from the Department of Justice's Public Integrity Section (PIN), while the Department's Child Exploitation and Obscenity Section (CEOS) and the Southern District of Florida's Miami division consulted on the underage prostitution allegations. On January 28, 2013, agents working with the Newark team invited defendant Melgen to sit for a voluntary interview. Ex. 2, ¶ 4. He refused. *Id.* The next day, January 29, Agent Sheehy, who

had traveled from Newark to West Palm Beach to participate in the interview, confirmed with defendant Melgen's attorney that he did not want to meet with the FBI.  *Id.*

Also on January 29, 2013, FBI agents with the health care fraud team observed Cintas shredding trucks outside defendant Melgen's ophthalmology practice while surveilling it in anticipation of obtaining a search warrant.  Ex. 3, ¶ 4.  Within hours, the FBI confirmed that Cintas had shredded documents that day in the ordinary course of a service contract with VREC.  *Id.*  The fact that documents from defendant Melgen's ophthalmology practice were subject to routine destruction prompted the health care fraud team to advance its preparations for a search warrant.  *Id.*  Magistrate Judge James M. Hopkins approved the health care fraud warrant at 9:07 p.m. that night, January 29, and agents executed it within about an hour.  Ex. 1; Ex. 3, ¶ 3.

Defendant Melgen was present at his office receiving a massage when agents arrived to execute the search warrant.  Ex. 3, ¶ 6.  Defendant Melgen's attorney traveled to VREC and spoke with the supervising agent of the search, Timothy Donovan, the Assistant Special Agent in Charge of the Miami Field Division, which encompasses West Palm Beach.  *Id.*  Defendant Melgen's attorney informed ASAC Donovan of his hope that the FBI's search, which ultimately lasted until the afternoon of January 30, would finish as soon as practicable so that defendant Melgen could resume his practice.[1]  *Id.*

Attachment B to the health care fraud warrant authorized agents to seize eleven broad categories of documents—each with several subparts—related to defendant Melgen and his ophthalmology practice.  Ex. 1 at 5-6.  Attachment A authorized agents to search anywhere within VREC where that broad swath of documents could be found.  *Id.* 2-3.

---

[1] Defendant Melgen was represented with respect to the search warrant by Dean Wilbur, who is not part of the defense team in this case.  Defendant Melgen's current counsel was aware of Mr. Wilbur's role at the time and confirmed it to the Government.  Ex. 4.

In the course of their authorized search, health care fraud agents discovered emails, photographs, financial instruments, and other documents that were relevant to the corruption and underage prostitution investigations, including:

- A notebook containing 168 pages of handwritten notes, comprised predominantly of names and phone numbers, including at least nine references to defendant Menendez, at least 13 references to business associates and agents of defendant Melgen, and entries that appeared to agents on the scene as possible references to prostitution, Ex. 5;

- Professional photographs of young women, many of whom posed in lingerie, including four postcards containing photographs that listed the women's measurements, such as height, waist, and bust size, Ex. 6;

- Flight records reflecting instances in which defendant Menendez had flown on defendant Melgen's private jet, Ex. 7;

- A November 26, 2012, email from Eduardo Rodriguez, defendant Melgen's personal assistant, to defendant Menendez, listing flights that defendant Menendez had taken on defendant Melgen's private jet and listing the cost of each leg of those flights, Ex. 8;

- A copy of a $58,500 check dated January 4, 2013, from defendant Menendez to DRM Med Assist, LLC, which is registered to defendant Melgen; a corresponding deposit slip dated January 8; and a letter from defendant Menendez's attorneys representing that the check was "in reimbursement for flights" defendant Menendez had taken on defendant Melgen's private jet in 2010, and asking that it be "cashed as soon as possible," Ex. 9;

- A March 2, 2009, note from defendant Menendez to defendant Melgen thanking him for hosting an event raising over $150,000 for the Democratic Senatorial Campaign Committee, Ex. 10; and

- Assorted documents related to defendant Menendez, including newspaper articles about the defendants' relationship and the underage prostitution allegations, communications about defendant Menendez's work, thank you notes from defendant Menendez to defendant Melgen and his wife for campaign contributions, and other papers.

Members of the health care fraud team executing the search warrant were well aware of the corruption and underage prostitution allegations. Ex. 3, ¶ 5. They were therefore prepared for the possibility that they might encounter evidence pertinent to those allegations during their search

for health care fraud evidence, and knew that they might need to take additional steps to assure they could lawfully seize any such evidence. *Id.* Indeed, hours before the search was conducted, a federal prosecutor involved in the underage prostitution investigation explicitly cautioned her health care fraud counterparts in that regard:

> If the [health care fraud] warrant is signed, please make sure to stress to the [West Palm Beach] agents executing the warrant that we would have to obtain an additional search warrant if they see in plain view or later discover electronic evidence of other non-[health care fraud] crimes such as travel to the [Dominican Republic], contact lists of persons in the Dominican Republic, etc., if they think it is of evidentiary value. It seems like all of the [West Palm Beach] agents are informed about the sex tourism and corruption allegations so they should be able to identify anything that they come across that could be of evidentiary value in this regard.

Ex. 11.

ASAC Donovan believed that all of the above-listed evidence could be seized, either under the health care fraud warrant, which broadly authorized the seizure of contact information, financial documents, and many other categories, or under the plain-view doctrine. *See* Ex. 3, ¶ 10. However, in an abundance of caution, ASAC Donovan directed that evidence related to corruption and prostitution be segregated from evidence related exclusively to health care fraud. *Id.* ¶¶ 7-8, 10.

Meanwhile, Agent Sheehy was still in South Florida working on the bribery investigation when the search warrant was executed. Ex. 2, ¶¶ 5-6. He was not, however, present at VREC when the search began or when the above-described items were discovered; in fact, Agent Sheehy did not even know that the search warrant was being executed. *Id.* ¶ 6. He first learned about it through an early morning phone call on January 30, 2013, from his supervisory agent, who informed him that media outlets were reporting on the search. *Id.* Agent Sheehy subsequently learned that material pertinent to the corruption investigation may have been found at VREC. *Id.*

6

¶ 7.  Agent Sheehy therefore drove to VREC, where he was shown some of the items described above, including the $58,500 check and the documents that accompanied it.  *Id.* ¶ 8; Ex. 3, ¶ 9.  He did not inspect defendant Melgen's black notebook or the professional photographs of women, which health care fraud agents described to him.  Ex. 2, ¶ 8.

Agent Sheehy and ASAC Donovan both consulted federal prosecutors, who advised them to box the items and obtain a separate warrant.  Ex. 2, ¶ 9; Ex. 3, ¶ 10.  Prosecutors also advised ASAC Donovan to contact defendant Melgen's attorney to ask whether defendant Melgen had any objection to this procedure.  Ex. 3, ¶¶ 6, 10.  ASAC Donovan called defendant Melgen's attorney, told him that the FBI had discovered evidence related to the publicly reported allegations involving the defendants, informed him that the FBI intended to obtain a new warrant for that evidence, and requested consent to remove it from VREC rather than secure it in place.  *Id.* ¶ 11.  Defendant Melgen's attorney expressly consented because this procedure avoided prolonging the FBI's presence at VREC.  *Id.*  Defendant Melgen's attorney asked only that the FBI provide him with a copy of the search warrant once it was obtained, to which ASAC Donovan agreed.  *Id.*  After obtaining defendant Melgen's consent, Agent Sheehy personally removed the box from VREC and stored it until a separate warrant was approved by a magistrate.  Ex. 2, ¶¶ 10-12; Ex. 3, ¶¶ 11-12.  The box, which contained all the evidence defendant Melgen now seeks to suppress, had less than 1,200 pages of material.[2]  A health care fraud agent prepared a single page inventory summarizing the box's contents.  Ex. 12.

