UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 2:15-cr-155 |
| v. | ) | Hon. William H. Walls |
| | ) | |
| ROBERT MENENDEZ and | ) | |
| SALOMON MELGEN, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PURSUANT TO *McDONNELL v. UNITED STATES*

After spending two years unsuccessfully arguing that the Indictment alleges only legislative acts, defendants Robert Menendez and Salomon Melgen now advance the irreconcilable position that the Indictment does not allege any official acts. The defendants' motion is meritless. The *McDonnell* case on which they rely certainly limited the definition of "official act," but it did not limit it so narrowly that it could never be satisfied, as the defendants imply with their analysis. It also did not invalidate, or even weaken, the well-established stream of benefits theory of bribery, as the defendants contend. In fact, the *McDonnell* opinion says nothing at all about the stream of benefits theory of bribery, which was neither part of the question presented nor part of the petition for certiorari.

Defendant Menendez's relentless and aggressive advocacy as a United States Senator on defendant Melgen's behalf, at the highest levels of our federal government, over the course of several years, and on disparate issues ranging from tourist visa applications to litigation over Melgen's multi-million dollar Medicare fraud, demonstrate Menendez's intent to use the power of his public office to affect the outcome of Melgen's specific pending disputes with executive agencies. This conduct easily satisfies *McDonnell*'s narrowed definition of "official act." In fact,

the *McDonnell* opinion uses as examples of official action conduct that defendant Menendez performed in this very case.

As a threshold matter, because satisfying the official act element is a factual question to be resolved by a properly instructed jury, the Indictment's allegations are sufficient to proceed to trial. The defendants' motion is therefore an improper challenge to the sufficiency of the evidence before the Government has had an opportunity to present any evidence. As the Supreme Court concluded in *McDonnell*, "[a] more limited interpretation of the term 'official act' leaves ample room for prosecuting corruption." *McDonnell v. United States*, 136 S. Ct. 2355, 2375 (2016). This case illustrates that point. The defendants' motion should be denied.

## I.      THE *McDONNELL* DECISION

In *McDonnell v. United States*, the Supreme Court clarified the definition of "official act" under the federal bribery statute. The Court observed that the statutory definition of "official act" contains two requirements. First, there must be a question or matter at issue. Second, the public official must have taken action or made a decision on the question or matter at issue. *Id.* at 2368.

For the first requirement, the Government must allege a "'question, matter, cause, suit, proceeding or controversy' that 'may at any time be pending' or 'may by law be brought'" before any public official. *Id.* (quoting 18 U.S.C. § 201(a)(3)). Those terms connote the formality of "a lawsuit before a court, a determination before an agency, or a hearing before a committee." *Id.* at 2369. That is, they refer to "the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete." *Id.* To be pending or potentially brought by law before a public official, a question or matter must be "focused" and "concrete." *Id.*; *see also id.* at 2372 (describing a qualifying matter as "something specific and focused"). Because the federal bribery statute uses the phrase, "which may at any time be pending, or which may by law be brought before

2

*any* public official," 18 U.S.C. § 201(a)(3) (emphasis added), the matter need not be pending before the public official who is performing the official act—i.e., the public official being bribed.  Rather, it can be before another—indeed, *any*—public official.  *Id.*  In other words, the official involved in the bribery scheme need not have control over the outcome of the question or matter—the matter may be pending before "any public official."  *McDonnell*, 136 S. Ct. at 2369.

For the second requirement, the Government must show that the defendant "made a decision" or "took an action" on the particular question or matter.  *Id.* at 2368.  While merely hosting an event, meeting with interested parties, or expressing support for an idea, without more, does not involve making a decision or taking action, more overt advocacy can.  For example, *McDonnell* clarifies that using an official position "to exert pressure on another official to perform an 'official act,' or to advise another official, knowing or intending that such advice will form the basis for an 'official act,'" qualify as "official acts" under the federal bribery statute.  *Id.* at 2372. The official act need not be the ultimate governmental decision, like passing a law.  Rather, "a decision or action to initiate a research study—or a decision or action on a qualifying step, such as narrowing down the list of potential research topics—would qualify as an 'official act.'"  *Id.* at 2370.  Despite this clear holding, the defendants argue precisely the opposite.  *See* Dkt. No. 177-1 (Defs.' Mot. Dismiss) at 20 (asserting, incorrectly, that "*McDonnell* clarifies that 'official act' does not include the various steps that lead to 'a formal exercise of governmental power'").

Whether the public official did or intended to "exert pressure on another official or provide advice, knowing or intending such advice to form the basis for an 'official act,'" is a factual question for a properly instructed jury to decide.  *Id.* at 2371 ("It is up to the jury, under the facts of the case, to determine whether the public official agreed to perform an 'official act' at the time of the alleged *quid pro quo*.").

