## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | **No. 2:15-cr-155** |
| **v.** ) | **Hon. William H. Walls** |
| ) | |
| **ROBERT MENENDEZ and** ) | |
| **SALOMON MELGEN,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

## <u>UNITED STATES' TRIAL BRIEF</u>

In November 2012, the relationship between Robert Menendez, a United States Senator from New Jersey, and Salomon Melgen, a wealthy ophthalmologist from South Florida, came under unwelcome public scrutiny. The press revealed for the first time that Menendez had flown free of charge multiple times in 2010 on Melgen's private jet—a fact that Menendez had omitted from the annual financial disclosure form he is required to file. Once exposed, on January 4, 2013, Menendez wrote a $58,500 check to Melgen to cover two roundtrip flights, more than two years after Menendez took them in 2010.

A few weeks later, when the FBI executed a search warrant at Melgen's offices on January 30, 2013, Menendez swiftly issued a statement: "Senator Menendez has traveled on Dr. Melgen's plane on three occasions, all of which have been paid for and reported appropriately." That was a lie. The truth is that Menendez and his personal guests had enjoyed more than a dozen flights on Melgen's private jet, dating back at least as far as 2006—not a single one of which Menendez had paid for or reported on his annual financial disclosure forms. Menendez persisted in the obfuscation just a few days later, telling CNN on February 4 that the reason he wrote the $58,500 check to Melgen over two years after the flights was that the payment "fell through the cracks."

A month later, Melgen repeated the "three occasions" lie in an interview appearing in an online newspaper owned by Melgen.

What both defendants' false public statements sought to hide was that the $58,500 check did not cover all of the private flights that Menendez accepted from Melgen—it covered just the two personal trips that the defendants believed the public knew or would find out about.  But Menendez's and Melgen's lies to the public were aimed at covering up more than just flights.  They were aimed at hiding a corrupt pact spanning seven years, in which Melgen showered many more things of value on the New Jersey Senator than just flights on a private jet, and Menendez reciprocated with official action advancing the South Florida eye doctor's personal whims and business interests.

As described below, the evidence at trial will prove the defendants' bribery scheme beyond a reasonable doubt.  In an effort to save time at trial, this memorandum is intended to provide a guide for the Court regarding the evidence the Government will offer and to preview several legal issues that may arise.

## I.     THE GOVERNMENT'S PROOF OF THE DEFENDANTS' BRIBERY SCHEME

The Government's evidence at trial will demonstrate that, over time, the defendants' bribery scheme grew in magnitude and breadth.  The jury will hear testimony from a variety of individuals who witnessed the scheme unfold, including guests and pilots who were present for the lavish vacations Melgen furnished for Menendez, public officials that Menendez pressured on Melgen's behalf, and Menendez staffers who helped carry out Menendez's advocacy.  In addition, the jury will see evidence of the defendants' corrupt bargain in scores of contemporaneous communications between the defendants, their agents, and the officials they endeavored to influence, as well as records spanning everything from flight manifests and hotel bills to credit

card statements and Federal Election Commission (FEC) filings.  Together, this testimony and these documents will expose the defendants' corruption.

### A. Melgen provided a stream of benefits to Menendez, and Menendez engaged in a scheme to conceal it.

The defendants' bribery scheme began shortly after Menendez's elevation to the Senate in 2006, when Melgen began a pattern of treating Menendez to weekend and week-long getaways in the Dominican Republic that would continue for the next several years.  For the first four years of the corruption scheme, the all-expense paid trips Melgen provided often included free roundtrip flights on Melgen's private jet for Menendez and his various guests.  When the doctor's private jet was unavailable, Melgen supplied equally luxurious travel for the Senator.  Melgen once secured the private jet of a business associate to fly Menendez, himself, and others one-way from the Dominican Republic to Fort Lauderdale at a cost of $20,000.  On another occasion, he purchased a first-class ticket for Menendez to fly from New Jersey to West Palm Beach and an $8,000 chartered jet for his return.  The vacations typically included lodging at Melgen's villa at Casa de Campo, a cloistered resort on the southeastern coast of the Dominican Republic with renowned golf courses, a spa, polo fields, a marina, restaurants, and other amenities.  The tranquil Caribbean enclave, venerated for its seclusion, is frequently visited by luminaries in sports, entertainment, and business, including Beyonce, Jay-Z, Jennifer Lopez, Richard Branson, and Bill Gates. Moreover, on at least one occasion, Melgen arranged for Menendez and his girlfriend to stay in Punta Cana, an exclusive oceanside resort town on the easternmost tip of the Dominican Republic. At trial, the jury will hear about Menendez's luxurious Dominican travel through witness testimony from those who were there, and they will see Melgen's resources placed at Menendez's disposal for these trips in, among other things, contemporaneous emails, resort records, flight records, and credit card and bank statements.

But the vacations Melgen provided Menendez were not constrained by Melgen's ties to the Dominican Republic.  Nor were they provided only at Melgen's overture.  Email exchanges between the defendants and their agents will establish that Melgen also supplied them on Menendez's demand.  On March 24, 2010, the Senator sent his patron an email informing him that he wanted either a Park Suite King or Park Deluxe King room at the Park Hyatt Hotel in Paris, France, for a three-night stay in April.  The hotel is one of Europe's most elite, routinely hosting celebrities from the world over, including the likes of George Clooney and Maria Sharapova.  In his email, Menendez specified that the rooms featured a "king bed, work area with internet, limestone bath with soaking tub and enclosed rain shower, views of courtyard or streets," and he instructed Melgen: "You call American Express Rewards and they will book it for you.  It would need to be in my name."  Within a day, Melgen complied, bettering the Senator's request by booking him an even more expensive Park Executive Suite, which hotel and credit card records will show retailed for over $1,500 per night.[1]  Moreover, testimony and records from American Express will establish that the 650,000 rewards points Melgen used to book the room far out-stripped Menendez's own points-earning ability.

---

[1] Like the dollar value of the stay, evidence of the hotel's luxury presented through photographs and testimony—and similar evidence of the jets on which Melgen allowed Menendez to fly and the amenities Melgen provided to Menendez at Casa de Campo or Tortuga Bay—provide evidence of the value of the bribes Melgen paid to Menendez.  Just like the details of the official acts Melgen paid Menendez to perform, details of the bribes' value are highly probative of the defendants' corrupt intent.  These details demonstrate Menendez's willingness to be influenced in his official action, as well as Melgen's intent to exert that influence, keep Menendez on retainer, and obtain official action as needed.  The luxury Melgen afforded Menendez is all the more probative of intent in this case, where, as discussed more below, the defense claims that the motivation for Melgen's gifts and Menendez's acceptance of them was friendship, not corruption; the lavishness of the gifts Melgen provided to Menendez is evidence that Menendez accepted them, at least in part, to be influenced in his official action.