Subsequently, on January 30-31, 2013, Agent Sheehy collaborated with prosecutors to prepare an affidavit in support of a separate warrant arising from the corruption and underage

---

[2] The exhibits attached to this motion comprise a handful of the items that the FBI found at VREC.  Copies of all the items the FBI found and boxed, which have been produced to the defendants in discovery, can be made available for the Court's inspection upon request.

prostitution investigations. Ex. 2, ¶ 12. Simultaneously, prosecutors working on the health care fraud investigation were in communication with defendant Melgen's attorney regarding the search conducted the day before. *See* Ex. 13. A health care fraud prosecutor wrote an email to a counterpart working on the underage prostitution investigation to apprise her that defendant Melgen's lawyer "has been very cooperative." *Id.* The email added, "He advised that he spoke to agent Donovan who told him that a search warrant for records related to the political stuff would be prepared to justify their seizure of items they have already isolated. He wanted to know if this was still the plan." *Id.* The prosecutor working on the underage prostitution investigation promptly responded, "Yes, we are definitely still planning on getting a warrant. We are hoping to get it to the judge this afternoon." *Id.*

Later that day, on January 31, 2013, Agent Sheehy presented his affidavit in support of the corruption and prostitution warrant to Judge Hopkins, the same magistrate who had approved the health care fraud warrant. Ex. 14. The affidavit specified that the warrant sought authority "to search items seized from or imaged on January 29, 2013 at [VREC]" for evidence that defendant Melgen violated prostitution statutes and that he and defendant Melgen each violated corruption statutes. *Id.* ¶ 3. The affidavit expressly identified items that the FBI had found during the January 29 search. *See id.* ¶¶ 28-31. The affidavit also made clear that the search leading to the discovery of those items "stemmed from allegations that Dr. Melgen was engaging in health care fraud." *Id.* ¶ 28. In addition, the affidavit contained information developed independent of the January 29 search. *See id.* ¶¶ 5-27, 32-33. Judge Hopkins approved the warrant. Ex. 15. Consistent with the agreement ASAC Donovan had made with defendant Melgen's attorney, Agent Sheehy emailed a copy of the warrant to defendant Melgen's attorney the next morning and thanked him for "all of [his] cooperation." Ex. 16; Ex. 2, ¶¶ 10, 13; Ex. 3, ¶ 11.

Five days later, on February 5, 2013, defendant Melgen's attorney contacted a prosecutor in the Southern District of Florida who was working on the underage prostitution investigation and asked that the Government "quash" the search warrant. Ex. 17. The attorney stated that defendant Melgen was willing to "just allow [the Government] to review all of the materials." *Id.* Defendant Melgen's attorney also proposed that the Government "issu[e] a subpoena as an alternative to letting the warrant continue to authorize the search." *Id.* The request was rejected.

After obtaining the search warrant, Agent Sheehy opened the box of materials taken from VREC and thoroughly reviewed the contents. Ex. 2, ¶ 12; *see also* Ex. 18, ¶ 31. Among the items he personally examined for the first time was defendant Melgen's black notebook. Ex. 18, ¶ 31. Agent Sheehy believed that the description of the notebook in his original affidavit, which was based on information he had obtained on the search scene from a health care fraud agent, should be corrected.[3] *See* Ex. 18, ¶¶ 5, 31. On February 15, 2013, barely two weeks after obtaining the warrant, Agent Sheehy presented an amended affidavit to Judge Hopkins, the same magistrate judge who approved the original warrant. Agent Sheehy's amended affidavit expressly disclosed that the purpose of submitting it was "to correct the description, contained in the original search warrant affidavit, of certain items seized from VREC on January 29, 2013," and directed Judge Hopkins' attention to the exact paragraphs in which corrections were made. *Id.* ¶ 5. Agent Sheehy

---

[3] The original affidavit stated that the notebook contained "lists of female's names, along with certain other personal characteristics, including their phone numbers, their nationalities, and their prices." Ex. 14, ¶ 28. The affidavit explained that, "[i]n the training and experience of several agents on scene [at VREC] who have worked prostitution cases before, the notebook looked to be a ledger of prostitution activities." *Id.* It also stated that "[i]nside the notebook, the [health care fraud] agents noticed that Senator Menendez's name was listed on several different pages of the notebook. Below each of these entries for Senator Menendez was a list of several women, along with, again, these women's phone numbers, their nationalities, and their prices." *Id.*

provided the following corrected description of defendant Melgen's black notebook (which defendant Melgen's motion neglects to quote in full):

> In that notebook, the agents noticed that Senator Menendez's name was listed along with his phone number. Based on a description provided by fellow agents, and in reliance upon their training and experience in prostitution investigations, your Affiant described the notebook in the original search warrant as a notebook that "looked to be a ledger of prostitution activities." After personally viewing the notebook, your Affiant knows that the notebook does contain the names of several women. Many women are denoted simply by a single name in quotation marks. Nearly all of the female names have an associated phone number. Some, though less than a majority, also include a nationality. The name of one woman, "Dixi," appears to be accompanied by a daily rate or price of "1200-1500." The notebook also contains several men's names and associated phone numbers, including the name and phone number of Senator Menendez, which appears on nine separate pages. On each of those pages, Senator Menendez's name appears along with the names and phone numbers of several women and men. On one of these pages, one of the women's names is accompanied by her nationality, "Spain"; on a second page, one of the women's names is accompanied by the name of a city in the Dominican Republic, "Macoris"' and on a third page, one of the women's names is listed in quotation marks as "Jaditza."

*Id.* ¶ 31.

Additionally, the amended affidavit specified that four of the professional photographs of women found in defendant Melgen's office during the VREC search contained physical measurements, so as to make clear that not all of the many photographs of women found during the search contained such measurements. Ex. 18, ¶ 32. The amended affidavit also described newly discovered facts further supporting probable cause, which, as the affidavit noted, did not "stem[ ] from the evidence seized and/or searched as a result of the original search warrant." *Id.* ¶ 5. Judge Hopkins reapproved the warrant. Ex. 19. Agent Sheehy subsequently emailed a copy of it to defendant Melgen's attorney, as he had done with the original warrant. Ex. 20. Defendant Melgen's attorney responded: "Thanks. I am assuming that everything has already been seized. If you need anything else, please contact me at your convenience." *Id.*

More than two-and-a-half years have passed since the search warrant was executed.  Only after he was indicted in this case, in July 2015, by way of this motion and letters exchanged with the Government, *see* Dkt. No. 64-1 at 15-18 & Exs. P, Q, R, S, T, U, did defendant Melgen ever register any complaint about the evidence he now seeks to suppress, the procedures used to secure and seize it, or the fact that it has not been returned to him.  *See* Ex. 2, ¶ 14.

## ARGUMENT

The Fourth Amendment only prohibits "unreasonable searches and seizures."  U.S. CONST. amend. IV; *see Florida v. Jimeno*, 500 U.S. 248, 250 (1991) ("The touchstone of the Fourth Amendment is reasonableness.").[4]  Upon a claim that a search or seizure was unreasonable, "[a]s a general rule, the burden of proof is on the defendant who seeks to suppress evidence. . . . However, once the defendant has established a basis for his motion, *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable."  *United States v. (Paul) Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).

The record establishes that defendant Melgen cannot meet even his initial burden to establish a basis for his motion.  First, the health care fraud warrant authorized the FBI to conduct a thorough search of VREC for documents and to examine those documents to ascertain whether they were within the scope of the warrant.  Second, the FBI was authorized to temporarily secure evidence related to the corruption and prostitution investigations that it found during that search,

---

[4] This is defendant Melgen's motion alone, of course, because the search and seizure he alleges to have violated the Fourth Amendment occurred at VREC, his ophthalmology practice, a place in which defendant Menendez has no reasonable expectation of privacy.  *See Katz v. United States*, 389 U.S. 347, 351 (1967) (holding that the Fourth Amendment "protects people, not places").  Defendant Menendez therefore lacks Fourth Amendment standing to join defendant Melgen's motion.  *See United States v. Burnett*, 773 F.3d 122, 131 (3d Cir. 2014) (explaining that to establish Fourth Amendment standing a defendant must "show both that he had a subjective expectation of privacy in the area searched and that his expectation was objectively reasonable").

pending a separate warrant, because defendant Melgen expressly consented to it and doing so was consistent with established Fourth Amendment precedent.  Third, the separate warrant authorizing the search and seizure of that evidence was valid.