The Court in *McDonnell* reaffirmed several important principles of bribery law that have particular relevance to this case.  For example, "[t]he agreement need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain."  *Id.* at 2371.  Therefore, "[a] jury could, for example, conclude that an agreement was reached if the evidence shows that the public official received a thing of value knowing that it was given with the expectation that the official would perform an 'official act' in return."  *Id.*  Moreover, the official need not carry through, nor must he even intend to carry through, with the official act.  *Id.* at 2370–71.

Importantly, *McDonnell* does not preclude evidence of non-official acts.  Evidence of meetings, calls, and other actions that do not themselves qualify as official acts nonetheless remain relevant and admissible, and the jury can infer from those acts that the official agreed to perform a qualifying official act.  *Id.* at 2371.  Specifically, the Court clarified:

> Of course, this is not to say that setting up a meeting, hosting an event, or making a phone call is always an innocent act, or is irrelevant, in cases like this one.  If an official sets up a meeting, hosts an event, or makes a phone call on a question or matter that is or could be pending before another official, that could serve as evidence of an agreement to take an official act.  A jury could conclude, for example, that the official was attempting to pressure or advise another official on a pending matter.  And if the official agreed to exert that pressure or give that advice in exchange for a thing of value, that would be illegal.

*Id.*

Defendant Melgen's issues—pending visa applications, enforcement of a disputed contract with a foreign government, halting the donation of scanning equipment to a foreign government, and litigation over his multi-million dollar defrauding of Medicare—are indubitably "questions, matters, causes, suits, proceedings or controversies," and therefore satisfy the first prong of "official act."  Indeed, one matter involved a lawsuit, others involved agency determinations, and defendant Menendez threatened to hold committee hearings if he did not get what he wanted.

These are the types of matters "that can be put on an agenda, tracked for progress, and then checked off as complete."  As alleged in the Indictment and as the evidence will prove at trial, defendant Menendez's advocacy on Melgen's behalf in these matters was relentless and aggressive, exhibiting pressure, providing unsolicited advice, and elevating the issue to the higher rungs of our federal government when he failed to win Melgen's matters at the lower levels.  This activity clearly satisfies the second prong of "official act."

*McDonnell* does not require the completion of an official act, nor even the agreement to perform an official act, since corruptly offering, demanding, or seeking a thing of value with intent to influence an official act is sufficient to violate Section 201(b).  Here, however, the Indictment alleges and the evidence will prove the actual completion of numerous official acts.

## II.  THE STREAM OF BENEFITS THEORY OF BRIBERY IS WELL ESTABLISHED, VALID, AND UNAFFECTED BY *McDONNELL*.

The defendants contend that the *McDonnell* opinion foreclosed the stream of benefits theory of bribery.  Dkt. No. 177-1 at 1–10.  They advance this interpretation of *McDonnell* even though the opinion says nothing about it.  Indeed, *McDonnell* does not contain any references to "stream of benefits"; it also does not contain any references to "retainer theory."  The validity of the stream of benefits theory of bribery was not part of the petition for certiorari in *McDonnell*, *see* Petition for Writ of Certiorari, *McDonnell*, 136 S. Ct. 2355 (No. 15-474), nor was it part of the question presented for which the Court granted certiorari, *see McDonnell v. United States*, 136 S. Ct. 891 (2016).  Therefore, the defendants must contend that the Supreme Court invalidated the well-established stream of benefits theory of bribery without actually saying so.  That is not how the Supreme Court issues its rulings.  *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("This Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*.").

The stream of benefits theory of bribery has long been recognized as a valid theory for prosecuting corruption. It captures the most egregious forms of bribery where, like here, corruption is so pervasive that it involves more than a single gift or an isolated official act, and often lasts for years. Specifically, it refers to a category of corruption where there are many gifts exchanged for many acts.

The Third Circuit has issued an abundance of cases recognizing the validity of the stream of benefits theory of bribery under federal law. *See, e.g.*, *United States v. Ciavarella*, 716 F.3d 705 (3d Cir. 2013) *cert. denied,* 134 S. Ct. 1491, 1492 (2014) ("While the *Skilling* Court confined criminality under 18 U.S.C. § 1346 to schemes involving bribes or kickbacks, the bribery theory does not require that each *quid*, or item of value, be linked to a specific *quo*, or official act. Rather, a bribe may come in the form of a 'stream of benefits.'" (citations omitted) (internal quotation marks omitted) (quoting *United States v. Wright*, 665 F.3d 560, 568 (3d Cir. 2012)); *United States v. Andrews*, 681 F.3d 509 (3d Cir. 2012) (same); *United States v. Mariano*, 316 F. App'x 99, 102 (3d Cir. 2008) (ruling that "a rational trier of fact could have concluded that Mariano accepted the 'stream of benefits' in exchange for the official acts he took"); *United States v. Chartock*, 283 F. App'x 948, 956 (3d Cir. 2008) (upholding jury instructions that read, in part, "[i]f you find beyond a reasonable doubt that a person gave an official a stream of benefits in implicit exchange for one or more official acts, you may conclude that a bribery has occurred") (alteration in original). Addressing the issue in greater detail, the Third Circuit offered the following analysis:

> [T]o prove a *quid pro quo*, the Government is not required to present evidence that attributes each official action to a corrupt payment. It is enough for the Government to present evidence that shows *a course of conduct* of favors and gifts flowing to a public official in exchange for a *pattern of official actions* favorable to the donor. Thus, payments may be made with the intent to retain the official's services on an 'as needed' basis, so that whenever the opportunity presents itself the official will take specific action on the payor's behalf. The evidence of a *quid pro quo* can be implicit, that is, a conviction can occur if the Government shows that the defendant

accepted payments or other consideration with the implied understanding that he
would perform or not perform an act in his official capacity.