Menendez enjoyed these flights and vacations free of charge.  But, in a scheme to hide the trips from public view and keep the corrupt pact secret, Menendez mentioned nothing of the gifts on his annual financial disclosure forms.  At trial, the Government will offer those forms as evidence, demonstrating the Senator's indisputable obligation to report the flights, Paris vacation, and other reportable gifts he accepted from Melgen, and his willful decision to omit them.

### B. Menendez took several opportunities to perform official acts for Melgen in exchange for the stream of benefits Melgen supplied.

Although Menendez did not pay Melgen back for the lavish gifts in money, he did pay him back using the currency of his Senate office to take official action to benefit the South Florida doctor.  Email exchanges between the defendants, their agents, and officials from Executive Branch agencies will show Menendez's considerable efforts to pressure the Executive Branch on Melgen's behalf.  And testimony from the agency officials over whom he exerted that pressure will illuminate the relentlessness of those efforts.

Menendez's first opportunity to repay Melgen arose when Melgen wanted to bring his foreign girlfriends to the United States to visit him.  The women—from Brazil, the Dominican Republic, and Ukraine—all needed visas to enter the United States.  Between trips to Melgen's Caribbean villa, as witness testimony, internal emails, and State Department records chronicling the visa application process will show, the New Jersey Senator helped them obtain those visas.  Menendez's most fervent efforts on behalf of Melgen's girlfriends came after Melgen's Dominican girlfriend and her sister were initially denied visas because the interviewing agent was "[n]ot fully convinced of motives for travel."  When Melgen alerted Menendez, Menendez told one of his Senate staffers he wanted to "[c]all Ambassador asap."  A month later, at the Ambassador's request, as documented in a consular record, Melgen's girlfriend and her sister were re-interviewed by a different official, who reversed the decision to deny the visas.  Upon hearing of the reversal,

Menendez's staffer emailed Menendez's chief of staff: "In my view, this is ONLY DUE to the fact that RM intervened."

Menendez took other opportunities to repay Melgen through official action when Melgen found himself in the middle of two multimillion dollar disputes. One of those disputes arose from Melgen's purchase of a cargo screening contract in the Dominican Republic despite its performance being indefinitely halted after it was wrapped up in litigation for years. But perhaps even more important to Melgen, and thus to Menendez, was a multimillion dollar dispute the doctor had with Medicare over his billing practices for the drug Lucentis.

Melgen's fortune was anchored by his South Florida ophthalmology practice, and a substantial portion of that practice involved treating Medicare-eligible patients for macular degeneration, an eye disease treated with the drug Lucentis. His lucrative practice was threatened in 2009, when a post-payment review of his Lucentis claims by the Centers for Medicare and Medicaid Services (CMS) revealed that he had billed Medicare for millions of dollars' worth of the drug that he never actually bought, leading to a formal demand that he repay Medicare $8.9 million in overbillings for the years 2007 and 2008. That is when Melgen called upon Menendez, as one staffer memorialized in an email, to "weigh in with CMS."

Lucentis is an injectable preservative-free solution that is stored in single-use vials. The label approved by the Food and Drug Administration (FDA) specifies: "Each vial should only be used for the treatment of a single eye. If the contralateral eye requires treatment, a new vial should be used." Each single-dose vial, which costs approximately $2,000, is deliberately packaged with more Lucentis than is actually needed for a single dose in case any is spilled while preparing to administer the drug; this "overfill" ensures that there will be a sufficient amount for the dose. Any overfill that remains after administration should be discarded. The Centers for Disease Control

and Prevention (CDC) warns that using a single-dose vial to treat multiple patients risks infection. Medicare reimbursement policy reflects the one-vial, one-eye administration of Lucentis by allowing for full reimbursement of a single vial, despite the overfill lost after the single dose from that vial is administered.

Testimony from CMS officials, Menendez staffers, and others, along with internal records, correspondence, and Melgen's own admissions, will demonstrate that, from at least 2007 through 2012, Melgen disregarded the FDA label, defied the CDC's warning, and exploited Medicare's billing procedures. Under Melgen's direction, his ophthalmology practice, Vitreo-Retinal Consultants (VRC), routinely extracted and harvested overfill from single-dose Lucentis vials, used the overfill to treat multiple patients, and billed Medicare for a full vial each time the drug was administered. Because VRC managed to extract multiple doses of Lucentis per vial, but billed Medicare for a full vial for each dose, Melgen was paid millions by Medicare for vials he never bought.[2]

Witness testimony, contemporaneous emails, and internal memoranda will also establish that, shortly after Melgen was caught for this fraudulent practice and served with the $8.9 million repayment demand in 2009, Menendez arranged for a call with CMS's Director of the Center for Medicare to advocate on Melgen's behalf. During the call, on July 17, 2009, in what the

---

[2] Because Melgen's overbilling dispute with CMS is central to the bribery charges and critical to establishing the defendants' motives and intent, the Government will introduce concise and clear evidence to establish the nature of Melgen's overbilling and ensuing dispute. The probative value of Melgen's billing practices is not somehow diminished by his recent guilty verdict in the Southern District of Florida, which need not come into evidence for the Government to establish the gravamen of his dispute with CMS. In fact, unless the defense opens the door—as it certainly could—or if one of the defendants takes the stand, the Government does not intend to admit the fact of the conviction itself, but rather intends to limit its evidence to the fact that Melgen multi-dosed Lucentis, billed for vials he never bought, and persisted in that practice throughout the course of the corruption scheme—and Senator Menendez knew about it.

Government anticipates a participant will describe as a "prosecutal" tone, Menendez personally argued that CMS's reimbursement policy was confusing and pressed the agency to approve Melgen's bills. The "confusing" policy to which Menendez referred was the straightforward expectation that Medicare not be billed for medicine a doctor neither bought nor used. The Director did not budge, informing the Senator that Melgen had due process and appellate rights he could pursue through CMS's administrative appeals process. Menendez replied that he did not want to be told about the doctor's appellate rights and hung up. A few weeks later, Menendez emailed his chief of staff: "Dr. Melgen is still in the nonlitigant stage, so we should determine who has the best juice at CMS and Dept of Health."