Even if the FBI had not obtained a new warrant, the search and seizure of the evidence defendant Melgen seeks to suppress still would have been lawful.  Among the seized items, at a minimum, defendant Melgen's black notebook and the $58,500 check from defendant Menendez were within the scope of the health care fraud warrant, because the warrant broadly authorized the seizure of contact information and financial records.  Furthermore, all the seized items are exempt from the Fourth Amendment's warrant requirement under the plain-view doctrine.  Finally, the FBI and Agent Sheehy acted conscientiously and in good faith, demonstrating commendable caution for the Fourth Amendment, thereby rendering the exclusionary rule inapplicable.  Thus, the evidence should not be suppressed.

Moreover, this Court should deny defendant Melgen's motion without a hearing.  "A motion to suppress requires an evidentiary hearing only if the motion is sufficiently specific, non-conjectural, and detailed to enable the court to conclude that (1) the defendant has presented a colorable constitutional claim, and (2) there are disputed issues of material fact that will affect the outcome of the motion to suppress."  *United States v. Hines*, 628 F.3d 101, 105 (3d Cir. 2010).  A claim is "colorable" only if it consists "of more than mere bald-faced allegations of misconduct." *United States v. Voight*, 89 F.3d 1050, 1067 (3d Cir. 1996).  Defendant Melgen's motion contains nothing but bald-faced allegations of misconduct, supported only by conjecture.  The disingenuousness of his Fourth Amendment claim should not be rewarded or exacerbated by a hearing, which can serve only as a platform to broadcast false allegations and promote speculation.

I.    **THE FBI LAWFULLY FOUND THE EVIDENCE DEFENDANT MELGEN SEEKS TO SUPPRESS UNDER THE HEALTH CARE FRAUD WARRANT.**

Defendant Melgen contends that FBI agents "undertook an unconstitutionally exploratory rummaging" of his ophthalmology practice when they executed the health care fraud warrant on January 29, 2013. Dkt. No. 64-1 at 18; *see also* Dkt. No. 53-1 at 9 ("Although that warrant authorized only the search and seizure of materials related to allegations of Medicare fraud, FBI agents used the warrant as an opportunity to rummage through Dr. Melgen's practice, in violation of his Fourth Amendment rights."). Not so. As defendant Melgen concedes, "a government agent has discovered evidence within the scope of the search allowed by the warrant if the agent's search fits within the literal terms of the warrant and is a reasonable means of obtaining the objects described in the warrant." Dkt. No. 64-1 at 25 (quoting *United States v. Menon*, 24 F.3d 550, 560 (3d Cir. 1994)); *see also Maryland v. Garrison*, 480 U.S. 79, 84 (1987) ("[T]he scope of a lawful search is defined by the object of the search and the places in which there is probable cause to believe it may be found.") (internal quotation marks omitted). Attachment A to the health care fraud warrant, which defendant Melgen neglected to attach to his motion, *see* Dkt. No. 64-2, authorized the FBI to search the entire VREC premises. *See* Ex. 1 at 3-4. Attachment B authorized the seizure of eleven categories of documents (not counting subparts) related to the health care fraud allegations. *See id.* at 4-5. The items defendant Melgen has moved to suppress were all discovered in locations within his ophthalmology practice where agents could reasonably expect to find documents within the scope of Attachment B. The items were found within individual offices on the premises, on top of desktops and inside desk drawers, inside cabinets, atop shelves, and elsewhere. *See* Ex. 12. Searching all of these areas and containers within VREC was not "an unconstitutional[ ] exploratory rummaging," as defendant Melgen alleges, but rather "a reasonable means of obtaining the objects described in the warrant." *Menon*, 24 F.3d at 560.

Defendant Melgen further contends that, upon finding the items he has moved to suppress, in particular his black notebook, agents were not permitted to look "through the whole document to determine its responsiveness to the warrant." Dkt. 64-1 at 24-25. This also is not so. Defendant Melgen concedes, as he must, *see id.* at 24, that "in searches for papers, it is certain that some innocuous documents will be at least cursorily perused in order to determine whether they are among those papers to be seized." *United States v. Christine*, 687 F.2d 749, 760 (3d Cir. 1982); *see also United States v. Stabile*, 633 F.3d 219, 234 (3d Cir. 2011) ("[A]s a practical matter, [w]hen a search requires review of a large collection of items, such as papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized.") (internal quotation marks omitted). Here, upon discovering defendant Melgen's black notebook, agents were authorized to examine it to determine whether it contained information within the scope of Attachment B. This much is clear from *Menon*, which explains—in the paragraph immediately following the excerpt defendant Melgen selectively quotes on page 25 of his brief—that "[a]ny reasonable agent looking for evidence in a clearly circumscribed area would continue the search until she was certain that no more evidence existed[,] which could not happen until the entire desk was searched." 24 F.3d at 560. Likewise, here, a reasonable agent looking through defendant Melgen's black notebook of names, phone numbers, and other information would not stop his search after examining an arbitrary number of pages, but rather would continue his review until he could make a firm determination about whether it contained information responsive to the warrant.

Moreover, contrary to defendant Melgen's contention, the agents were permitted to conduct their examination of the notebook and other items with sufficient care to determine whether they fell within the warrant's scope. Defendant Melgen argues that his "penmanship and

14

the sheer number of names in the [notebook]" demonstrate that the FBI's review extended beyond the extent necessary to ascertain its responsiveness to the warrant. *See* Dkt. No. 64-1 at 25. But poor penmanship and prolific note taking are not shields to a lawful search; no doctrine of law bestows heightened Fourth Amendment protection to indiscriminate note takers with illegible handwriting. *See Menon*, 24 F.3d at 563 (stating that the agent "was entitled to look at [the papers] carefully enough to determine that they were not blank Abad invoices"); *United States v. Santarelli*, 778 F.2d 609, 615-16 (11th Cir. 1985) ("Given the fact that the search warrant entitled the agents to search for documents . . . , it is clear that the agents were entitled to examine each document . . . to determine whether it constituted evidence they were entitled to seize under the warrant.").

To support his outcome-driven claim that the FBI's search exceeded the scope of the health care fraud warrant, defendant Melgen erroneously cites to a body of caselaw that in reality squarely supports the constitutionality of the search. For example, the defendant cites *United States v. Johnston*, *see* Dkt. No. 64-1 at 24, in which the First Circuit held that opening a folded piece of ledger paper and examining the contents of a closed spiral notebook bearing only the seal of a local university constituted searches beyond the scope of a warrant that "authorized a search for [c]ontraband consisting of marijuana[ and] marijuana deratives [sic]." 784 F.2d 416, 418-19, 419 n.2 (1st Cir. 1986) (internal quotations omitted). The First Circuit deemed those particular searches unlawful because neither a folded piece of ledger paper nor a spiral notebook is a place where marijuana is likely to be found. *Id.* at 419 n.2. By contrast, the agents who conducted the health care fraud search looked in defendant Melgen's office, desk, shelves, drawers, and notebook—precisely the sorts of places to find things like claim forms, financial records, correspondence, checks, invoices, corporate records, patient lists, accounting records, payroll

records, and appointment books, all of which the FBI was authorized to look for, among other types of documents, under the health care fraud warrant.  *See* Ex. 1 at 5-6.

Similarly, *Arizona v. Hicks*, 480 U.S. 321 (1987), on which defendant Melgen also mistakenly relies, *see* Dkt. No. 64-1 at 25, bears no resemblance to the facts of this case.  Indeed, the factual contrast should strengthen this Court's confidence in the constitutionality of the FBI's search.  In *Hicks*, officers conducted a warrantless search of an apartment where a shooting had recently occurred, in search of the shooter, victims, and weapons.  *Hicks*, 480 U.S. at 323.  Inside the apartment, an officer observed a turntable he suspected was stolen, moved it to read its serial number, and ran the serial number to confirm his suspicion.  *Id.*  Although officers had probable cause to enter the apartment and search it for evidence of the shooting, moving the turntable was an "action[] unrelated to the objectives of the authorized intrusion" and therefore unlawful.  *Id.* at 325.  Here, looking through defendant Melgen's office, desk, shelves, drawers, and notebook was not just related, but necessary "to the objectives of the authorized intrusion" into his ophthalmology practice; in fact, there was no other way that agents could practically have searched for documents within the warrant's scope.