*United States v. Bryant*, 655 F.3d 232, 241 (3d Cir. 2011).

The defendants grudgingly acknowledge some, but not all, of these controlling cases, but fail to heed their significance. This controlling authority should end the inquiry into whether the Supreme Court silently invalidated a widely-recognized theory of bribery. *See United States v. Mitlo*, 714 F.2d 294, 298 (3d Cir. 1983) ("[A] decision by this court, not overruled by the Supreme Court[,] is a decision of the court of last resort of this federal judicial circuit and is therefore 'binding on all inferior courts and litigants in the Third Judicial Circuit . . . .'"). District courts should not ignore controlling authority based on what a superior court leaves unaddressed. *In re Bayside Prison Litig.*, 190 F. Supp. 2d 755, 763 (D.N.J. 2002) ("District Courts are bound by *stare decisis* to apply the last statement of their Court of Appeals on an issue until either that Court or the Supreme Court *addresses* the issue.") (emphasis added); *see also Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016) ("[I]t is this Court's prerogative alone to overrule one of its precedents . . . .").

Rather than question the stream of benefits theory of bribery, the Supreme Court has endorsed it. In *Skilling v. United States*, 561 U.S. 358, 412–13 (2010), the Court pointed to just three cases as models from which to draw the contours of bribery under federal law, and all three were stream of benefits bribery cases: *United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007), *United States v. Whitfield*, 590 F.3d 325 (5th Cir. 2009), and *United States v. Kemp*, 500 F.3d 257 (3d Cir. 2007). Notably, the Court pinpoint cited to the portions of those opinions that discussed the stream of benefits theory of bribery. *See Skilling*, 561 U.S. at 413. *Skilling* and those opinions are instructive.

In *Ganim*, the Second Circuit rejected the same narrow definition of bribery proposed by defendants Menendez and Melgen here. 510 F.3d at 145–47 ("[The defendant's] proposal—that

a specific act be identified and directly linked to a benefit at the time the benefit is received—demands too much. . . .  [S]o long as the jury finds that an official accepted gifts in exchange for a promise to perform official acts for the giver, it need not find that the specific act to be performed was identified at the time of the promise, nor need it link each specific benefit to a single official act.").  The Second Circuit recognized the importance of the stream of benefits theory of bribery in capturing egregious and pervasive corruption schemes, like those engaged in by defendants Menendez and Melgen: "To require otherwise could subvert the ends of justice in cases—such as the one before us—involving ongoing schemes."  *Id.* at 147.

In *Whitfield*, the Fifth Circuit observed that "rather than single, lump-sum bribes, this case involved two prolonged bribery schemes spanning nearly four years each."  590 F.3d at 352.  The prolonged and implicit nature of those schemes did not exculpate the defendants under the federal bribery laws:

> Although the district court did not require the Government to prove that Minor and the judges had identified a particular case that would be influenced at the time that Minor guaranteed the loans, the overwhelming weight of authority from this court and our sister circuits supports the conclusion that the law does not require such a showing from the Government.

*Id.* at 353.

And in *Kemp*, the Third Circuit observed that "the *quid pro quo* requirement is satisfied so long as the evidence shows a course of conduct of favors and gifts flowing to a public official *in exchange* for a pattern of official actions favorable to the donor."  500 F.3d at 282 (internal quotation marks omitted).  This "course of conduct" and "pattern" permit a jury to infer a bribe agreement.  The Third Circuit concluded, therefore, that "payments may be made with the intent to retain the official's services on an 'as needed' basis, so that whenever the opportunity presents itself the official will take specific action on the payor's behalf."  *Id.*  The Supreme Court's express

reliance on these three stream of benefits cases undermines the defendants' argument that the Supreme Court implicitly invalidated the stream of benefits theory of bribery.

Confronted with this overwhelming adverse authority, the defendants fruitlessly argue that *McDonnell* foreclosed the stream of benefits theory of bribery because the opinion requires that an official act be "specific and focused," and that an official act be part of the initial offer, solicitation, or agreement. Dkt. No. 177-1 at 2. But this has always been the case. Specifically, a bribe has always required an intent to exchange a thing of value (or things of value) for an official act (or official acts), and that is consistent with the stream of benefits theory of bribery. In their analysis, the defendants seem to confuse a requirement that the official act be "specific and focused" with a requirement that the official act be "identified" at the time a thing of value is offered or solicited. *See* Dkt. No. 177-1 at 2. But no court has held that the nature of the official act must be identified at the time an agreement is made, and the defendants' interpretation contravenes *McDonnell*'s guidance that "the public official need not specify the means that he will use to perform his end of the bargain." *McDonnell*, 136 S. Ct. at 2371.