As will be displayed to the jury in emails written as events unfolded, along with the testimony of several witnesses, Menendez persisted in trying to help Melgen keep his $8.9 million over the next three years, deploying the power of his office to perform a series of official acts aimed at reversing CMS's decision. He painstakingly elevated his advocacy until, in 2012, as described more below, he directly pressed CMS's highest ranking official and arranged for the Secretary of Health and Human Services (HHS) to be hailed to the U.S. Capitol office of the Senate Majority Leader, where he personally pressured her to intervene in the billing dispute.

### C. Melgen provided campaign contributions in return for Menendez's exercise of specifically requested official action.

The Government's evidence will show that, eventually, Melgen's bribes to Menendez grew to include more than just private flights and luxury vacations, and Menendez's official acts moved beyond merely advancing Melgen's personal interests and placing phone calls to Executive Branch officials. The Government will offer emails, checks, mail receipts, a ledger, FEC records, and testimony from fundraising personnel showing that, in just a five month-period spanning May to October 2012, Melgen gave $771,500 to Menendez's legal defense fund and assorted campaign

committees fueling the New Jersey Senator's reelection bid, and did so in a manner that obscured the relationship between benefactor and beneficiary.  In return, as emails, memoranda, and witness testimony will show, Menendez performed his most aggressive and pointed advocacy, including personally meeting with and pressuring a Cabinet Secretary and an Assistant Secretary of State, to advance financial interests that implicated tens of millions of dollars in profit for the Florida doctor.

For example, in early 2012, Melgen acquired full control of a Dominican company, ICCSI, SA, which had a contract giving it the exclusive right to install and operate X-ray imaging equipment in the Dominican Republic's ports for up to 20 years.  Melgen projected the contract's worth to be up to $115 million.  But, since before Melgen's acquisition, performance of the contract had been tied up in litigation between the Government of the Dominican Republic and ICSSI.  To reap any reward, Melgen had to resolve the long-standing dispute.  One State Department official observed that Melgen—a Florida eye doctor with no apparent container screening experience or expertise—simply purchased a lawsuit.  In fact, the Government will introduce correspondence indicating that Melgen was willing to accept, and was actually seeking, a financial settlement to walk away.

At trial, emails and the testimony of State Department officials will establish that Menendez and his staff exerted substantial pressure on the State Department to intervene with the Dominican Government to resolve the contract dispute in Melgen's favor.  But simultaneous correspondence between the defendants' agents, along with financial records, will establish that, in order for Menendez to use his office in this way, Menendez demanded $60,000 in campaign and legal defense fund contributions—and Melgen complied.

On May 10, 2012, Menendez's office began arranging a meeting with an Assistant Secretary of State so that Menendez could question him about Melgen's multimillion dollar

contract.  The same day, after months of putting off requests from Menendez's fundraisers and chief of staff for large campaign contributions, Melgen finally agreed to give $60,000 to entities supporting Menendez.  Six days later, on May 16, Menendez met with the Assistant Secretary of State.  That same day, Melgen satisfied the contribution commitment he had made, orchestrating a series of payments to support Menendez exactly as Menendez's chief of staff had bade in an email to Melgen's personal assistant:

> Four family members contribute $10,000 each to "New Jersey Democratic State Committee Victory Federal Account."

> Two family members contribute $10,000 each to "The Fund to Uphold the Constitution." [3]

> It would be great if the contributions could be sent via Fedex to my home address and I'll distribute them once I receive them.

Just as instructed, Melgen and his wife wrote a $20,000 check to Menendez's legal defense fund, The Fund to Uphold the Constitution.  Next, they wrote a separate $20,000 check to the New Jersey Democratic State Committee Victory Federal Account.  On the memo line of the check the words "MFS Contribution" were written and subsequently crossed out.  "MFS" are the initials of "Menendez for Senate," the name of Menendez's Senate campaign committee to which Melgen already had contributed the maximum allowed under federal law.  Finally, Melgen's daughter and her husband also wrote a $20,000 check to the New Jersey Democratic State Committee.  Like the check written by Melgen and his wife, the memo line bore the crossed-out words, "(MFS) Menendez Contribution."  Bank records will reveal to the jury that Melgen simultaneously reimbursed the couple with a $20,000 check from his ophthalmology practice, VRC, leaving no question about who the benefactor really was.  And emails will show that Melgen had the checks,

---

[3] Applicable federal giving limits prevented Melgen from making the $60,000 in demanded contributions solely in his name.

all three of which were dated May 16, sent by Federal Express to the home of Menendez's chief of staff—exactly as directed.

Meanwhile, at the meeting, Menendez pressed the Assistant Secretary on the State Department's lack of initiative to convince the Dominican Republic to resolve Melgen's contract dispute.  After the meeting, the Assistant Secretary sent an email to his staff instructing them to explore a port initiative and "see if it could leverage a correct GODR decision on the port contract," cautioning: "[Menendez] said he wanted to hear of a solution by July 1.  If not, he would call a hearing to discuss it."  Emails and testimony will show that the Assistant Secretary and his staff subsequently explored ways to appease the Senator, including tacitly broaching the subject of the contract dispute in a meeting with the Dominican Republic's president.

The Government's evidence will show that the $60,000 to buy pressure on an Assistant Secretary of State was just the start to the large contributions Melgen would write for the New Jersey Senator in 2012.  By the summer of that year, Melgen's problem with CMS's finding that he owed Medicare $8.9 million was worsening, as he had lost at multiple levels of the administrative appeals process and his case sat languishing.  What is more, even after he received the first demand letter, Melgen had continued to overbill for Lucentis, subjecting him to millions more in potential repayment demands.  Melgen therefore needed to intensify his efforts for a political solution.  And he used campaign contributions to try to buy it through Menendez.

Emails, internal memoranda, and witness testimony will establish that on June 1, 2012, Melgen joined Menendez in New Jersey at the annual Pegasus Dinner, a Menendez fundraiser, where he delivered to a long-time Menendez confidante a $300,000 VRC check made payable to Majority PAC.  Majority PAC was a "Super PAC" supporting Democratic Senate candidates nationwide, but Melgen earmarked his check specifically for New Jersey.  And just as Menendez's

omissions on his financial disclosure forms left no public trace of the South Florida doctor, passing the contribution through Majority PAC—which was not required to disclose Menendez's name or the New Jersey earmark on its public FEC filing—left no trace of the New Jersey Senator.  What is more, by issuing the check from VRC, Melgen assured that only a person familiar with his ophthalmology practice could readily discern its source.[4]  At trial, the Government will introduce internal PAC records and fundraiser testimony showing the clear earmarking for New Jersey, which can be compared with the public FEC records that show no such designation for the contributions.