Finally, defendant Melgen insinuates throughout his motion that the FBI used the health care fraud warrant as a pretext to search his ophthalmology practice for evidence of corruption and prostitution.  *E.g.*, Dkt. No. 64-1 at 1-2, 11, 19; *see also* Dkt. No. 53-1 at 9.  The factual record rebuts this insinuation.  The health care fraud warrant was executed by health care fraud agents.  Contrary to what defendant Melgen suggests, the Fourth Amendment does not require the FBI agents to have placed artificial limitations on the scope of their objectively reasonable search for health care fraud evidence, merely because they knew that VREC may also contain evidence of other crimes.  In any event, "an investigator's subjective intent is not relevant to whether a search

falls within the scope of a search warrant." *Stabile*, 633 F.3d at 240.  Indeed, "[t]he fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by the terms of a warrant or a valid exception to the warrant requirement." *Horton v. California*, 496 U.S. 128, 138 (1990); *see also United States v. (Curtis) Williams*, 592 F.3d 511, 522-24 (4th Cir. 2010) (holding that where investigators executed a search warrant for evidence of computer harassment, their seizure of child pornography discovered during the search was permissible under the plain-view doctrine, "even if finding child pornography was their hope from the outset").  Because the FBI's search and initial examination of documents and other papers it found was confined to the bounds of the health care fraud warrant, the discovery of other evidence was lawful, regardless of what agents may have hoped to find.

Searching the entirety of defendant Melgen's office and examining the contents of the documents and papers found there, including defendant Melgen's black notebook and the other items he has moved to suppress, "fit[] within the literal terms of the [health care fraud] warrant and [were] reasonable means of obtaining the objects described in the warrant." *Menon*, 24 F.3d at 560.  The FBI's discovery of the evidence defendant Melgen seeks to suppress during its search of VREC for health care fraud evidence was therefore lawful.

## II.   THE FBI LAWFULLY SECURED THE EVIDENCE DEFENDANT MELGEN SEEKS TO SUPPRESS PENDING A NEW WARRANT.

Defendant Melgen contends that the FBI lacked authority to remove from VREC the evidence he seeks to suppress, accusing the Government of "not return[ing] the property upon realizing that it lacked the authority to seize it."  Dkt. No. 64-1 at 27.  What defendant Melgen neglects to tell the Court, however, is that he expressly consented to the FBI removing the evidence in order to speed the FBI's departure from his office and allow him to resume his practice—with

full knowledge that this was being done so that the FBI could obtain a separate warrant to search and seize that evidence.  Defendant Melgen's claim is as disingenuous as it is legally meritless.

The Supreme Court has held unequivocally that, "[w]here law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant, . . . the [Fourth] Amendment [ ] permit[s] seizure of the property, pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present." *United States v. Place*, 462 U.S. 696, 701 (1983); *see also United States v. Martin*, 157 F.3d 46, 54 (2d Cir. 1998) ("[W]here officers have probable cause to believe [a] container contains contraband, it 'may be seized, *at least temporarily*, without a warrant.'" (quoting *United States v. Jacobsen*, 466 U.S. 109, 121 (1984) (emphasis in original))).  Here, having lawfully discovered evidence of other crimes in the course of their search for health care fraud evidence, agents were entitled to secure that evidence in order to obtain a warrant.

But rather than rely solely on "the exigencies of the circumstances," *Place*, 462 U.S. at 701, to secure defendant Melgen's property, the FBI acted transparently, informing his counsel that it had found evidence related to a separate investigation and obtaining his express consent to remove it from VREC, pending a separate warrant.  Defendant Melgen's consent conclusively resolves the lawfulness of the FBI's conduct.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) ("It is . . . well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent.").  And although the law does not require defendant Melgen's consent to have been logical, *see United States v. Lockett*, 406 F.3d 207, 211 (3d Cir. 2005) ("Consent must be voluntary, may be express

or implied, and need not be knowing or intelligent."), it most certainly was, as it helped wind down the FBI's search of his office so that he could resume his practice. *See* Ex. 3, ¶¶ 6, 11.

At no point did the FBI's safeguarding of the evidence exceed the scope of defendant Melgen's consent, *see Jimeno*, 500 U.S. at 251-52 (requiring an explicit limit on consent), or become "unreasonable as a result of its duration," *Segura v. United States*, 468 U.S. 796, 812 (1984). Agent Sheehy presented the original affidavit to the magistrate the day after the VREC search was finished and promptly disclosed the warrant to defendant Melgen's attorney, consistent with the agreement between defendant Melgen's attorney and the FBI. Ex. 2, ¶¶ 10, 12-13; Ex. 3, ¶ 11; Ex. 16. Such diligent and expeditious action is further confirmation of the lawfulness of the FBI's conduct. *See United States v. Burgard*, 675 F.3d 1029, 1033 (7th Cir. 2012) ("When police act with diligence, courts can have greater confidence that the police interest is legitimate and that the intrusion is no greater than reasonably necessary.").

The Seventh Circuit's opinion in *Burgard*, where police waited six days before obtaining a warrant for a cell phone they had temporarily detained, is particularly instructive. There, the defendant "had a strong interest in possessing his cell phone" and "asserted his possessory interest over the phone by voluntarily going to the police station to obtain a property receipt, which would help him obtain the phone's return." *Id.* at 1034. Still, the Seventh Circuit affirmed the reasonableness of the delay in seeking a warrant, because there was probable cause that the cell phone contained evidence of a crime and the affiant "wanted to be sure that he had all the information he needed from the seizing officer and he wanted to consult with the AUSA, all the while attending to his other law enforcement duties." *Id.*

In contrast to the *Burgard* defendant, in the more than two-and-a-half years since the search warrant, defendant Melgen never once attempted to assert his possessory interest over the evidence

19

he now seeks to suppress.  Instead, defendant Melgen: consented to the FBI temporarily securing the items; never complained that the FBI took too long to get a new warrant; never requested that the items be returned; and never attempted to compel the Government to return the items under Rule 41(g) of the Federal Rules of Criminal Procedure.  In fact, rather than assert any possessory interest over the evidence, defendant Melgen actually tried to surrender the evidence to the Government.  *See* Ex. 17.  Defendant Melgen's failure to assert his possessory interest over these items is telling; unlike the property he seeks to suppress, defendant Melgen repeatedly requested that the Government return cell phones and other devices that were seized from his ophthalmology practice, *see* Exs. 21-24.  *See United States v. Johns*, 469 U.S. 478, 487 (1985) (noting that defendants who "never sought return" of seized packages cannot argue that delay in searching them adversely affected Fourth Amendment rights); *Stabile*, 633 F.3d at 235-36 (finding defendant's claim of heightened possessory interest in his computer for personal and business reasons unavailing where he waited 18 months to request its return).

Moreover, like the police in *Burgard*, here the FBI had probable cause to believe that the items in question contained evidence of serious criminal allegations—including allegations of crimes involving minor victims—and whatever time elapsed between the temporary seizure of the items and the original warrant, and the original warrant and the amended affidavit, was the result of careful investigation, consultation with prosecutors, and other due diligence.  The agents' conduct here met and exceeded the Fourth Amendment's requirements.