The defendants also argue that, despite the overwhelming adverse authority described above, *McDonnell* foreclosed the stream of benefits theory of bribery because it applied the stricter nexus requirement of *Evans v. United States*, 504 U.S. 255 (1992), to all bribery cases. Again, their position must be that the Supreme Court expanded *Evans*' reach without actually saying so, because there is no support for the defendants' interpretation in the *McDonnell* opinion. Quite the opposite. In *Evans*, the Supreme Court ruled that where campaign contributions are used as the basis for a bribe, there must be an "explicit *quid pro quo*." 504 U.S. at 258. In their motion, the defendants note that *McDonnell* contains three citations to *Evans*. But the defendants exaggerate the significance of these citations. The Court merely cited *Evans* to establish principles that have

long been settled, not to create any new law. *See, e.g.*, *McDonnell*, 136 S. Ct. at 2370-71 (citing *Evans* for the proposition that "[u]nder this Court's precedents, a public official is not required to actually make a decision or take an action on a 'question, matter, cause, suit, proceeding or controversy'; it is enough that the official agree to do so"); *id.* at 2365 (citing *Evans* to establish that "Hobbs Act extortion [] include[s] taking a bribe") (internal quotation marks omitted). Nowhere in the *McDonnell* opinion does the Court use *Evans* to impose new requirements on bribery cases involving things of value that are not campaign contributions.

The defendants invite this Court to upend the rule of law by overturning a superior court. They also urge this Court to be the first to invalidate the well-established stream of benefits theory of bribery. This Court should decline the defendants' misguided requests.

## III.   THE INDICTMENT ALLEGES AND THE EVIDENCE WILL PROVE THAT DEFENDANT MENENDEZ PERFORMED OFFICIAL ACTS.

In *McDonnell*, the Supreme Court rejected the argument previously advanced by the defendants that official action does not include one public official pressuring or advising another official. This is significant because, in his pre-*McDonnell* pleadings when he thought it would advance his Speech or Debate argument, defendant Menendez repeatedly conceded that he was attempting to influence Executive Branch officials and affect the outcome of specific matters pending before executive agencies. In other words, defendant Menendez eagerly characterized his activities in terms subsequently adopted by the Supreme Court in *McDonnell* to describe the scope and meaning of official action. And, in fact, the Indictment alleges numerous actions that satisfy *McDonnell*'s definition of "official act," and the evidence will establish defendant Menendez's official action at trial.

## A.   *McDonnell* Rejected the Defendants' Interpretation of "Official Act."

Pre-*McDonnell*, the defendants argued that "a Legislator's advocacy to other government officials regarding a matter that is not within the Legislator's control is not an 'official act.'  Dkt. No. 57-1 at 5; *see also* Dkt. No. 57-1 at 10 ("A Senator's advocacy to Executive Branch officials with respect to how those officials decide matters within the Executive Branch simply does not concern any 'official' responsibility the Senator holds as a Member of the Legislative Branch, and the 'question, matter, cause, suit, proceeding or controversy' that are charged were never 'pending' before the Senator and would never come before him in his 'official capacity.'").  In an effort to enervate the federal bribery statute, the defendants also proposed the existence of an inter-branch limitation on "official act."  Dkt. No. 103 at 6 ("The prosecution's claim that an 'official act' includes efforts 'to exert influence' over public officials in other branches is nowhere to be found in Congress' definition."); Dkt. No. 103 at 14 ("Advocacy by a Senator to persuade Executive Branch officials to take 'official acts' is not an 'official act' by the Senator for purposes of the public corruption laws.").  They went so far as to maintain that the federal bribery statute does not criminalize using gifts to influence a Senator to pressure an Executive Branch official.  Dkt. No. 103 at 2 ("Paying someone, even a Senator, to lobby or advocate to Executive Branch officials with respect to 'official acts' in the Executive Branch is no threat to the integrity of those decision-makers, and the bribery laws are not served by restricting who may advocate to them.").  This was never the law.  And the error in the defendants' interpretation was unanimously reaffirmed by the Supreme Court in *McDonnell*.  *See* 136 S. Ct. at 2370 ("A public official may also make a decision or take an action on a 'question, matter, cause, suit, proceeding or controversy' by using his official position to exert pressure on *another* official to perform an 'official act.'").