The same day that Melgen's $300,000 check arrived at Majority PAC, June 7, 2012, Menendez met with the Acting Administrator of CMS—its highest-ranking official—and pressed for CMS to change the reimbursement policy leading to the $8.9 million repayment demand.  Emails and mail receipts will establish that Melgen's $300,000 Majority PAC check had been put in the mail just two days prior, the same day that Menendez met with Melgen's lobbyist to prepare for the meeting with the Acting Administrator.  Menendez followed up after the meeting with the Acting Administrator by phone on July 2, at which time she informed the Senator that CMS would not revise its policy.  Witness testimony will establish that Menendez was upset and responded that he intended to elevate the issue to the HHS Secretary.

---

[4] Menendez's ushering of $300,000 of Melgen's corporate money to Majority PAC to benefit Menendez's reelection effort was made possible by the Supreme Court's 2010 decision in *Citizens United v. FEC*, 558 U.S. 310 (2010), which invalidated federal prohibitions on corporate contributions to political action committees.  Less than a week after the decision was handed down, on January 24, 2010, Menendez took to CNN to condemn it, calling it "a dark day for democracy in our country" and "a dark day for the average citizen."  Said Menendez: "The last thing we need is big oil, big health insurance companies, big banks being able to spend unlimited amounts of money from their treasury to influence the result of elections."  He continued: "The last thing that the average citizen needs who already feels that these big monied interests already have too much influence in Washington is to add more money."

The Government's evidence will show that Menendez called upon the Senate Majority Leader to help him do just that.[5]  On August 2, 2012, Menendez met with the HHS Secretary in the Majority Leader's Capitol office, where, according to witnesses at the meeting, he argued vehemently for Melgen's position on the billing policy.  But the Secretary informed Menendez that she was powerless to intervene in a pending CMS administrative appeal, and the meeting ended without a resolution satisfactory to Menendez.

On October 12, 2012, confronted with the Secretary's assertion that she lacked the authority to intervene in the administrative appeals process, Melgen issued a second $300,000 VRC check to Majority PAC, which the PAC's records and fundraiser testimony will prove he again earmarked for New Jersey, so that it would directly benefit Menendez.  Checks and a VRC ledger will establish that, on that very same day, Melgen also issued more than $100,000 in VRC checks to local Democratic party organizations in New Jersey.  A week later, on October 19, after obtaining confirmation that the Majority PAC check had been received, Melgen forwarded Menendez and his chief of staff a memorandum arguing that the HHS Secretary in fact had the authority to intervene in his Medicare appeal.  Before Menendez could press Melgen's matter

---

[5] Menendez had first enlisted the Senate Majority Leader's help to amplify the pressure on CMS to reverse course in November 2011.  At that time, the Majority Leader reached out to the White House Deputy Chief of Staff, informing her that Menendez was upset about how a Florida ophthalmologist was being treated by CMS and asking that she call the agency.  Recognizing that the matter involved a dispute between a single doctor and an administrative agency, not a policy matter, the White House Deputy Chief of Staff demurred.  Because the conduct is direct proof of official action and Menendez's intent to apply "pressure on another official to perform an 'official act,' or to advise another official, knowing or intending that such advice will form the basis for an 'official act,'" *McDonnell v. United* States, 136 S. Ct. 2355, 2372 (2016), it is admissible at trial. *See United States v. Green*, 617 F.3d 233, 248-49 (3d Cir. 2010) (holding that uncharged conduct is admissible as intrinsic evidence when it "directly proves the charged offense" (internal quotation marks and citation omitted)).

further, however, the pair was confronted with the public revelation that Menendez had enjoyed free flights on Melgen's private jet.

Just a few months later, on February 6, 2013, as news of the relationship between the New Jersey Senator and South Florida doctor unraveled in the press—and only a week after Menendez lied to the public about the number of times he flew on Melgen's private jet—*The Washington Post* published a detailed account of Menendez's advocacy to HHS on Melgen's behalf. Menendez's chief of staff emailed his boss the article, advising a strategy to shift blame: "As I suspect you see, your quote or tps for tmrw will have to highlight some surprise and disdain for anybody who would try to use your relationship for some end."  Menendez replied a minute later: "Yes, of course."

> **D.  To expedite the presentation of documentary evidence, the Government intends to recall a law enforcement agent at various points in the trial and use summary exhibits.**

To aid the jury's understanding of the scheme as it advanced from Dominican trips and visas for girlfriends to hundreds of thousands of dollars in campaign contributions and pressuring a Cabinet Secretary, the Government intends to present a thematic case-in-chief, punctuated by substantial documentary evidence.  To save time and promote clarity, the Government intends to take a pragmatic approach to introducing this documentary evidence, using two commonly accepted practices.

First, the Government intends to recall one of its case agents at different points in the trial to streamline the presentation of documentary evidence as the Government's case moves through the various categories of official acts and things of value that the defendants exchanged.  This will help the trial move apace by preventing the need to call a multitude of law enforcement agents, each of whom the Government would have to take time introducing to the jury, for the sole purpose

14

of introducing documentary evidence.  Recalling law enforcement agents is commonly allowed to promote the efficient and orderly presentation of evidence.  *See, e.g.*, *United States v. Butera*, 677 F.2d 1376, 1381 (11th Cir. 1982) (affirming district court's discretion under Federal Rule of Evidence 611(a) to permit case agent to take the stand on four separate occasions to describe events in chronological order); *United States v. Rodgers*, 2014 WL 3735585, at *2 (W.D. Pa. July 28, 2014) (permitting recall of law enforcement officers pursuant to the court's authority under Rule 611(a) to allow the government to present its evidence chronologically); *United States v. Bacon*, 2012 WL 5381415, at *1 (W.D. Pa. Oct. 31, 2012) (same); *United States v. Edelin*, 128 F. Supp. 2d 23, 47 (D.D.C. 2001) (collecting cases that have approved of the practice of recalling witnesses; allowing recall of witnesses throughout the government's case-in-chief as "the best way of providing a clear and orderly trial"); *cf. United States v. Coleman*, 805 F.2d 474, 482 (3d Cir. 1986) ("The district court has discretion to allow the recall of a witness, even if the witness has consulted with the prosecutor in the interim.").