## III.   THE FBI LAWFULLY SEARCHED AND SEIZED THE EVIDENCE DEFENDANT MELGEN SEEKS TO SUPPRESS UNDER VALID WARRANTS.

Defendant Melgen further contends that the evidence found at VREC was unlawfully searched and seized because Agent Sheehy's affidavits in support of the original and amended corruption and prostitution warrants were "based on intentional mischaracterizations of evidence

that was unconstitutionality seized from Dr. Melgen's offices."  Dkt. No. 64-1 at 2; *see also* Dkt. No. 53-1 at 9 ("Ultimately, Agent Sheehy's affidavit contained blatant mischaracterizations of the seized evidence, which were undoubtedly relied upon by the magistrate judge who concluded that the FBI had found evidence of prostitution.").   Specifically, he argues that Agent Sheehy intentionally mischaracterized the black notebook found in defendant Melgen's office as a ledger of prostitution activities.  Dkt. No. 64-1 at 2-3, 21-23.  Defendant Melgen does not contest that, on their face, the original and amended affidavits established probable cause.  Instead, he argues that "[a]bsent those mischaracterizations of the unlawfully seized evidence, there was nothing in Agent Sheehy's affidavits to corroborate the allegations of criminality" in the warrant.  *Id.* at 3-4.

Defendant Melgen's accusations are outright wrong.  Agent Sheehy did not intentionally falsify information, and his characterizations of defendant Melgen's black notebook were entirely reasonable under the circumstances, as explained below.  Moreover, defendant Melgen is unable to muster any credible legal support for his claim.  On this point, his motion quotes from and relies upon a single unpublished Third Circuit opinion, arguing that Agent Sheehy's alleged mischaracterizations of evidence rendered his affidavits "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."  Dkt. 64-1 at 4 (quoting *United States v. Sarraga-Solana*, 263 F. App'x 227, 231 (3d Cir. 2008)) (internal quotation marks omitted).  What defendant Melgen fails to mention—and fails to account for in his motion—is that *Sarraga-Solana* makes clear, citing to a well-established body of published Third Circuit law, that there are scarce circumstances under which affidavits have been deemed "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."  263 F. App'x at 231.  As *Sarraga-Solana* states, such instances have been limited to "affidavits based on conclusory assertions, a single piece of outdated evidence, or an uncorroborated or unreliable

anonymous tip"—circumstances that do not apply here.  *Id.* (citing *United States v. Ritter*, 416 F.3d 256, 263 (3d Cir. 2005); *United States v. Zimmerman*, 277 F.3d 426, 436-37 (3d Cir. 2002); *United States v. (Dante) Williams*, 3 F.3d 69, 74 (3d Cir. 1993)).

The standard for determining whether an affidavit establishes probable cause—a standard defendant Melgen's motion fails to describe—requires a magistrate to "make a practical, common sense decision whether, given all the circumstances set forth in that affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Kepner*, 843 F.2d 755, 762 (3d Cir. 1988) (quoting *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983).  Contrary to what defendant Melgen's motion might lead one to believe, direct evidence is not required to establish probable cause to search, which instead "can be based on an accumulation of circumstantial evidence that together indicates a fair probability" that the place to be searched contains contraband or evidence of a crime.  *United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002).  In the event "that some factual averments in the affidavit are tainted, they do not vitiate a warrant which is otherwise validly issued upon probable cause reflected in the affidavit." *United States v. (Howard) Johnson*, 690 F.2d 60, 63 (3d Cir. 1982); *accord Burton*, 288 F.3d at 103 (explaining that a warrant with tainted information "need not be invalidated if the other evidence in the [ ] affidavit independently would have established probable cause . . . .").

Here, Agent Sheehy's alleged intentional mischaracterizations of evidence were in fact reasonable descriptions, appropriate under the circumstances, which in any event were unlikely to sway the probable cause determination.  Moreover, even if Agent Sheehy's affidavits were stripped of all references to the black notebook, or even all of the evidence found at VREC, the affidavits contained substantial other evidence establishing probable cause that the defendants participated

in a bribery scheme and that defendant Melgen was involved in prostitution.  Defendant Melgen's claim should therefore be rejected.

**A.    The Descriptions of Defendant Melgen's Black Notebook in the Affidavits Were Not Intentionally False and Did Not Affect the Probable Cause Determination.**

Defendant Melgen's contention that Agent Sheehy's descriptions of the black notebook were intentionally false is wrong and legally irrelevant.  First, it is impossible for Agent Sheehy to have intentionally mischaracterized the black notebook in his original affidavit because he did not personally review it until after Judge Hopkins signed the warrant.  Rather, Agent Sheehy appropriately relied on information provided to him by health care fraud agents who discovered the notebook and examined it, among many other documents, while still on scene at VREC.  *See United States v. Yusuf*, 461 F.3d 374, 385 (3d Cir. 2006) ("[I]nformation received from other law enforcement officials during the course of an investigation is generally presumed to be reliable.").  Upon recognizing that some of the characterizations in the original warrant were incorrect, Agent Sheehy took the sound and perfectly lawful step of amending his affidavit.

Second, the original affidavit's description of the black notebook was hardly critical to the probable cause determination, as once Agent Sheehy corrected it, Judge Hopkins still approved the warrant.  Because Agent Sheehy was transparent and specifically identified his corrections, *see* Ex. 18, ¶ 5, Judge Hopkins assuredly had the opportunity to reverse his original probable cause decision if the description of the black notebook in the first affidavit played such an important part in it.  *See Gates*, 462 U.S. at 236 (noting that a magistrate's probable cause finding is owed "great deference" (internal quotation marks omitted)); *United States v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001) (explaining that a reviewing court "must uphold the [probable cause] finding if the affidavit on which it was based provided a substantial basis for finding probable cause").

Third, Defendant Melgen's claim that Agent Sheehy's statement in the amended affidavit that "[t]he name of one woman, 'Dixi,' appears to be accompanied by a daily rate or price of '1200 to 1500'" was "unambiguously false" is simply indicative of his motion's inflammatory rhetoric and baseless accusations. Dkt. 64-1 at 23 (quoting 2nd Sheehy Aff. (Ex. 18), ¶ 31). As the Court can examine for itself from Exhibit 25, defendant Melgen's notebook in fact contains the name "Dixi"—which Agent Sheehy reasonably inferred to be "the name of one woman"—with the accompanying notes "1200-1500," "day," "flat fee"—which, as Agent Sheehy wrote in his amended affidavit, "appear" to be "a daily rate or price." Ex. 18, ¶ 31; Ex. 25. Agent Sheehy's description of what he observed was not "unambiguously false"—it was an accurate description of the contents of the notebook on its face.

Moreover, the inference that Agent Sheehy drew from this observation—that it may be a reference to prostitution—was not unreasonable, in light of other entries in the notebook, such as the many references to women by a single name in quotation marks followed by a phone number, some of which had nationalities written next to them. Ex. 18, ¶ 31; *see also* Ex. 5. Agent Sheehy was also well aware of independent information corroborating the prostitution allegations against defendant Melgen, which he included in both the original and amended affidavits, and which reasonably informed his examination of the notebook. That Agent Sheehy may ultimately have been mistaken about the significance of the "Dixi" reference is irrelevant, given the reasonable inferences he made in good faith. *See Yusuf*, 461 F.3d at 387 (explaining, on a *Franks* challenge, that even where information in a warrant "later turned out to be incorrect," that fact "is not determinative, as [courts] focus [their] analysis under *Franks* on whether a reasonable officer in [the agent's] position would have had an obvious reason at the time he submitted the affidavit to doubt the accuracy of the information").

24

Agent Sheehy's description of the notebook in the amended affidavit was fulsome and non-conclusory. For example, in addition to the description of Dixi and the nine appearances of defendant Menendez's name in the notebook, the amended affidavit provides information about the notebook's entire composition, including that it contained the names of several men that, like names of women, also had phone numbers written next to them. Ex. 18, ¶ 31. The amended affidavit also clarified that a majority of the women listed in the notebook did not have a nationality written next to their names. *Id.* Transparency such as this equipped Judge Hopkins with the information and context necessary to evaluate the notebook's significance—or insignificance—to a probable cause determination. There is no legal or factual basis for concluding that Agent Sheehy's description of defendant Melgen's black notebook, in either the original or amended affidavit, rendered the warrant "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Sarraga-Solana*, 263 Fed. Appx. at 231.[5]

### B. The Affidavits Were Sufficient to Establish Probable Cause Even Without Reference to the Black Notebook or Any Other Evidence Found at VREC.