Nevertheless, the defendants now reassert their erroneous interpretation of the federal bribery statute. For instance, they continue to assert that the Indictment must be dismissed because any official act alleged by the Indictment "would be the official act of someone in the Executive Branch." Dkt. No. 177-1 at 15; Dkt. No. 177-1 at 20 ("Here, the official acts would be granting visas, the State Department encouraging ports to protect port security, and modifying Medicare payment policy – all of which are Executive Branch determinations. As such, none are 'official acts' of Senator Menendez and all charges in the Superseding Indictment based on bribery should be dismissed."). Under the defendants' flawed interpretation of "official act," a Member of Congress can *never* be prosecuted for bribery if he accepts things of value in exchange for pressuring Executive Branch officials. This interpretation contravenes the Supreme Court's unequivocal declaration in *McDonnell* that "official act" encompasses pressuring or advising *another* official.

The defendants' categorical position that "advocacy across branches of government is not an official act," Dkt. No. 177-1 at 17, is akin to their previously asserted position that a Member of Congress can never be prosecuted for bribery, since the federal bribery statute's definition of "official act" is co-extensive with the Speech or Debate Clause's definition of "legislative act," creating the absurd consequence—though personally beneficial to defendant Menendez—that the very conduct Congress criminalized by the federal bribery statute was also immunized by the U.S. Constitution. *See* Dkt. No. 103 at 5-6 ("Because only legislative acts can come before Members of Congress in 'such official's official capacity,' the only type of 'official acts' a Member of Congress can take for purposes of Section 201 are legislative acts."). The defendants' interpretation of "official act" would create an unmappable territory of unprosecutable criminal activity. This interpretation is foreclosed by *McDonnell*. In sum, the defendants' argument that

"[i]n cases where it is a person in one Branch trying to influence a decision by an official in another Branch, it is no longer the public official who received the *quid* who is 'being influenced in the performance of an official act,' as Section 201 requires," Dkt. No. 177-1 at 19, cannot be squared with *McDonnell*'s ruling that "if the official agreed to exert that pressure or give that advice in exchange for a thing of value, that would be illegal," 136 S. Ct. at 2371; *see also id.* at 2369 (matter may be pending or brought before "any public official").

The significance of defendant Menendez's previous attempt to limit the scope of "official act" cannot be overstated: *McDonnell*'s rejection of defendant Menendez's legal theory makes his prior factual concessions fatal to his current claim. As noted below, defendant Menendez's pre-*McDonnell* motions to dismiss the Indictment included numerous concessions that the Indictment here does, in fact, satisfy the definition of "official act" subsequently adopted by the Supreme Court in *McDonnell*. Now that the Supreme Court has issued its opinion rejecting the constrained definition of "official act" proposed by defendant Menendez in his prior pleadings, defendant Menendez is in the uncomfortable position of having to claw back his concessions now that they are fatal to his current request for relief.

**B.      The Defendants have Conceded in their Prior Pleadings that the Acts Described in the Indictment are "Official Acts" Pursuant to *McDonnell*.**

In their pre-*McDonnell* pleadings before this Court and the Third Circuit, the defendants characterized defendant Menendez's activities in terms that satisfy *McDonnell*'s definition of "official act." For instance, the defendants conceded that "to the extent the Indictment alleges any type of 'official acts' by Senator Menendez at all, those 'official acts' all relate to efforts allegedly taken by Senator Menendez to *influence Executive Branch officials in making decisions*." Dkt. No. 57-1 at 12 (emphasis added); *see also* Dkt. No. 99 at 9 (describing defendant Menendez's activities as "advocating or seeking to influence the Executive Branch"). And defendant

Menendez conceded that the decisions he was attempting to influence were official acts of the Executive Branch, thus satisfying *McDonnell*'s first prong. *See* Dkt. No. 103 at 1 ("[T]he only acts charged in the Indictment that would qualify as 'official acts' under Section 201 are the 'official acts' of Executive Branch officials—approving visa applications, clarifying Medicare reimbursement policy, and promoting port security measures."); Dkt. No. 57-1 at 12 ("[T]o the extent the Indictment alleges any type of 'official acts' by Senator Menendez at all, those 'official acts' all relate to efforts allegedly taken by Senator Menendez to influence Executive Branch officials in making decisions that were within the exclusive authority of the Executive Branch, rather than the Senate.").

Moreover, defendant Menendez has acknowledged that his attempts to influence the Executive Branch went beyond simply expressing support for a particular position. When it suited his Speech or Debate argument, defendant Menendez repeatedly described his activities as legislative "oversight" of the Executive Branch.[1] And oversight, defendant Menendez proffered, "inherently involves efforts by Congress to influence—and control—agencies." Appellant Br. 14; *see id.* 16 ("[O]versight [is] a part of the process by which Congress attempts to control the actions of administrators and to serve its own political interest in a complex system.") (citation omitted).