Second, to further advance the efficiency of its case-in-chief, the Government intends to introduce several charts that summarize many types of relevant records, totaling more than 20,000 pages of admissible evidence, such as: (1) U.S. Department of Homeland Security records of the flights that the defendants and their guests took on Melgen's private jet to and from the Dominican Republic; (2) flight data collected from the Federal Aviation Administration; (3) credit card statements for accounts held by the defendants and Melgen's personal assistant covering almost

seven years; and (4) bank records for accounts held by the defendants, VRC, and Melgen's personal assistant also covering almost seven years.[6]

Summary charts are properly admissible under Federal Rule of Evidence 1006, which allows their use "to prove the content of voluminous writings [or] recordings . . . that cannot be conveniently examined in court."  Fed. R. Evid. 1006.  "Rule 1006 does not require that it be literally impossible to examine all the underlying records [before a summary chart may be utilized], but only that in-court examination would be an inconvenience."  *United States v. Onque*, 169 F. Supp. 3d 555, 574 (D.N.J. 2015), *aff'd*, 665 F. App'x 189 (3d Cir. 2016) (internal quotation marks and citations omitted) (alteration in original).   Courts routinely permit the use of such summary charts where, as here, their use will aid the jury's understanding of the evidence and expedite trial.  *See, e.g.*, *United States v. Onque*, 665 F. App'x 189, 198 (3d Cir. 2016) (affirming admission of a summary chart of deposits into several co-conspirators' accounts, and rejecting that the inference that each deposit was a conspiracy-related payment rendered the chart improper); *United States v. Bansal*, 663 F.3d 634, 668 (3d Cir. 2011) (affirming admission of two exhibits summarizing invoices and providing revenue percentages).  Moreover, summary charts can be used by the jury in its deliberations and can properly be admitted whether or not the underlying documents are also placed into evidence.  *See United States v. Velasquez*, 304 F.3d 237, 240 (3d Cir. 2002) ("The use of summaries and charts is proper and may be put before a jury with limiting instructions."); *United States v. Bertoli*, 854 F. Supp. 975, 1050 (D.N.J.), *aff'd in part, vacated in*

---

[6] Many of the records the Government will introduce or summarize at trial are business records accompanied by a certification complying with Federal Rule of Evidence 902(11).  As required under the Rule, the Government notified counsel for the defendants of the records the Government intends to introduce by such certifications.  By the same letter, the Government notified defense counsel of the records on which its summary charts rely and provided the summary charts as pre-marked exhibits.

*part on other grounds*, 40 F.3d 1384 (3d Cir. 1994) ("One of the most significant aspects of Rule 1006 is that there is no prerequisite that the underlying documents have been submitted into evidence." (citations omitted)).

## II. LEGAL ISSUES PRESENTED BY ANTICIPATED DEFENSES

From the defendants' motions to dismiss, trial subpoenas, and public statements, the Government anticipates the defendants will attempt to rebut the Government's proof in several ways. Legal issues presented by these anticipated defenses are previewed below.

### A. The Court should prohibit the defendants from distracting and confusing the jury with their baseless claims that the investigation and indictments are political retribution.

Since well before a New Jersey grand jury returned the initial indictment in April 2015, the defendants have attempted to undermine the legitimacy of the investigation and resulting charges by repeatedly using public statements and court filings to promote unfounded claims that this case is the result of a global conspiracy led by Menendez's political opponents. And as needed to suit their agenda, the defendants have shifted their conspiracy theories, even when one conflicts with another. The defendants began their diversion campaign with a claim of a supposed Cuban or Republican effort to undermine Menendez. *See* Evan Perez and Pamela Brown, *Spies, GOP and Chris Christie: Menendez prostitute story theories*, CNN, July 11, 2014 (citing a letter from Menendez's attorney urging the Government to turn its focus away from his client and toward Cuba or Chris Christie as two possible sources of a smear campaign). They then turned their focus to an inconsistent claim of retribution by the Obama administration. *See* Elizabeth Llorente, *Key Democrat lawmaker steps up criticism of White House Iran deal as Obama's term nears end*, FOX NEWS.COM, Dec. 2, 2016 (quoting Menendez claiming that "[t]here have been attempts to punish me for what I've said about the administration's policy on Iran and Cuba"). Most recently, they

have spun yet another contradictory theory, this time pointing to the current administration—which was not even in office at the time that either of the indictments against the defendants were returned—as the source of political retaliation.  *See* Dkt. No. 201 at 2 (suggesting that the Government's goal in requesting that Menendez be treated the same as any other defendant is actually to prevent him from voting on upcoming legislation).

The defendants' various claims are nothing more than unprincipled attempts to distract from the evidence against them.  This Court recognized as much almost two years ago, rejecting as meritless the defendants' assertions of selective prosecution based on their groundless claims of the retributive origins of the investigation.  Dkt. No. 123 at 5-6 (finding that the defendants "offer no evidence that the Government had an improper motive to investigate Senator Menendez or Dr. Melgen").  The issue has thus been resolved and should be not be renewed in front of the trial jury.  *See United States v. Armstrong*, 517 U.S. 456, 463 (1996) ("A selective-prosecution claim is not a defense on the merits to the criminal charge itself."); *see also* Fed. R. Crim. P. 12(b)(3) (requiring that claims of selective or vindictive prosecution "must be raised by pretrial motion"); *cf. United States v. Cordova*, 157 F.3d 587, 594 (8th Cir. 1998) (holding trial court properly limited defendant's cross-examination of government agent regarding what he had not done during the investigation because "an exhaustive exploration of things not done in the investigation would be time-consuming and of little relevance"); *United States v. Sherman*, 821 F.2d 1337, 1341 (9th Cir. 1987) (holding district court did not abuse its discretion in precluding the defendant from questioning informants' motives where the government's proof was not based on the informants' tips).  Any effort by the defendants to do so could only be aimed at inviting jury nullification, which is indisputably improper.  *See United States v. Boone*, 458 F.3d 321, 329 (3d Cir. 2006) ("[A] juror . . . who commits jury nullification violates the sworn jury oath and

prevents the jury from fulfilling its constitutional role."); *United States v. Rosado*, 728 F.2d 89, 93 (2d Cir. 1984) (noting that the defendants had "invited jury nullification by questioning [at trial] the Government's motives in subpoenaing [the defendants] and prosecuting them for contempt").