Defendant Melgen's motion is so hyper-focused on his black notebook and "Peter Williams" that he ignores the overwhelming other evidence of probable cause contained in the warrant affidavits—with or without all the other evidence discovered at VREC.

---

[5] For all of these same reasons, there is no basis for rewarding defendant Melgen with a *Franks* hearing. A *Franks* hearing is warranted only "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," and "the allegedly false statement is necessary to the finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). "In order to make this preliminary showing, the defendant . . . must present an offer of proof contradicting the affidavit, including materials such as sworn affidavits or otherwise reliable statements from witnesses." *Yusuf*, 461 F.3d at 383 n.8; *see also United States v. Kurlander*, No. 11-315, 2012 WL 2263290, *3 (D.N.J. June 14, 2012) (denying a suppression motion without a *Franks* hearing where "[a] magistrate judge could still determine that a corrected affidavit including the [allegedly intentionally] omitted information establishes probable cause to issue the warrants").

Unsurprisingly, when arguing about his black notebook, defendant Melgen makes no mention of the fact that the warrant was not directed exclusively at prostitution, but at corruption as well.  *See* Ex. 14, ¶ 4; Ex. 18, ¶ 4.  Even prior to the search warrant, there was substantial evidence supporting probable cause that the defendants were engaged in a bribery scheme.  The original affidavit explained that, before searching VREC, the FBI had confirmed the following: (1) that defendant Melgen had admitted to the FBI's Legal Attaché in the Dominican Republic that he had enlisted defendant Menendez's assistance to try and secure a container screening contract with the Dominican government, Ex. 14, ¶ 23; (2) that defendant Menendez had flown on defendant Melgen's private jet on six separate occasions in May 2010, August 2010, and September 2010, *id.* ¶ 21; and (3) that defendant Menendez did not report the flights he enjoyed on defendant Melgen's private jet on his financial disclosure form covering the 2010 calendar year, *id.* ¶ 32.  These facts, all of which were obtained from sources independent of the VREC search, surpass the probable cause requirements for the bribery, honest services, false statements, and other corruption offenses cited in the original and amended affidavits.  *See United States v. Gawrysiak*, 972 F. Supp. 853, 861 (D.N.J. 1997) ("The Fourth Amendment has never demanded that all details of the crime be known, and the crime be solved, before the search warrant's probable cause requirement is met.").

Moreover, the other independently discovered information that was added to the amended affidavit—*i.e.*, that two girlfriends of defendant Melgen's had met defendant Menendez at defendant Melgen's home in Casa de Campo in the Dominican Republic and that one of them had witnessed him give gifts to defendant Menendez—strengthened the probable cause that already existed.  Ex. 18, ¶¶ 20, 23.  The evidence lawfully discovered during the execution of the health care search warrant itself—such as defendant Menendez's January 4, 2013, check for $58,500

26

purportedly reimbursing defendant Melgen for flights he had taken almost three years earlier, along with other documents related to their relationship—served only to further confirm probable cause, not create it.

Likewise, defendant Melgen's motion turns a blind eye to the substantial evidence—independent of that obtained during the VREC search—establishing probable cause that he was involved in prostitution.  Both the original and amended affidavits described allegations from an anonymous source, "Peter Williams," that defendant Menendez had flown to the Dominican Republic on defendant Melgen's private plane to have sex with minor-aged prostitutes arranged for by defendant Melgen. Ex. 14, ¶¶ 5-14; Ex. 18, ¶¶ 6-15.  "Peter Williams" also provided names of women he claimed were minor and adult prostitutes, as well as an email, letter, and statement of three women who claimed to have had sex with defendant Menendez at defendant Melgen's home in Casa de Campo.  Ex. 14, ¶¶ 6, 10, 11, 13; Ex. 18, ¶¶ 7, 11, 12, 14.

Although "Peter Williams" refused to identify himself or meet with the FBI, and did not provide sufficient information to identify the alleged minor prostitutes—facts disclosed in Agent Sheehy's affidavits, Ex. 14, ¶¶ 7, 14; Ex. 18, ¶¶ 8, 15—the FBI was able to corroborate important details and lend sufficient credibility to the allegations for purposes of probable cause.  For example, the original affidavit notes that the FBI confirmed the following: that (1) "Peter Williams" gave the correct address for defendant Melgen's home in Casa de Campo, Ex. 14, ¶ 5; (2) "Peter Williams" and one of the alleged minors who claimed to have had sex with defendant Menendez at Casa de Campo, M.C., appeared to be two different people based on the locations from which they accessed their email accounts, *id.* ¶ 16; (3) two anonymous women gave video interviews to "The Daily Caller" claiming to have been put in touch with defendant Menendez in the Dominican Republic by defendant Melgen and that defendant Menendez had paid them to have

sex, *id.* ¶ 17; and (4) another woman "Peter Williams" claimed to be a prostitute used by defendant Melgen, Svitlana Buchyk, was someone who had flown on his private jet, stayed at Casa de Campo, driven his car, used him as a contact for a visa, listed his address as her own, and received various wire transfers from him at a bank account in Madrid, Spain, *id.* ¶¶ 19-21.  Furthermore, the original affidavit explains that the FBI had developed witnesses who had seen defendant Melgen surround himself with multiple young women at the same time.  *Id.* ¶¶ 22-23, 26-27.

Moreover, as noted in the amended affidavit, the credence of those allegations was heightened by the FBI's discovery, after the health care search warrant was executed, but independent of evidence obtained from VREC, that defendant Menendez had taken multiple trips to the Dominican Republic during time frames in which one unidentified alleged minor victim specifically claimed to have had sex with him in the Dominican Republic, along with further confirmatory details about Buchyk's relationship with defendant Melgen.  Ex. 18 ¶¶ 17, 20-23. Absent the black notebook about which defendant Melgen devotes so much of his brief, and even absent all the material seized from VREC, there was more than sufficient evidence described in the original and amended affidavits to establish probable cause that defendant Melgen was involved in prostitution.

Defendant Melgen concedes that many of the facts supporting probable cause are "undisputed," suggesting that a lack of dispute over facts somehow renders them irrelevant to probable cause.  Dkt. No. 64-1 at 29-30.  However, there is no doctrine forbidding law enforcement from relying on undisputed facts to corroborate an informant's allegations and establish probable cause.  Nor does the fact that some of the corroborating details were otherwise innocuous, or the fact that defendant Melgen's simultaneous romantic relationships with multiple women were apparently open and notorious, *see id.*, diminish a finding of probable cause.  The Supreme Court

has observed that probable cause does not require "an actual showing of [criminal] activity," and that "[i]n making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of non-criminal acts." *Gates*, 462 U.S. at 243 n.13 (internal quotation marks omitted). Under the circumstances—the existence of serious allegations of underage prostitution—the FBI's ability to corroborate important details of the "Peter Williams" allegations gave rise to probable cause and justified a search warrant. *See id.* at 232 ("[T]he evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.").

There is no support for defendant Melgen's contention that, without the black notebook and other evidence discovered at VREC, the original and amended corruption and prostitution affidavits were "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Sarraga-Solana*, 263 Fed. Appx. at 231.

## IV.   THE FBI DID NOT NEED A NEW WARRANT TO LAWFULLY SEARCH AND SEIZE THE EVIDENCE DEFENDANT MELGEN SEEKS TO SUPPRESS.

Although Agent Sheehy and the FBI took the precaution of obtaining a separate search warrant explicitly authorizing them to search and seize the evidence defendant Melgen seeks to suppress, it could have been lawfully seized under the authority of either the health care fraud warrant or the plain-view doctrine.

### A.   At a Minimum, the Health Care Fraud Warrant Authorized Agents To Seize Defendant Melgen's Notebook and the $58,500 Check.

Most, if not all, of the evidence defendant Melgen seeks to suppress was within the scope of the health care fraud warrant. Defendant Melgen takes issue with two pieces of evidence in particular—his black notebook and the $58,500 check he received from defendant Menendez for

flights he had given defendant Menendez on his private jet nearly three years earlier.  Both of these items could have been seized under the authority of the health care fraud warrant.