Defendant Menendez also conceded that he exerted pressure on officials in his co-defendant's disputes. He acknowledged that he threatened to call an Assistant Secretary of State to testify at a hearing if there was no solution to Melgen's foreign contract dispute. *See* Dkt. No. 48-1 at 30 ("Senator Menendez stated that if there was no solution soon, 'he would call a hearing to discuss it.'"); Dkt. No. 99 at 20 ("Senator Menendez viewed the situation as quite significant

---

[1] In his opening brief on appeal alone, defendant Menendez used the term oversight more than 50 times. *See* Appellant Br.

and advised the State Department that he wanted to learn of a solution to the problem soon or he would 'call a hearing to discuss it.'"); *id.* at 23 (describing defendant Menendez's actions as "seeking a briefing from the State Department on port security issues and *threatening* to hold oversight hearings if State did not comply with his informal oversight requests." (emphasis added)). And when he was unsuccessful pressuring Executive Branch officials on Melgen's multi-million dollar defrauding of Medicare, defendant Menendez proposed "a hearing before the Senate Finance Committee." Dkt. No. 48-1 at 19. By his own admission, when faced with resistance from the Secretary of HHS, he stated that "he intended to 'go before SFC' (Senate Finance Committee) and raise the issue there." *Id.* at 24. Defendant Menendez clearly recognized that threatening congressional hearings is one of a Member's more powerful tools to exert pressure on Executive Branch officials, and he deployed it accordingly. Indeed, foreclosing any relief for himself under *McDonnell*, defendant Menendez conceded in a pre-*McDonnell* pleading that "[w]ith respect to a U.S. Senator, invoking oversight authority and a threatened use of official powers would be an official act." Dkt. No. 57-1 at 6 n.4.

The *McDonnell* Court unambiguously ruled that advising or exerting pressure on officials to influence their action is an "official act" in itself. 136 S. Ct. at 2372. Defendant Menendez's self-styled attempts to influence, pressure, advise, and control decisions of the Executive Branch easily fit within this definition. *See, e.g.*, Dkt. No. 99 at 23 (describing his actions as "*pressing* HHS") (emphasis added). Therefore, the defendant's own characterization of his conduct satisfies *McDonnell*'s definition of "official act."

### C.    The Indictment Alleges "Official Acts."

As noted above, *McDonnell* does not require the completion of an official act, but here, the Indictment alleges, and the evidence at trial will establish, the completion of many official acts.

Throughout the defendants' years-long bribery scheme, defendant Menendez did not merely express support and gather information on behalf of defendant Melgen.  Rather, he exerted pressure and provided unsolicited advice in an effort to affect the outcome of his co-defendant's specific pending disputes with executive agencies.  The defendants complain in their motion that the Indictment alleges too many official acts.  *See* Dkt. No. 177-1 at 13.  The reason the Indictment alleges so many official acts, however, is because defendant Menendez went to such extraordinary lengths on his co-defendant's behalf.  The number of official acts included in the Indictment is a reflection of the broad scope of the defendants' conspiracy and defendant Menendez's dogged advocacy in pursuit of his co-defendant's interests.

This inquiry, however, is one for the jury to perform after the presentation of evidence at trial.  136 S. Ct. at 2371 ("It is up to the jury, under the facts of the case, to determine whether the public official agreed to perform an 'official act' at the time of the alleged *quid pro quo*.").  This Court emphasized the importance of this principle at the last status conference, when it advised the defendants that "[t]he significance of *MacDonald* [sic] remains to be determined factually." Apr. 21, 2017, Tr. at 66; *see also id.* ("So based upon my reading of that case, and comments—commentaries on that case, it seems to me premature for you to be filing motions without the production of evidence for me to consider.").  Therefore, the defendants' motion is procedurally defective.

Putting aside for the moment the defendants' procedural deficiency, that it was "official acts" defendant Menendez traded for things of value is no more clear than in his threats to hold hearings.  The *McDonnell* Court used a legislative hearing as an example of an "official act," 136 S. Ct. at 2372, and that is precisely what defendant Menendez threatened here.  Specifically, he threatened to hold hearings in his advocacy on behalf of his co-defendant's multi-million dollar

defrauding of Medicare and in his advocacy on behalf of his co-defendant's multi-million dollar foreign contract dispute.  His threats to hold hearings are alone sufficient to defeat the defendants' motion.

Likewise, in his advocacy on behalf of the student and tourist visa applications of Melgen's girlfriends, defendant Menendez did not merely send a generalized letter of support.  Rather, he "advocate[d] unconditionally for Dr. Melgen."  Superseding Indict. at ¶ 72.  He also called a U.S. Ambassador to reverse a decision rejecting the visa applications of Melgen's girlfriend and her sister.  Calling to force a reconsideration is not merely generalized support, but rather an example of the defendant exerting his influence to impact an official action of the State Department.  In fact, defendant Menendez's own staff recognized the "official act" nature of this conduct, when his Senior Policy Advisor wrote, "2 people from the DR who wanted visas to visit Dr. Melgem [sic] GOT THEM.  In my view, this is ONLY DUE to the fact that RM intervened.  I've told RM."  Superseding Indict. at ¶ 104.  As this Court observed, "a Senator's non-legislative advocacy can influence the actions and decisions of Executive Branch officials."  Dkt. No. 129 at 5.  The email sent by the defendant's Senior Policy Advisor demonstrates that Menendez's pressure had exactly that effect here.