This case is about serious questions of fact and law related to the corruption of one of the highest elected offices in the United States government.  It is not about anonymous tips, Cuba, Iran, party politics, or the political consequences of a conviction.  The question of whether the defendants engaged in a corrupt scheme cannot be answered by the defendants' conspiracy theories.  Rather, it only can be answered through a focused examination of the defendants' and their agents' own contemporaneous statements, black-and-white financial, government, and business records, and live, non-anonymous witness testimony.  The defendants' groundless allegations about how the investigation began or whether the Government sufficiently investigated a claimed smear campaign are irrelevant to the issue the jury will be asked to decide in this case: whether Melgen and Menendez exchanged things of value for official action.  The Court should reject any effort by the defendants to interfere with the jury's deliberation of this question by injecting their frivolous conspiracy theories into this trial.[7]

---

[7] The Government explained the actual origins of the investigation in its pre-trial response to the defendants' prosecutorial misconduct motion.  *See* Dkt. No. 83 at 4-7; *see also* Dkt. No. 84 at 3-11.  And, although the true origins of the investigation are irrelevant to resolving the charges in this case, and the Government has no intention of ever referencing them, the Government would necessarily be permitted to do so should the defendants be allowed to suggest some improper basis for the investigation to the jury. *United States v. Homick-Van Berry*, 240 F. App'x 966, 969 (3d Cir. 2007) (affirming, in a robbery case, the district court's admission of testimony from an informant about his prior work for the FBI in investigating the defendant's prior, unrelated bribery scheme after the defense elicited testimony from the informant on cross-examination that left the misimpression that all of his payments from the FBI were related to his work on the robbery investigation); *Rosado*, 728 F.2d at 95 (finding it "entirely appropriate" in a criminal contempt case for the government to offer evidence of what the grand jury was investigating once the defendants had argued that the grand jury before which they had refused to appear was being used for political oppression).

**B.       The defendants are guilty of bribery if any part of their intent was corrupt.**

The defendants have repeatedly claimed two motivations other than bribery to explain Menendez's relentless advocacy for Melgen and Melgen's showering of lavish gifts and campaign contributions on Menendez: friendship and the merits of Melgen's positions.  Even if the jury were to credit those claims, however, or credit any other lawful motivation the defendants may offer for their actions, the defendants still can be found guilty of bribery.

It is black-letter bribery law that a defendant who is partially motivated to take official acts or provide things of value by friendship, the merits of those acts, or some other non-corrupt reason, is still guilty of bribery if the jury finds that *any* part of the defendant's intent was corrupt—that is, to effect a quid pro quo.  *See United States v. Wright*, 665 F.3d 560, 572 (3d Cir. 2012) ("[F]riendship is no bar to an honest services fraud conviction."); *United States v. Bryant*, 655 F.3d 232, 245-46 (3d Cir. 2011) (noting that a payment could still constitute a corrupt payment for official acts even where it was partially intended to pay for legitimate work); *United States v. Biaggi*, 909 F.2d 662, 683 (2d Cir. 1990) (finding that "a payment may be found to constitute a bribe . . . where it is sought and paid for both lawful and unlawful purposes").  As the Third Circuit has emphasized, any other outcome would be "untenable," because it would allow individuals to bribe "with impunity" as long as they could show even the slightest part of their intent to arise from a lawful purpose.  *Bryant*, 655 F.3d at 246.  Reflecting this well-established principle, courts routinely instruct juries that a defendant has committed bribery even where his intent was only partially corrupt.  *See, e.g.*, *id.* (affirming instruction to the jury that it "may find that any salary and other financial benefits accepted by [the defendant] was a bribe even if you also find it was paid, in part, for legitimate work if it was also paid, in part, in return for [the defendant]'s official action"); *United States v. Coyne*, 4 F.3d 100, 113 (2d Cir. 1993) (approving instruction that

defendant could be found guilty of bribery if he "accepted or solicited the thing of value, *at least in part*, for or because of his conduct or intending to be influenced" (emphasis added)).

Accordingly, even should the defendants muster some credible evidence of another motive for their acts, it is not a silver bullet to the charges against them.  With respect to claims of friendship in particular, it is not uncommon for defendants to establish some evidence of friendship in bribery cases but still be found guilty; indeed, just as genuine friendship may underlie a business arrangement, it should come as no surprise that friendship may very well form the foundation of a corrupt endeavor.  *See, e.g.*, *Wright*, 665 F.3d at 572 (noting that "the parties involved are often friends" in honest services fraud cases); *United States v. Evans*, 572 F.2d 455, 470 (5th Cir. 1978) (noting that the defendant's "friendship with [the public officials] was a vehicle for the corruption of those officials"); *cf. United States v. Woodward*, 149 F.3d 46, 70 (1st Cir. 1998) ("Relationships among human beings, especially among lobbyists and elected officials, will frequently not follow a bright-line pattern, falling on one side or the other of some magical wall dividing friendship from attempts at undue influence.").

### C. Evidence of the objective merits of Menendez's official acts is irrelevant.

The Court should preclude the defendants from presenting evidence that goes only to the objective merits of the official acts Melgen paid Menendez to influence.  Such evidence is nothing more than a post-indictment explanation for the defendants' conduct—and post-indictment explanations are not evidence of pre-indictment intent.  Accordingly, before allowing the defendants to argue that the merits motivated Menendez's acts instead of bribes, the Court should require the defendants to demonstrate Menendez's subjective knowledge of the merits at the time he took or agreed to take those acts.

As the Government set forth in its motion to quash defendants' subpoenas to various federal agencies, Dkt. No. 187, the objective merits of an official act are irrelevant to resolving bribery charges. *See, e.g.*, *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 378 (1991) ("A mayor is guilty of accepting a bribe even if he would and should have taken, in the public interest, the same action for which the bribe was paid. (That is frequently the defense asserted to a criminal bribery charge—and though it is never valid in law, it is often plausible in fact.)" (citing *United States v. Jannotti*, 673 F.2d 578, 601 (3d Cir. 1982) (*en banc*), *cert. denied* 457 U.S. 1106 (1982))); *Jannotti*, 673 F. 2d at 601 ("[I]t is neither material nor a defense to bribery that 'had there been no bribe, the (public official) might, on the available data, lawfully and properly have made the very recommendation that (the briber) wanted him to make.'" (quoting *United States v. Labovitz,* 251 F.2d 393, 394 (3d Cir. 1958))). The objective merits do not matter because the core problem posed by bribery is not the nature of the official act undertaken or promised—in fact, the act may have been no different without the bribe, *see Jannotti*, 673 F.2d at 601. Rather, the problem posed by bribery is that it "substitute[s] the will of an interested person for the judgment of a public official as the controlling factor in official decision." *Labovitz*, 251 F.2d at 394.