Defendant Melgen's notebook is within the scope of the health care fraud warrant.  Among the many categories of documents that Attachment B to the health care fraud warrant authorized agents to seize were the following:

- Any and all personal and payroll record of those employees, agents, independent contractors, or representatives related to, paid by or associated with Dr. Salomon Melgen or [VREC].  Such personnel records may include employment agreements, contracts, correspondence, application, resumes, records of position held, job descriptions, telephone numbers, records of remuneration or wages, and other documents that reflect the names and identifying information of employees, agents, independent contractors, and representatives, from January 2010 to the present; [and]

- Patient sign in sheets, appointment books, patient logs, and medical test or service logs; call logs (regardless of format) or diaries of Dr. Salomon Melgen or [VREC], related to the patients listed on Attachment C[.]

Ex. 1 at 6, ¶¶ 9, 10.  An examination of the black notebook shows that several pages list known independent contractors, agents, or representatives "related to, paid by, or associated with" defendant Melgen or VREC, including Hank Asher, Jean Beauchamp, Larry Duffy, Pedro Pablo Permuy, and Elio Muller, each listed with an associated telephone number, placing the notebook well within the scope of paragraph 9 of Attachment B.  *See* Ex. 5 at 2, 24, 28, 55, 60, 74, 77, 81, 85, 130, 131, 139, 147, 151, 154.  Indeed, defendant Melgen practically concedes that his black notebook was subject to seizure under paragraph 9, admitting that it contains "contact information for many of [his] family, friends, and business associates."  Dkt. No. 64-1 at 2.  Furthermore, because the notebook was discovered in defendant Melgen's office within his ophthalmology practice, agents could reasonably have concluded that the notebook's list of names and telephone numbers constituted "call logs" and "diaries" relating to his patients, fitting it squarely within paragraph 10 of Attachment B.

30

Although this exact reasoning may not have been employed by the agent who discovered and first examined defendant Melgen's notebook, it did not need to be in order to confirm the legality of the seizure.  It would be unreasonable to expect a single searching agent to make these connections on the spot—and neither the Fourth Amendment nor Third Circuit precedent require it.  Notably, defendant Melgen's citation to *Christine* on page 24 of his brief, in which he concedes that agents were authorized to examine documents at VREC "in order to determine whether they are among those papers to be seized," omits the two sentences immediately following that quote, which resolve this point: "But no tenet of the Fourth Amendment prohibits a search merely because it cannot be performed with surgical precision.  Nor does the Fourth Amendment prohibit seizure of an item, such as a single ledger, merely because it happens to contain other information not covered by the terms of the warrant."  687 F.2d at 760.  The health care fraud warrant authorized the notebook to be seized without obtaining a second warrant; that agents, recognizing that the notebook may be more probative of the developing corruption and underage prostitution allegations than the health care fraud investigation, elected to segregate it and obtain a separate warrant to confirm they could seize it, simply demonstrates commendable caution and good faith.

The $58,500 check also falls within the scope of the health care fraud warrant, which authorized the seizure of "[a]ny and all financial records, documents, and materials related to [VREC], including but not limited to . . . copies of checks, check stubs, check registers, . . . canceled checks, . . . and records of transfers of funds . . . ."  Defendant Melgen contends that the fact that the check was written to DRM Med Assist, LLC, renders it irrelevant to VREC and hence not covered by the warrant.  Dkt. No. 64-1 at 19-20.  This argument ignores two key facts: DRM Med Assist, LLC, and VREC are controlled by the same individual—defendant Melgen—and the check was found at VREC itself.  The check is therefore sufficiently related to VREC to have

31

warranted its seizure under the health care fraud warrant.  Nonetheless, just as with defendant Melgen's black notebook, agents took the commendable cautionary step of securing a separate warrant.

Defendant Melgen cites just one case to support his argument that the notebook and $58,500 check were outside the scope of the warrant, *Marron v. United States*, 275 U.S. 192 (1927).  *See* Dkt. No. 64-1 at 20.  Defendant Melgen uses *Marron* to establish the uncontroversial principle that the Fourth Amendment prohibits "the seizure of one thing under a warrant describing another."  *Marron*, 275 U.S. at 196.  As with almost every case cited in defendant Melgen's brief, reading it reveals that it actually supports the constitutionality of the search and seizure here.  In *Marron*, agents obtained a warrant to search a suspected speakeasy for "intoxicating liquors and articles for their manufacture."  *Id.* at 193.  When agents executed the search, the speakeasy was in operation, and they arrested its manager.  *Id.* at 193-94.  Agents also seized a ledger and a number of bills for gas, electric light, water, and telephone service, in addition to intoxicating liquors.  *Id.* at 194.  Because the warrant was explicitly confined to "intoxicating liquors and articles for their manufacture," it did not authorize the seizure of papers such as the ledger and bills.  *Id.* at 198.  Still, the Supreme Court deemed the seizure justified as having been accomplished pursuant to a lawful search incident to arrest, because the papers were within the speakeasy manager's "immediate possession" and were "things by which the [speakeasy] was being maintained" and "closely related to the [unlawful] business."  *Id.* at 199.  Unlike the warrant in *Marron*, the health care fraud warrant was not confined to such discrete items, but rather was sufficiently broad to authorize the seizure of any and all documents bearing some relationship to defendant Melgen and his ophthalmology practice.  Additionally, as in *Marron*, even if the notebook and $58,500 check fall outside the confines of the health care fraud warrant, there are

manifold alternative justifications for their seizure, as already discussed at length above and continued below.

### B.     The Plain-View Doctrine Authorized Agents To Seize Evidence That Appeared Related to Corruption and Prostitution Without a New Warrant.

Even absent a warrant, the seizure of the evidence defendant Melgen seeks to suppress was lawful under the plain-view doctrine, which has three requirements: "First, the officer must not have violated the Fourth Amendment in 'arriving at the place from which the evidence could be plainly viewed.' . . .  Second, the incriminating character of the evidence must be 'immediately apparent.' . . .  Third, the officer must have a 'lawful right of access to the object itself.'" *Menon*, 24 F.3d at 559 (quoting *Horton*, 496 U.S. at 141).

As explained above, the FBI lawfully entered defendant Melgen's ophthalmology practice and examined the evidence he seeks to suppress under the authority of the health care fraud warrant, fulfilling the first and third prongs of the plain-view doctrine.  Furthermore, as also explained above, the agents executing the warrant were sufficiently familiar with the corruption and underage prostitution allegations for the "incriminating character" of documents and photographs they saw in the course of their search at VREC to be "immediately apparent," *see* Ex. 11, fulfilling the second prong of the plain-view doctrine.  Indeed, the incriminating character of the evidence was so apparent that the agents immediately segregated it from evidence related only to health care fraud and swiftly contacted prosecutors for guidance.

Defendant Melgen baldly contends that there was "no basis" for agents to believe that any of the items seized were "immediately apparent" evidence of corruption or prostitution, going so far as to contend that "[t]here was no basis to believe that the items . . . were evidence of a crime." Dkt. No. 64-1 at 20-21.  That argument disregards the context in which the agents were conducting their investigation.  In *Johnston*, discussed at length above, and to which defendant Melgen

erroneously cites to support his claim that the VREC search exceeded the scope of the health care fraud warrant, the First Circuit approved of the seizure of adding machine tapes and loose pages appearing to be drug ledgers because they were plainly visible in the house and, coupled with other evidence found in the house, properly caused the suspicions of the seizing agent to increase and lead to probable cause that they were evidence of a crime.  784 F.2d at 421.  Similarly, here, given the public nature of the allegations—which were reported extensively in the media—and the information the FBI had developed on its own, finding a $58,500 check from a sitting United States Senator, a notebook listing defendant Menendez's name and phone number several times, flight records listing defendant Menendez as a passenger, and a November 2013 email to defendant Menendez calculating the cost of flights he had taken on defendant Melgen's private jet years earlier—all inside the office of a South Florida doctor more than 1,000 miles from New Jersey— reasonably caused agents' suspicions to increase and warranted the seizure of the evidence under the plain-view doctrine.[6]

## V.       THE FBI ACTED REASONABLY, TRANSPARENTLY, AND IN GOOD FAITH.

Holding aside the above analysis demonstrating the precision with which Agent Sheehy and the FBI adhered to the Fourth Amendment, the circumstances of the search warrant display objective good faith and reasonableness—the trademark of Fourth Amendment compliance.