Defendant Menendez's efforts to dictate the outcome of Melgen's litigation regarding his multi-million dollar defrauding of Medicare is rich with examples of official acts.  For example, when he could not secure a commitment to reverse CMS's $8.9 million overpayment determination against defendant Melgen during his July 2, 2012, phone call with the Acting Administrator of CMS, defendant Menendez warned that he would elevate the issue to her boss— the Secretary of HHS.  Superseding Indict. at ¶ 202.  When he followed through with his threat and met with the Secretary of HHS, defendant Menendez "advocated on behalf of Melgen's

position in his Medicare billing dispute, focusing on Melgen's specific case and asserting that Melgen was being treated unfairly." Superseding Indict. at ¶ 214. Particularly pertinent to the official act analysis, "[t]he Secretary of HHS [] informed Menendez that because Melgen's case was in the administrative appeals process, she had no power to influence it." Superseding Indict. at ¶ 214. The allegations make clear that defendant Menendez's advocacy was more involved than just setting up a meeting to talk about a pending matter before the Secretary. He specifically scheduled this meeting in an attempt to influence the Secretary, by providing her with unsolicited advice and exerting pressure to resolve his co-defendant's specific pending dispute with Medicare. As the Indictment alleges, one of the ways he created pressure for the Secretary of HHS was by leveraging the power of the Senate Majority Leader. Superseding Indict. at ¶¶ 191-94, 207-08 & 211.

Defendant Menendez did not simply shrug his shoulders after he "did [his] best on this" or any other action. Dkt. No. 177-1 at 16. When it came to defendant Melgen, he was relentless and aggressive in his advocacy. This relentless advocacy satisfies *McDonnell*'s definition of official act. *See United States v. Fattah*, 223 F. Supp. 3d 336, 367 (E.D. Pa. 2016) (ruling, post-*McDonnell*, that Congressman's conduct was an official act in part because "[h]is conduct on behalf of [co-defendant] was unrelenting").

In the face of the Indictment's straightforward allegations of "official acts," the defendants make several meritless claims in an attempt to secure the Indictment's dismissal. First, they complain that the official acts alleged are routine parts of the political process. *See* Dkt. No. 177-1 at 19. But the official act need not be something that is itself unlawful. *See McDonnell*, 136 S. Ct. at 2370–72. And, as demonstrated above and below, there was nothing routine about defendant Menendez's advocacy for his co-defendant's personal and financial interests.

18

The defendants next rely on the recent Second Circuit reversal of Sheldon Silver's bribery convictions in an effort to get the Indictment dismissed.  *See* Dkt. No. 177-1 at 17.  Their reliance is misplaced.  *Silver* is easily and immediately distinguishable, as it was a pre-*McDonnell* trial. Therefore, it did not have the benefit of the Supreme Court's guidance on official action to incorporate into the jury instructions.  This case will not have that problem.

Finally, the defendants are disingenuous to frame Melgen's dispute with CMS as limited to "policy issues with Medicare paying for wasted medicine and inefficiency."  Dkt. No. 177-1 at 25.  Defendant Melgen was recently convicted of 67 counts of Medicare fraud.  In response, defendant Menendez publicly proclaimed, "That case has nothing to do with my case."  Alex Napoliello & Jonathan D. Salant, *Menendez says Megen conviction has no impact on his trial on corruption charges*, NJ.com (May 1, 2017, 4:11 PM), http://www.nj.com/politics/index.ssf/2017/05/menendez_says_melgen_conviction_has_no_impa ct_on_h.html.  A simple comparison of the Indictment here with the indictment charging Melgen with Medicare fraud in the Southern District of Florida illustrates the falsity of Menendez's public statement and confirms the connection between the two cases and thus the centrality of defendant Melgen's fraud to defendant Menendez's advocacy.

Here, defendant Menendez is alleged to have advocated to the highest levels of CMS and HHS on behalf of defendant Melgen in his $8.9 million fight with Medicare over his fraudulent overbilling of the drug Lucentis.  *See* Superseding Indict. at ¶¶ 143-45, 154-56, 161, 163, 165 & 209.  With respect to his fraudulent overbilling of Lucentis, the Southern District of Florida indictment describes Melgen's scheme as follows:

> The defendant would further cause the submission of false claims for the purchase of Lucentis that substantially exceeded his actual cost, in that the defendant would cause "single-use" vials of Lucentis to be split into as many as four doses.  These split vials would then be administered to multiple patients, in contravention of the

> First Coast LCD on Lucentis, and separately billed to Medicare and other health care providers at the full reimbursement rate for each, resulting in exorbitant and improper profits.

Indict. at ¶ 48, *United States v. Melgen*, No. 15-cr-80049-KAM (S.D. Fla Apr. 14, 2015).

Similarly, the Indictment here describes Melgen's fraudulent overbilling matter regarding Lucentis as follows:

> Melgen sought and obtained reimbursement from CMS for the full cost of a single vial of Lucentis for each dose he administered, even though he had not incurred the expense of purchasing a new vial for each dose. In other words, Melgen billed CMS for multiple vials of Lucentis that he never actually used and for which he never incurred any cost.