The jury therefore will be asked to determine not whether Menendez's official acts were good or bad, or ultimately beneficial or harmful to New Jersey. Instead, it must determine Menendez's intent when he accepted or demanded the things of value from Melgen—specifically, whether he intended, at least in part, to be influenced in his official acts in exchange for the lavish gifts. And while Menendez's subjective, contemporaneous understanding of the merits of the official acts at issue may be relevant in making that determination, evidence untethered from what Menendez knew at the time he acted is not.

**D.      The defendants cannot use evidence of "prior good acts" to negate evidence of their corrupt intent.**

The defendants cannot attempt to rebut evidence of their corrupt intent by offering evidence of official acts or gifts falling outside the scope of the charged scheme and occurring in situations distinct from those here—for example, by claiming that Menendez has a history of helping others with their visa applications or that Melgen has a history of allowing others to fly free-of-charge on his private jet.  Such "prior good acts" evidence is nothing more than classic improper propensity evidence, offered to show that, because Menendez took official acts for, or Melgen provided gifts to, other people at other times and in other circumstances without corruptly intending to obtain something in return, they did not engage in bribery here.  *See* Fed. R. Evid. 404(b)(1) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."); Fed. R. Evid. 405(b) (allowing the introduction of specific instances of conduct proving character or a character trait only when that character or character trait "is an essential element of a charge, claim, or defense").

It is axiomatic that a defendant's intent under distinct circumstances on one day is not probative of his intent under different circumstances on another.  Indeed, "evidence of good conduct is not admissible to negate criminal intent."  *United States v. Ellisor*, 522 F.3d 1255, 1270 (11th Cir. 2008) (affirming district court's exclusion of evidence that defendant had put on prior events in case brought for fraudulently selling tickets to an event that did not occur); *see also United States v. Dimora*, 750 F.3d 619, 630 (6th Cir. 2014) (affirming exclusion of evidence that defendant occasionally helped constituents *without* receiving bribes because the case was built on "agreements between [the defendant] and a closed circle of bribers . . . evidence about acts with no connection to these agreements tells us nothing relevant about this case;"); *United States v. Marrero*, 904 F.2d 251, 260 (5th Cir. 1990) ("The fact that [the defendant] did not overcharge in

every instance in which she had an opportunity to do so is not relevant to whether she, in fact, overcharged as alleged in the indictment.").

Nevertheless, in pre-trial litigation, public statements, and discovery, the defendants have indicated that they will seek to use improper evidence of prior good acts to rebut the evidence that they intended a quid pro quo.  In their pre-trial motions to dismiss, the defendants argued, "The alleged 'official acts' were simply actions that Senator Menendez took consistent with long-standing policy positions that have characterized his entire career."  Dkt. No. 53-1 at 3.  Just days before jury selection, Menendez's attorney repeated the theme in a statement to the media about the Senator's readiness for trial, claiming that Menendez "has constantly stood up for the most vulnerable in our society and lent his voice to the voiceless."  Thomas Moriarty and MaryAnn Spoto, *Menendez in 'good spirits' as jury selection for trial begins next week*, NJ.COM, Aug. 19, 2017.  And in the reciprocal Rule 16 discovery the defendants provided to the Government on August 14, 2017, they included hundreds of pages of communications and records related to Menendez's staffers' efforts—regarding visa applications and matters in front of HHS, CMS, and the FDA—on behalf of individuals other than Melgen and VRC and in circumstances and on issues completely dissimilar to those surrounding his advocacy here.  These matters are factually and legally irrelevant to the question of whether Menendez and Melgen partook in a years-long corrupt exchange.  Just as the fact that someone did not rob a bank on one day is irrelevant to determining whether he robbed a bank on another, whether Menendez did not act corruptly on one day is irrelevant to determining whether he deprived the citizens of New Jersey of his honest services on another.

**E.    Menendez may open the door to proof of otherwise-protected Speech or Debate evidence.**

Menendez's claims that the Superseding Indictment improperly charges him for conduct protected by the Speech or Debate Clause, U.S. CONST., Art. I, § 6, cl. 1, have been litigated thoroughly and resolved, with this Court and the Third Circuit finding that the Superseding Indictment does not allege any legislative acts.  Accordingly, the Government does not intend to offer any evidence of legislative acts taken by Menendez.  The Government notes, however, that Menendez may offer such evidence.  *United States v. McDade*, 28 F.3d 283, 294 (3d Cir. 1994) ("The Clause protects a member of Congress from being 'questioned,' and a member is not 'questioned' when he or she chooses to offer rebuttal evidence of legislative acts.").  Should he do so, thus putting his legislative acts in issue, the Government is entitled to counter it with evidence of otherwise-protected legislative acts.  *McDade*, 28 F.3d at 295 (finding that the Speech or Debate Clause "does not prevent [a legislator] from offering such acts in his own defense, even though he thereby subjects himself to cross-examination" (internal quotation marks and citation omitted)); *United States v. Renzi*, 769 F.3d 731, 747 (9th Cir. 2014) ("[I]f a member of Congress offers evidence of his own legislative acts at trial, the government is entitled to introduce rebuttal evidence narrowly confined to the same legislative acts, and such rebuttal evidence does not constitute questioning the member of Congress in violation of the Clause.").

**F.    The United States Senate's internal code of conduct is irrelevant to resolving whether the defendants have committed federal crimes.**

This Court has already recognized the irrelevance of the Senate's internal code of conduct—the Senate Ethics Rules—to determining whether Menendez engaged in a scheme to conceal material facts by violating his financial disclosure obligations for the many reportable gifts he accepted from Melgen.  Dkt. No. 131 at 26 ("[T]he indictment does not charge Senator

Menendez with violating a Senate Rule, nor are the material facts he is charged with concealing defined by a Senate Rule.").  In doing so, the Court found that, despite the defendants' claims to the contrary, Menendez's reporting obligations arose from a federal statute, the Ethics in Government Act (EIGA), 5 U.S.C. App. 4 § 101, *et seq.*, not the Senate Ethics Rules.  *Id*. at 20-21; *see also United States v. Menendez*, 831 F.3d 155, 174 (3d Cir. 2016) (finding that EIGA, not the Senate Rules, "is the source of a Senator's obligation to make financial disclosures").  And at trial, the jury will see that it was EIGA's definition of reportable gifts that he intentionally ignored when he refused to disclose flights on Melgen's private jet, luxury hotel stays, and other gifts Melgen gave him.