---

[6] It bears noting that each and every one of the items defendant Melgen has moved to suppress are within the scope of grand jury subpoenas served on defendant Melgen and VREC on February 19, 2013, *see* Ex. 26; Ex. 27, and are therefore additionally shielded from exclusion under the inevitable discovery doctrine.  *See United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998) ("[I]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received." (quoting *Nix v. Williams*, 467 U.S. 431 (1984))).  Moreover, immediately after the VREC search was executed, defendant Menendez issued a written public statement asserting that he had reimbursed defendant Melgen for the flights he had enjoyed on defendant Melgen's private plane, ensuring the inevitable discovery of the $58,500 check.  Ex. 28.

Because reasonableness is the prevailing measure of whether official conduct complies with the Fourth Amendment, even in those circumstances where violations do occur, evidence should not be suppressed if law enforcement agents act in objective good faith. The Supreme Court has repeatedly emphasized that the exclusionary rule should be applied only to instances in which its application would plainly deter future police misconduct, not when it would punish scrupulous officers. *See Davis v. United States*, 131 S. Ct. 2419, 2428-29 (2011) (refusing to apply exclusionary rule under circumstances where it "would deter . . . conscientious police work"); *Herring v. United States*, 555 U.S. 135, 136 (2009) ("To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."); *United States v. Leon*, 468 U.S. 897, 919-20 (1984) ("[W]here the officer's conduct is objectively reasonable, excluding the evidence will not further the ends of the exclusionary rule in any appreciable way; for it is painfully apparent that . . . the officer is acting as a reasonable officer would and should act in similar circumstances.") (internal quotation marks omitted).

Heeding these principles, the Third Circuit has observed that "[w]hether to suppress evidence under the exclusionary rule is a separate question from whether the Government has violated an individual's Fourth Amendment rights," and the rule's application must be "limited to those 'unusual cases' in which it may achieve its objective: to appreciably deter governmental violations of the Fourth Amendment." *United States v. Katzin*, 769 F.3d 163, 170 (3d Cir. 2014); *see also Davis*, 131 S. Ct. at 2427 (explaining that the exclusionary rule "exacts a heavy toll on both the judicial system and society at large" and should be applied "only as a 'last resort'" (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006))). "Accordingly, [courts] must determine whether—on the[ ] particular facts—the agents acted with a good faith belief in the lawfulness of

their conduct that was 'objectively reasonable.' . . .   If so, suppression is unwarranted." *Katzin*, 769 F.3d at 182.

The record is replete with evidence that Agent Sheehy and the FBI "acted with a good faith belief in the lawfulness of their conduct that was 'objectively reasonable.'"   *Katzin*, 769 F.3d at 182.   First, upon encountering evidence related to the corruption and underage prostitution investigations, agents took pains to separate it from evidence related to the health care fraud investigation and assure that it was dealt with lawfully.   Agents cannot and should not be expected to ignore potential evidence of criminal conduct—particularly evidence related to developing public allegations as serious as bribery and underage prostitution.

Second, the FBI cannot be said to have acted recklessly or in bad faith when it transparently consulted with defendant Melgen's attorney and acted in accordance with his preference to remove from VREC the evidence he now seeks to suppress, rather than secure it in place pending a new warrant, which would have extended the lawful shuttering of his ophthalmology practice.   *See United States v. Tracey*, 597 F.3d 140, 153 (3d Cir. 2010) (applying good faith exception where, among other things, agents informed the subject of the search that they were looking for child pornography).

Third, when Agent Sheehy sought out the original corruption and prostitution warrant, he went to the same magistrate from whom the health care fraud warrant had been obtained.   His affidavit disclosed the circumstances under which the evidence defendant Melgen seeks to suppress was found, specified the sources of the allegations against the defendants, and provided the magistrate the information necessary to evaluate the reliability of the allegations.   Additionally, Agent Sheehy did not reopen the box containing the evidence until the warrant was approved. Having obtained the warrant under those circumstances, neither Agent Sheehy nor the FBI had

any reason to believe that the search and seizure was unlawful (and in fact it was not unlawful). *See Leon*, 468 U.S. at 922 (noting that "a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search" (internal quotation marks omitted)); *United States v. Loy*, 191 F.3d 360 (3d Cir. 1999) ("[T]he test for whether the good faith exception applies is 'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" (quoting *Leon*, 468 U.S. at 922 n. 23)).

Fourth, upon personally examining the evidence found at VREC and reaching the conclusion that he should correct some of the information in his original affidavit, Agent Sheehy took rapid steps to do so. He was transparent with the magistrate, explaining the reason for submitting an amended affidavit and specifically identifying the corrections. *See* Ex. 18, ¶ 4. The magistrate's re-approval of the warrant under those circumstances confirms Agent Sheehy's and the FBI's good faith and transparency, as well as their objectively reasonable confidence in the lawfulness of their conduct.

Finally, the FBI consulted with federal prosecutors at every turn and followed their legal advice. *See Katzin*, 769 F.3d at 181 (noting that courts may "consider[ ] reliance on government attorneys in [the] good faith calculus").

Far from conforming to the accusations of reckless and malicious conduct flung about in defendant Melgen's motion, Agent Sheehy's and the FBI's conduct was conscientious and exemplary. Knowing that there stood a real possibility that, in the course of searching defendant Melgen's ophthalmology practice, agents might also encounter evidence of corruption or prostitution, the FBI took reasonable cautionary steps consistent with the Fourth Amendment to assure that they could seize that evidence and preserve its availability for use in any future criminal

proceeding.  The FBI's performance, and Agent Sheehy's performance in particular, is a model for how law enforcement agents should approach Fourth Amendment concerns—consulting prosecutors, seeking prophylactic approval from a magistrate to seize apparent evidence of criminal activity, apprising the magistrate of newly learned information, and providing the subject of the search information pertinent to his Fourth Amendment interests.  Paying such simultaneous care and attention to investigating serious allegations and safeguarding the Fourth Amendment should be encouraged, not punished or deterred.  There is no justification for excluding evidence obtained under these circumstances.

## CONCLUSION

Every step that Agent Sheehy and the FBI took in this case was transparent and by the book.  In contrast, defendant Melgen's suppression motion is opaque and misleading.  Rather than divulge that the FBI informed him that it had found evidence at his office for which it intended to obtain a new warrant, disclose that he consented to the FBI removing that evidence from his office pending the new warrant, or acknowledge that he actually tried to give that evidence to the Government, defendant Melgen omitted that information from his motion and resorted to hurling unsubstantiated misconduct accusations at Agent Sheehy and the FBI.  Defendant Melgen's motion is meritless and the related hearings he requests are unwarranted.  The Government respectfully requests that this Court deny Defendant Melgen's suppression (and dismissal) motion without an evidentiary hearing.

Respectfully submitted this 24th day of August, 2015.

RAYMOND HULSER
CHIEF, PUBLIC INTEGRITY SECTION

By:     s/ Peter Koski
        Peter Koski
        Deputy Chief
        J.P. Cooney
        Deputy Chief
        Monique Abrishami
        Trial Attorney
        Public Integrity Section
        1400 New York Ave. NW
        Washington, D.C. 20005
        Telephone:  (202) 514-1412
        Facsimile: (202) 514-3003

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this date, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record for the defendants.

Dated: August 24, 2015                        <u>s/ Peter Koski</u>
                                              Peter Koski
                                              Deputy Chief
                                              J.P. Cooney
                                              Deputy Chief
                                              Monique Abrishami
                                              Trial Attorney
                                              Public Integrity Section
                                              Criminal Division
                                              U.S. Department of Justice