Superseding Indict. at ¶ 143. Melgen's Medicare fraud indictment includes 16 counts predicated on, among other things, his Lucentis overbilling scheme: Counts 2, 3, 7, 10, 18, 20, 26, 29, 33, 35, 36, 37, 42, 43, 44 & 46.[2]

The Indictment in this case reflects that Melgen's financial dispute with CMS—in which Menendez is alleged to have repeatedly intervened—arose when "the ZPIC formally notified Melgen that it had conducted a post-payment review of claims and concluded that Medicare had overpaid Melgen on claims he submitted, through VRC, for Lucentis. The ZPIC informed Melgen that it had preliminarily determined that his practice owed approximately $8,981,514.42." Superseding Indict. at ¶ 154.

The Melgen indictment includes a substantive count of Medicare fraud predicated on defendant Melgen's Lucentis overbilling scheme from an August 16, 2012, date of service. Indict. at 27 (Count 20), *United States v. Melgen*, No. 15-cr-80049-KAM (S.D. Fla Apr. 14, 2015). This was only two weeks after defendant Menendez's August 2, 2012, meeting with the Secretary of

---

[2] The Melgen indictment explains that Lucentis is identified in the Medicare billing system as "Ranibizumab injection." Indict. at ¶ 9, *United States v. Melgen*, No. 15-cr-80049-KAM (S.D. Fla Apr. 14, 2015).

HHS.  The relevance of defendant Melgen's Medicare fraud convictions to the official act inquiry is that it demonstrates the importance of this matter to defendant Melgen, and his expectation that defendant Menendez was going to be successful in making this issue—which ultimately will result in a lengthy prison sentence for defendant Melgen—go away.  Thus, defendant Melgen's 67 convictions for Medicare fraud establish that when defendant Menendez was demanding audiences with the CMS Administrator and the Secretary of HHS, he was helping his co-defendant escape the consequences of his Medicare fraud, while being bribed with the fruits of that fraudulent activity.  Therefore, defendant Menendez's activities were not just official acts, they were official acts protecting his co-defendant's criminal activity.

### D.  The "Official Acts" Section of the Indictment is Consistent with *McDonnell*.

Finally, the defendants complain that not every paragraph within the "official acts" section of the Indictment qualifies as an "official act," since some paragraphs make no mention of defendant Menendez and "[t]he majority of the paragraphs describe actions by Senator Menendez's staffers, not Senator Menendez."  Dkt. No. 177-1 at 22.  As a preliminary matter, the evidence will establish that the staffers' official acts were performed at defendant Menendez's direction.  Moreover, of course not every paragraph in this section is an official act, just like not every paragraph in the "things of value" section describes a "thing of value."  *See, e.g.*, Superseding Indict. at ¶¶ 29-33.  But the Indictment's organizational structure provides context for the official acts that are alleged, just like each paragraph within the "things of value" section provides context for the things of value that are alleged.  And, as noted above, *McDonnell* does not preclude the admission or allegation of non-official acts.  To the contrary, the opinion notes that evidence of non-official acts "could serve as evidence of an agreement to take an official act."  *McDonnell*, 136 S. Ct. at 2371.  And, ultimately, whether an act is an official act—even if it is

alleged in the "official acts" section of the Indictment—is a factual inquiry that must go before a properly instructed jury.  *Id.*

**CONCLUSION**

The defendants' expansive interpretation of the *McDonnell* opinion would decriminalize corruption, legitimize pay-to-play politics, and create a blueprint for immunizing criminal activity on Capitol Hill.  It would permit, for example, Members of Congress to put a link to a PayPal account on their website and demand payment in exchange for exerting pressure on Executive Branch officials regarding specific pending disputes.  The defendants' interpretation of *McDonnell* is unsupported by the plain language of the unanimous opinion, and frequently contravenes its controlling principles.  As this Court recently remarked, "it is time to try this case."  Apr. 21, 2017, Tr. at 52.

Accordingly, the Government respectfully requests that this Court deny the defendants' motion to dismiss.

Respectfully submitted this 27th day of July, 2017.

> ANNALOU TIROL
> ACTING CHIEF
> PUBLIC INTEGRITY SECTION
>
> By:    s/ Peter Koski
>        Peter Koski
>        Deputy Chief
>        J.P. Cooney
>        Deputy Chief
>        Monique Abrishami
>        Trial Attorney
>        Amanda Vaughn
>        Trial Attorney
>        Public Integrity Section
>        1400 New York Ave. NW
>        Washington, D.C. 20005
>        Telephone:  (202) 514-1412
>        Facsimile:  (202) 514-3003

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this date, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record for the defendants.

Dated: July 27, 2017

<u>s/ Peter Koski</u>
Peter Koski
Deputy Chief
Public Integrity Section
Criminal Division
U.S. Department of Justice