But it is not just the scheme to conceal charge for which the defendants have suggested the Senate Ethics Rules are relevant.  They have also suggested that the legality of Menendez's acceptance of the gifts in the first place turns on the internal rules.  *See, e.g.*, Dkt. No. 60-1 at 30 (claiming that, under Senate Rule 34, "gifts of any kind based on personal friendship may be accepted (even if not personal hospitality)"); *id*. at 34 (claiming that, under the Senate Rules, "Senator Menendez was not prohibited from accepting AmEx points from Dr. Melgen based on the personal friendship exception").  It does not.

The defendants are charged with violating federal corruption statutes.  Under those statutes, it is Melgen's offering and Menendez's acceptance of gifts intending to influence the latter in his official acts that determines their culpability.  *See, e.g.*, *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404 (1999) ("Bribery requires intent 'to influence' an official act or 'to be influenced' in an official act.").  How the Senate decides to police its own members has nothing to do with whether the defendants committed the charged offenses.  Indeed, the Senate's guidance on the rules recognizes as much, explicitly warning that "[w]here the solicitation or acceptance [of

a gift] is tied to an official act . . . the U.S. Criminal Code comes into play."  SENATE ETHICS

MANUAL S. Pub. 108-1, 108th Cong, 1st Sess., at 58 (2003); *see also id.* ("Violation of the[ federal

bribery and illegal gratuity] laws may also lead to disciplinary action by the Senate."); *id.* at 127

(informing Senators in the section on financial disclosure reports that "anyone who knowingly and

willfully falsifies or conceals any material fact in a statement to the Government . . . is subject to

criminal prosecution," and citing 18 U.S.C. § 1001—the very statute that Menendez is charged

with having violated here).  Moreover, the Senate has no authority to overwrite or change the

application of federal statutes by promulgating its own internal, administrative rules.  *See* U.S.

CONST. art. I, § 7, cls. 2, 3.

When faced with similar claims that an organization's internal rules or state or local laws

sanctioned a defendant's conduct, courts have rejected such evidence as likely to sow confusion

and mislead the jury, especially where, as here, the defendant offers no proof of his knowledge of

or reliance on such policies or laws at the time the relevant conduct was undertaken.  *See United

States v. Gaw*, 817 F.3d 1, 10-11 (1st Cir. 2016) (affirming the district court's exclusion of an

internal code of conduct and state law as irrelevant to determining the defendant's intent to engage

in mail fraud and Hobbs Act extortion absent evidence that the defendant knew of and relied on

the code when engaging in the charged conduct); *United States v. Lupton*, 620 F.3d 790, 800 (7th

Cir. 2010) (holding that the trial court properly excluded testimony regarding Wisconsin state law

in a federal funds bribery and honest services fraud case, as evidence regarding state standards had

"limited value at best and [was] unduly confusing at worst").

The risk of confusion and misdirection should the defendants present evidence or argument

about what the Senate Ethics Rules allowed is especially great here.  The defendants have made

clear their intention to use the rules to claim that Melgen's gifts and Menendez's acceptance of

those gifts and later refusal to disclose them was somehow sanctioned by the United States Senate. It was not. The rules do not condone bribery—period. They even expressly emphasize that gifts provided because of a senator's office are prohibited. *See* SENATE RULE 35.1(c)(4)(A), *in* SENATE MANUAL, S. Doc. No. 112-1, 112th Cong., 1st Sess. (2011) [hereinafter SENATE RULE]. Moreover, even accepting for a moment the defendants' claims that Melgen did not offer and Menendez did not accept things of value to influence official acts, Menendez's acceptance of the gifts still constituted a violation of the Senate Ethics Rules. For example, despite the requirement that a senator obtain written permission from the Senate Select Committee on Ethics prior to acceptance of any gift of friendship worth more than $250, SENATE RULE 35.1(e), Menendez never once did so. Further, the Senate's manual on its rules makes clear that, regardless of what the Senate's gift rules may or may not allow, gifts must be reported on a senator's annual financial disclosure forms as required by EIGA—guidance Menendez chose to ignore. *See* SENATE ETHICS MANUAL, at 42 (noting that waivers from disclosure are separate from waivers of the gift rules).

Any effort by the defendants to introduce the Senate's internal code of conduct at trial can only be deemed an effort to suggest exoneration by compliance with those standards. But their criminal culpability does not turn on whether the Senate Ethics Committee had to approve the acceptance of a gift because it was worth $250 or more. Just as the defendants should not be allowed to use their false claims of political retaliation to interfere with the jury's deliberation of the charges, they should not be allowed to improperly suggest that the Senate has sanctioned their bribery. Any evidence or argument regarding the Senate's ethics rules should be excluded.

## III.   CONCLUSION

For years, both before and after a grand jury found probable cause that they had engaged in bribery, Robert Menendez and Salomon Melgen have endeavored to conceal their

corruption.  On September 6, they will face trial before a jury of New Jersey citizens on charges

that they corrupted one of the most powerful government positions in the country.  In that trial,

where outlandish conspiracy theories, irrelevant excuses, and cover-up stories must yield to sober

evidence in the form of contemporaneous emails, objective documents, and firsthand witness

accounts, the Government will prove the defendants' bribery scheme beyond a reasonable doubt.

                                            Respectfully submitted,

                                            ANNALOU TIROL
                                            Acting Chief
                                            Public Integrity Section

By:      *s/ Peter Koski*
                                            Peter Koski
                                            Deputy Chief
                                            J.P. Cooney
                                            Deputy Chief
                                            Monique Abrishami
                                            Trial Attorney
                                            Amanda Vaughn
                                            Trial Attorney
                                            Public Integrity Section
                                            1400 New York Ave. NW
                                            Washington, D.C. 20005
                                            Telephone:  (202) 514-1412
                                            Facsimile:  (202) 514-3003

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this date, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record for the defendants.

Dated: August 30, 2017                    *s/ Peter Koski*
                                          Peter Koski
                                          Deputy Chief
                                          Public Integrity Section
                                          Criminal Division
                                          U.S. Department of Justice